# Exhibit 20

Witness Name: James Gardner

Date of Deposition: 05/23/2018

Title: Account Manager of Direct Claims at Resolute.

```
          UNITED STATES DISTRICT COURT

     FOR THE NORTHERN DISTRICT OF ILLINOIS
               EASTERN DIVISION

----------------------------
                            )
NATIONAL SURETY CORPORATION, )
                            )
          Plaintiff         )
                            )
vs.                         )  C.A. No. 1:17-CV-3455
                            )
LAMORAK INSURANCE COMPANY,  )
                            )
          Defendant         )
----------------------------

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER


          30(b)(6) DEPOSITION

   OF LAMORAK INSURANCE COMPANY BY THEIR

   DESIGNEE JAMES M. GARDNER AND IN HIS

          INDIVIDUAL CAPACITY

          WEDNESDAY, MAY 23, 2018

          1:18 P.M. - 4:31 P.M.

        HINSHAW & CULBERTSON LLP

            28 STATE STREET

         BOSTON, MASSACHUSETTS


Job NO. 28171

Reported by:  Sandra A. Deschaine, CSR, RPR,

CLR, RSA
```



**EcoScribe Solutions**
www.EcoScribeSolutions.com
888.651.0505

```
 1                  UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF ILLINOIS
                         EASTERN DIVISION
 3
       - - - - - - - - - - - - - - - - - - - - - - - -
 4                                    )
       NATIONAL SURETY CORPORATION,   )
 5                                    )
                    Plaintiff         )
 6                                    )
       vs.                            ) C.A. No. 1:17-CV-3455
 7                                    )
       LAMORAK INSURANCE COMPANY,     )
 8                                    )
                    Defendant         )
 9                                    )
       - - - - - - - - - - - - - - - - - - - - - - - -
10

11     CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

12

13                  30(b)(6) DEPOSITION

14        OF LAMORAK INSURANCE COMPANY BY THEIR

15        DESIGNEE JAMES M. GARDNER AND IN HIS

16                  INDIVIDUAL CAPACITY

17                WEDNESDAY, MAY 23, 2018

18                1:18 P.M. - 4:31 P.M.

19              HINSHAW & CULBERTSON LLP

20                  28 STATE STREET

21              BOSTON, MASSACHUSETTS

22

23     Job NO. 28171

24     Reported by:  Sandra A. Deschaine, CSR, RPR,

25     CLR, RSA
```

NATIONAL SURETY vs LAMORAK INSURANCE
James Gardner on May 23, 2018  30(b)(6), Confidential

Job 28171
Pages 2..5

**Page 2**

```
1   APPEARANCES:
2   ON BEHALF OF THE PLAINTIFF:
3   KARBAL, COHEN, ECONOMOU, SILK & DUNNE, LLC
4       Rory Dunne, Esquire
5       150 South Wacker Drive
6       Chicago, Illinois 60606
7       312.431.3700
8       rdunne@karballaw.com
9
10  ON BEHALF OF THE DEFENDANT:
11  HINSHAW & CULBERTSON LLP
12      Jason R. Schulze, Esquire
13      151 N. Franklin Street, Suite 2500
14      Chicago, Illinois 60606
15      312.704.3000
16      jschulze@hinsahwlaw.com
17
18
19
20  Also Present:  Carol Griffin, Resolute
21                 Management, Inc.
22
23
24
25
```

**Page 3**

```
1   May 23, 2018
2                   1:18. P.M.
3           30(b)(6) Deposition of
4   James M. Gardner, held at the offices of
5   Hinshaw & Culbertson LLP, 28 State Street,
6   Boston, Massachusetts, pursuant to Agreement
7   before Sandra A. Deschaine, Registered
8   Professional Reporter, Certified LiveNote
9   Reporter, Real-time Services Administrator
10  and Notary Public within and for the
11  Commonwealth of Massachusetts.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1               INDEX
2   WITNESS                              PAGE
3   James M. Gardner
4   By Mr. Dunne                           5
5
    EXHIBIT      DESCRIPTION             PAGE
6
    (Retained by Mr. Schulze.)
7
    Exhibit 1   Notice of Deposition, Lamorak 6
8               Insurance Company
9   Exhibit 2   Lamorak Insurance Company's  36
                Answer and Affirmative
10              Defenses to First Amended
                Complaint
11
    Exhibit 3   Bates Nos. NSCLM009436      44
12              through  -9441
13  Exhibit 4   Bates Nos. NSCLM000187      68
                through  -0189
14
    Exhibit 5   Bates Nos. NSCLM009826      71
15              through / -9826
16  Exhibit 6   Interim Settlement Funding  74
                Agreement
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1        JAMES M. GARDNER, Deponent,
2   having first been satisfactorily identified
3   by the production of his Maine driver's
4   license and duly sworn by the Notary Public,
5   was examined and testified as follows:
6           P R O C E E D I N G S
7               EXAMINATION
8   BY MR. DUNNE:
9       Q.  Could you please state your name
10  for the record?
11      A.  James Gardner.
12      Q.  And, Mr. Gardner, have you ever
13  been deposed before?
14      A.  I have not.
15      Q.  Okay.  So I'm sure your counsel
16  told you, but I'll go over some rules and
17  regulations and other things for depositions.
18  She's taking down our audible answers and
19  questions, and so you need to answer audibly.
20  Grunts, "Yeses" and "nos" whatever is what
21  suffices.  Head nods she can't take down.
22       I don't plan to be here too long
23  today, but if any time you need to take a
24  break, please, you know, just indicate if you
25  need to take a break.  The one exception
```

NATIONAL SURETY vs LAMORAK INSURANCE
James Gardner on May 23, 2018  30(b)(6), Confidential

Job 28171
Pages 6..9

Page 6

1  would be if a question is pending, I would
2  ask that you answer the question, and if you
3  need to take a break, please do so.
4      I may ask questions that you may not
5  be clear to you.  If the question is not
6  clear to you, please let me know, because we
7  will assume that it's understood by you when
8  you answer it.
9          Today you are here both in your
10  individual capacity and as your corporate
11  capacity for Lamorak.
12          Do you understand that?
13      A.  Yes.
14      Q.  So I will try to make sure my
15  questions are clear in terms of what I'm
16  asking you, about something you did versus
17  what Lamorak's position is with regard to
18  this case.
19          Is that understood?
20      A.  Yes.
21  (Exhibit 1, Notice of Deposition, Lamorak
22   Insurance Company, marked for
23   identification.)
24  BY MR. DUNNE:
25      Q.  I'm showing you what's been marked

Page 7

1  as Gardner Exhibit 1.
2          Sir, have you seen this document
3  before?
4      A.  I have.
5      Q.  And a little while ago you
6  acknowledged that you're being presented here
7  today as Lamorak's witness.
8          Can you review the matters for
9  examination, on page 2?
10      A.  Okay.
11      Q.  Do you understand that you're
12  being presented here today to provide
13  Lamorak's positions with regard to the items
14  set forth in 1 through 6?
15      A.  I do.
16      Q.  And you understand, as Lamorak's
17  witness, you must testify about information
18  known or reasonably available to Lamorak, not
19  just within your own personal purview?
20      A.  I do.
21      Q.  And looking at items 1 through 6,
22  as you sit here today, are you prepared to
23  testify as to each of those items?
24      A.  I am.
25      Q.  What did you do to prepare for

Page 8

1  your deposition today?
2      A.  I met with counsel yesterday to
3  generally discuss the deposition, also review
4  some documents.
5      Q.  All right.  Was anybody else
6  present during your meeting with counsel?
7      A.  Just Jason Schulze and Carol
8  Griffin.
9      Q.  And who is Carol Griffin?
10      A.  Carol Griffin is Lamorak's
11  in-house counsel.  Let me correct that.
12  Excuse me.  Carol Griffin is Resolute
13  Management's in-person counsel, and she is
14  serving as counsel for -- in our capacity as
15  administrator for Lamorak Insurance.
16      Q.  Can you explain what the
17  relationship is between Lamorak and Resolute?
18          MR. SCHULZE:  Let me just voice an
19          objection, that that's not among the
20          deposition topics.  So to the extent
21          you're answering on behalf of just
22          yourself as to Lamorak --
23          MR. DUNNE:  I'll rephrase.
24          MR. SCHULZE:  As a general matter,
25          we can go ahead with that, but if

Page 9

1      it's -- we can be a lot more specific --
2          MR. DUNNE:  I'll rephrase.
3  BY MR. DUNNE:
4      Q.  What is understanding of the
5  relationship between Lamorak and Resolute?
6      A.  My understanding, as an employee
7  of Resolute, is that Resolute is a
8  third-party administrator on behalf of the
9  Lamorak Insurance.
10      Q.  What does it mean to handle claims
11  on behalf of the Lamorak?
12      A.  We handle asbestos claims, certain
13  asbestos claims for Lamorak Insurance.  We
14  also handle certain hazardous waste claims
15  and certain other health hazard claims.
16      Q.  Do you have full authority to
17  settle claims against Lamorak in those areas?
18      A.  No, I do not.
19      Q.  Do you understand whether
20  Lamorak -- Resolute has to contact anybody at
21  Lamorak to resolve claims again Lamorak that
22  are being handled by Resolute?
23          MR. SCHULZE:  Objection to form.
24      A.  It depends.
25  BY MR. DUNNE:

Page 10

1    Q.   What does it depend upon?
2    A.   The level or the settlement
3  dollars.
4    Q.   So what's your settlement
5  authority?
6    A.   My current settlement authority is
7  $5,000.
8    Q.   And were you involved in the
9  settlement of the Ciokajlo-Resinoid case?
10   A.   I was.
11   Q.   Do you know how much that case
12 settled for?
13   A.   I do.
14   Q.   And what was that number?
15   A.   ████████████████████
16   Q.   So not within your authority?
17   A.   Correct.
18   Q.   Who are your supervisors that are
19 involved in the resolution of the Ciokajlo
20 matter?
21   A.   My supervisors who were involved
22 in the Ciokajlo matters were my team leader,
23 Clayton Budlong.
24   Q.   And what's his authority?
25   A.   If I recall correctly, I believe

Page 11

1  he has authority up to ██████.
2    Q.   Okay.  Who's next above him?
3    A.   That would be Chris Dardis.
4    Q.   Okay.  And who is above him --
5  excuse me.  What's his authority, if you
6  know?
7    A.   If I recall correctly, I believe
8  it depends on the type of claim. ████████
9  ████████████████████████████
10   Q.   Let's limit these questions, if it
11 makes a investigation to asbestos claims.
12   A.   Sure.
13   Q.   You understand that the Ciokajlo
14 matter is an asbestos matter?
15   A.   Correct.
16   Q.   So above Chris?
17   A.   Above Chris would be Bob McCarthy.
18   Q.   Okay.  And what's his authority
19 level, if you know?
20   A.   ██████████████████████████████
21 ██████████████████████████████████
23   Q.   Okay.  With regard to the Ciokajlo
24 matter, did you have to go above Bob McCarthy
25 to get settlement authority?

Page 12

1    A.   We did get ultimate settlement
2  authority from Tom Ryan.
3    Q.   All right.  So can you briefly
4  describe for me what your duties and
5  responsibilities are as a -- strike that.
6        What's your title at Resolute?
7    A.   I am an account manager of direct
8  claims.
9    Q.   That's a mouthful.
10       And were you responsible For
11 handling the Ciokajlo case, during its entire
12 period at Resolute?
13   A.   No, I was not.
14   Q.   When did you become involved with
15 the Ciokajlo case?
16   A.   When I was assigned the Resolute
17 Engineering account, probably in or around
18 June of 2016.
19   Q.   And in June of 2016, was there
20 anything pressing going on in the Ciokajlo
21 matter when you took it over?
22   A.   I'm not sure what you mean by
23 "pressing."
24   Q.   What was, if you recall, what was
25 going on in the claim in June 2016, when you

Page 13

1  took it over?
2    A.   In June, when I took it over, I
3  believe we were still in the discovery phase.
4    Q.   And you handled the Ciokajlo claim
5  until resolution?
6    A.   Correct.
7    Q.   And do you recall approximately
8  when it was resolved?
9    A.   I believe it was resolved late
10 March of 2017.
11   Q.   And one of the things I forgot to
12 mention in the rules and regulations is this
13 isn't a memory test.  So if there's something
14 you want to look at, just let me know.
15   A.   Okay.  Understood.
16   Q.   The way I got down this tangent
17 was you are an account manager of direct
18 claims?
19   A.   Correct.
20   Q.   In June of 2016, you were an
21 account manager of direct claims?
22   A.   Correct.
23   Q.   What are your duties and
24 responsibilities as an account manager of
25 direct claims?

Page 14

1    A.   I review claims that impact my
2 accounts for coverage, and to the extent the
3 claims are covered, assess liability in
4 consultation with counsel and pay covered
5 claims.
6    Q.   Is part of your review of coverage
7 the investigation of policies?
8    A.   I'm not sure what you mean by
9 "investigation of policies."
10    Q.   Sure.  With regard to the Resolute
11 matter, you're responsible for coverage under
12 certain policies of insurance that
13 potentially apply to the Resinoid claims.  Is
14 that a fair statement?
15    A.   Sure.
16    Q.   Can you describe -- strike that.
17    And they weren't insured by
18 Lamorak, were they?
19    A.   I believe the policies were issued
20 by General Accident.
21    Q.   And do you recall between when and
22 when the General Accident policies were
23 issued?
24    A.   I believe Lamorak has acknowledged
25 General Accident policies from the period of

Page 15

1 12/31/1959 through 12/31/1973 and 12/31/1979
2 through 12/31/1989.
3    Q.   And at this point with regard to
4 the Resinoid account, there are policies that
5 are missing between '73 and '79.  Is that a
6 fair statement?
7    A.   It depends on what -- I'm not sure
8 what you mean by "missing."
9    Q.   Who issued the policies for the
10 period between '73 and '79.
11    A.   I do not know that, no.
12    Q.   And as part of your coverage
13 evaluation, did you investigate the coverage
14 for that period?
15    A.   Well, I mean, like I said, it
16 would depend what time period.
17    Q.   Okay.  Maybe I'm confused.
18    Did you have any involvement in
19 the Resinoid account before June of 2016?
20    A.   I do not.
21    Q.   Okay.  So one of the things I
22 think you said is when you were assigned an
23 account you looked at coverage?
24    A.   Correct.
25    Q.   And you looked at coverage in the

Page 16

1 Ciokajlo-Resinoid matter?
2    A.   Correct.
3    Q.   And you noted that there was
4 negotiating policies from '59 to '73 and '79
5 to '89?
6    A.   Correct.
7    Q.   Did you investigate who issued the
8 coverage between '73 and '79?
9    A.   Again, I'm not sure what you mean
10 by "who issued" or who, you know, investigate
11 as to who issued it.
12    We have run a policy search for
13 any and all policies issued by Lamorak
14 companies, and we have not -- that policy
15 search did not produce any additional
16 policies or any additional coverage from what
17 Lamorak had previously acknowledged.
18    Q.   And when you say it didn't reveal
19 any additional coverage, what do you mean by
20 that?
21    A.   The policy search did not locate
22 any additional policy information, other than
23 what we have already known to exist.
24    Q.   And what does a policy search
25 entail -- strike that.

Page 17

1    Did you do to a policy search?
2    A.   I did.
3    Q.   When you took over this --
4    A.   I initiated a policy search,
5 correct.
6    Q.   And what does a policy search
7 entail?
8    A.   A policy search, from my end,
9 involves providing a request to our records
10 specialist with permanent information, which
11 may include the insured's name, underwriting
12 entities and/or -- well, underwriting
13 entities, policy years and/or specific policy
14 numbers.
15    Q.   And you indicated that that did
16 not yield any information concerning
17 additional Lamorak insurer policies between
18 '73 and '79?
19    A.   Correct.
20    Q.   And are you aware, has Lamorak
21 produced that information in this case?
22    A.   I believe -- my understanding is
23 that that would have been produced.  Any
24 information with respect to policy searches
25 would have been in the file and would have

Page 18

1 been produced.
2    Q.  Now, "in the file," meaning would
3 it be in the claims information or the policy
4 information?
5    A.  It likely would have been in the
6 policy information.
7    Q.  Okay.  I think with regard to
8 asbestos claims, you said you review
9 coverage, you assess liability, and if
10 there's coverage you pay claims?
11    A.  Correct.
12    Q.  Anything else as account manager
13 of direct claims, are your duties and
14 responsibilities?
15    A.  I would say those are the core
16 functions.
17    Q.  All right.  I think we went
18 through who you talked with concerning your
19 preparation of -- for the dep today,
20 Mr. Schulze, Ms. Griffin.
21       Did you talk to anybody else in
22 preparation for your deposition today?
23    A.  I briefly -- I mean, I would have
24 generally briefed my supervisor Clayton
25 Budlong and the fact that I was taking the

Page 19

1 deposition today.
2    Q.  Did you talk to Mr. Bud Long in
3 order to obtain any information responsive in
4 the topics in the notice?
5    A.  No, I did not.
6    Q.  It's more just telling him what
7 was happening?
8    A.  Correct.
9    Q.  Anybody else?
10    A.  No.
11    Q.  And what documents did you look at
12 to prepare for your deposition today?
13    A.  I believe counsel provided me with
14 various documents that came from the claims
15 file.  I believe I've reviewed the deposition
16 notice, the complaint, the answer to the
17 complaint, and policy information.
18    Q.  Did you review any of the National
19 Surety production?
20    A.  I did.
21    Q.  So when you said, "claims file" --
22    A.  There were some claims information
23 from National Surety.
24    Q.  In your claims file?
25    A.  No.  From my understanding, from

Page 20

1 what's been produced.
2    Q.  From National Surety?
3    A.  Correct.
4    Q.  Do you recall what National
5 Surety-produced information you looked at
6 specifically?
7    A.  If I recall, some policies, and I
8 believe some claim file notes.  There were
9 also, I believe, were some email
10 correspondence.
11    Q.  And what were the claim file
12 notes, if you can recall, concerning?
13    A.  If I recall, I believe they just
14 discussed some of the issues that would be
15 analyzed by the claims handler at the time.
16 I think, if I recall correctly, there was
17 some discussion as to the application of Ohio
18 law to Resinoid claims based on the National
19 Surety policies.
20    Q.  Was that correspondence with
21 Shannon Hall?  Do you recall?
22    A.  I don't recall the name.  Could
23 be.
24    Q.  Do you recall having any
25 correspondence -- sorry, strike that.

Page 21

1       Do you recall, you, while you're
2 handling the claim, corresponding with
3 anybody at National Surety concerning the
4 applicable law?
5    A.  I do not.
6    Q.  Do you recall any conversations
7 that you had with anybody at National Surety
8 concerning the applicable law?
9    A.  I do not.
10    Q.  And when we're talking about
11 applicable law, I'm talking about the law
12 applicable to the insurance coverage issues
13 and not to the underlying Ciokajlo matter.
14    A.  Sure.
15    Q.  And what do you recall the note
16 about the applicable law saying?
17    A.  I believe that it was National
18 Surety's or, I guess, Fireman's Fund
19 assessment that Ohio law would apply to the
20 National Surety law policies.
21    Q.  Do you recall what that assessment
22 was based on?
23    A.  I don't recall the basis of the
24 assessment.
25    Q.  And during your handling of the

Page 22

1  Ciokajlo matter, did you confirm with anybody
2  at National Surety that that was, in fact,
3  their position with regard to the Ciokajlo
4  matter?
5          MR. SCHULZE:  Objection to form.
6      **A.  Can you repeat the question?**
7  BY MR. SCHULZE:
8      Q.  Sure.  So I think you testified
9  that you saw some notation in the National
10  Surety file?
11     **A.  Correct.**
12     Q.  That led you to believe that there
13  was a thought that Ohio law applied to the
14  coverage issues in the case?
15     **A.  Correct.**
16     Q.  Do you recall ever discussing with
17  anybody at National Surety that issue?
18     **A.  That was specific to that claim?**
19     Q.  Yes.
20     **A.  To those claim notes?  No, I do**
21  **not.**
22     Q.  What about that was specific to
23  the coverage issuing in the Ciokajlo claim?
24  And I'm not talking about any of the recent
25  discussions that you may had concerning the

Page 23

1  resolution of the claim.  I'm talking about
2  back when the file was being handled between
3  '16 and '17.
4      **A.  I think the first time I recall**
5  **this issue being discussed would have been**
6  **March of 2017, when, I believe, the claims**
7  **handler at Fireman's or Allianz issued some**
8  **reservation with respect to the applicable**
9  **law.**
10     Q.  And do you recall the claims
11  handler's name?
12     **A.  That would have been Richard**
13  **Harris.**
14     Q.  And as I understand it, the
15  discussion ensued after you received a
16  Fireman's Fund reservation of rights letter
17  with regard to coverage issues?
18     **A.  Correct.**
19     Q.  And do you remember what the
20  conversation was?
21     **A.  That I don't recall.  I don't**
22  **recall the substance of the conversations.**
23     Q.  Do you recall whether Mr. Harris
24  confirmed to you whether or not it was
25  National Surety's belief that Ohio law or

Page 24

1  Illinois law or any other law applied to the
2  coverage issues?
3      **A.  I'm trying to think.  Excuse me.**
4  **I believe it was -- I think it was around**
5  **then that I was having discussions.  It**
6  **was -- I apologize.**
7      **Can you repeat the question?**
8      Q.  Sure.  I'm just trying to track
9  down whether or not you recall specifically
10  any discussions with Richard Harris or anyone
11  else at National Surety, that the choice of
12  law issue concerning policy interpretation
13  for the Ciokajlo matter.
14     **A.  The conversations I would have**
15  **had, I believe, would have been -- I'm not**
16  **sure -- I'm still not sure if I quite**
17  **understand your question.**
18     Q.  Sure.  I think you said, and
19  correct me if I'm wrong -- well, strike that.
20         Do you recall whether or not
21  Fireman's Funds at some point issued a
22  reservation of rights letter with regard to
23  the Ciokajlo matter?
24     **A.  Yes, I do.**
25     Q.  And I think you said that occurred

Page 25

1  in, potentially, March of 2017?
2      **A.  If I recall, I believe they issued**
3  **two different ones.  One would have been**
4  **February, one would have been in March.**
5      Q.  And did you look at both of those
6  letters in preparation for your dep today?
7      **A.  I did.**
8      Q.  So my question is:  At any point
9  did you -- well, strike that.
10         Is it your understanding that
11  choice of law is an issue of the coverage
12  litigation?
13     **A.  Of this litigation?**
14     Q.  Yes.
15     **A.  I do understand that, yes.**
16     Q.  So my question is:  Before the
17  coverage litigation and before -- well,
18  during the June to March '17 time frame, did
19  you talk with anybody at National Surety
20  about the choice of law issue?
21     **A.  Yeah.  I would have talked to Rich**
22  **Harris.**
23     Q.  Do you recall the details of any
24  of those conversations?
25     **A.  I believe the substance would be**

Page 26

1  that National Surety was taking the position
2  that Illinois law applied to the
3  interpretation of their policies.
4      Q.  Okay.  And did he ever -- do you
5  recall him explaining to you why?
6      A.  I believe generally, he -- I
7  believe that was generally discussed in the
8  reservation of rights letter.  I'm not sure
9  if I had detailed conversation with him about
10  that.
11     Q.  In preparation for your deposition
12  today, have you learned what National
13  Surety's position is with regard to the
14  choice of law issue?
15     A.  Yes.
16        MR. SCHULZE:  I'm sure Mr. Dunne's
17     not asking you to divulge any
18     attorney-client communications that you
19     may have had in preparation for the
20     deposition.  But to the extent that
21     we're not talking about that, you're
22     certainly to provide that testimony.
23     A.  No.
24  BY MR. DUNNE:
25     Q.  And what is your understanding of

Page 27

1  National Surety's position with regard to
2  choice of law?
3      A.  My understanding of their
4  position, as to choice of law for this
5  litigation, is that Illinois law applies.
6      Q.  And do you have an understanding
7  as to why National Surety believes Illinois
8  law applies?
9      A.  Are you asking me -- let me just
10  be clear.  Are you asking for the factual --
11  their factual basis as to why --
12     Q.  Yes.
13     A.  -- Illinois law applies to their
14  policies?
15     Q.  Exactly.
16     A.  I believe it would be something to
17  that effect that, I supposed, Resinoid
18  Engineering had operations in Illinois.
19     Q.  Have you ever heard that it's
20  National Surety's position that the policies
21  were issued to an Illinois broker?
22     A.  I have heard that, correct.
23     Q.  Does Lamorak have any facts that
24  would indicate that that's not correct?
25        Schulze:  Objection to form.

Page 28

1      A.  I'm not sure I understand the
2  question.
3  BY MR. SCHULZE:
4      Q.  Sure.  So it's -- you understand
5  that it's National Surety's position that
6  Illinois law applies?
7      A.  Correct.
8      Q.  And do you have an understanding
9  that one of the reasons -- strike that.
10        Okay.  So is it your -- is it
11  Lamorak's sole understanding that the reason
12  -- strike that.
13        Other than the exhibit, the
14  document from National Surety that talked
15  about choice of law, do you specifically
16  remember any of the other claim file
17  information from National Surety that you
18  reviewed in preparation for your
19  deposition?
20     A.  Are you asking about the claim
21  file notes?
22     Q.  Yeah, National Surety's.
23     A.  National Surety's.  I don't recall
24  any specifics as to the notes.
25     Q.  So, in essence, as you sit here

Page 29

1  right now, you basically recall the one note
2  that discusses the potential of Ohio law
3  applying?
4      A.  Correct.
5      Q.  I think you said you reviewed some
6  National Surety email correspondence?
7      A.  Correct.  We recalled one.
8      Q.  Which is the one that you recall?
9      A.  I believe I recall an email from
10  Rick Harris to Ed Matushek, who was -- who is
11  Resinoid Engineering's national coordinating
12  counsel for asbestos matters.
13     Q.  And do you recall what that email
14  discussed?
15     A.  I believe it was discussing the
16  Ciokajlo claim.
17     Q.  And what aspect of the Ciokajlo
18  claim?
19     A.  I believe it was discussing Ed
20  Matushek's assessments and I believe
21  eagerness to settle the claim.
22     Q.  Was the email responding to an
23  email that Mr. Matushek had sent to all of
24  the claim handlers involved in resolving the
25  Resinoid-Ciokajlo case?

Page 30

1      A.  I believe it would have been.
2      Q.  Any other emails that you recall,
3  other than that one?
4      A.  I believe there was an email
5  from -- I believe it was -- yeah.  I believe
6  there was an email from Rick Harris
7  suggesting that, as the claim progressed,
8  that the carrier should put together a cost
9  share with respect to any future settlements
10  in the Ciokajlo claim.
11      Q.  Was there a cost share in the
12  Ciokajlo claim?  For the Ciokajlo claim?
13          MR. SCHULZE:  Objection.  Do you
14      mean defense or indemnity?
15          MR. DUNNE:  Any.
16      A.  Yes.  There was a cost of share
17  that the carriers were operating under for --
18  I believe since 2004 or thereabouts.
19  BY MR. DUNNE:
20      Q.  For defense?
21      A.  For defense.
22      Q.  And what was the allocation, if
23  you recall, for that cost share?
24      A.  It was based on each carrier's
25  time on the risk.

Page 31

1      Q.  And do you recall what period of
2  time -- strike that.
3          Was this cost share in writing?
4      A.  The cost share -- there was an
5  email, I believe, in and around 2004 -- well,
6  you know, I wouldn't say finalizing the cost
7  share.  You know, providing, you know the
8  final allocation of the cost share to the
9  carriers.
10      Q.  Provided percentages?
11      A.  Correct.
12      Q.  Was there any formal document
13  called the cost share?
14      A.  I don't believe it was ever a
15  formal document.
16      Q.  And you've handled well -- strike
17  that.
18          Have you handled other asbestos
19  cases?
20      A.  Yes.
21      Q.  Do you recognize a term "cost
22  share"?
23      A.  Yes.
24      Q.  Have you seen them memorialized?
25      A.  Yes.

Page 32

1      Q.  And cost share is come in all
2  forms?
3          MR. SCHULZE:  Objection to form.
4      A.  I'm not sure what you mean by "all
5  forms."
6      Q.  What do defense cost shares
7  usually address?
8      A.  Well, I mean, I would say it would
9  address the shares borne by each carrier.
10      Q.  And in your experience, are those
11  formalized agreements?
12      A.  I'm not sure what you mean by
13  "formalized agreements."
14      Q.  Sure.  They have -- well, strike
15  that.  I haven't asked your educational
16  background.
17          Are you familiar with cost shares
18  that have recitals, terms, and signatures of
19  the parties?
20      A.  Yes.
21      Q.  Okay.  Was there any kind of a
22  document like that in this case?
23      A.  No.
24      Q.  So would you call the cost share,
25  as to defense in this case, an informal cost

Page 33

1  share?
2      A.  Yes.
3      Q.  So I think we've talked about the
4  Harris and Matushek email, and then the email
5  involving Mr. Matushek.  Any other emails
6  that you recall looking at in preparation?
7  National Surety.  Sorry.
8      A.  Yeah.  I believe that the only
9  other email I can recall was another email
10  from Rick Harris with respect to the cost
11  share for the Ciokajlo claim providing the
12  carrier representatives with the agreed-upon
13  shares.
14      Q.  Any other emails?
15      A.  Not that I recall.
16      Q.  So we talked about the emails and
17  the claim file, the claim file notes.
18          Any other National Surety
19  documents and the policies that you recall
20  looking at?
21      A.  I think that was it.
22      Q.  I should have done this a little
23  bit earlier.  But can you briefly go through
24  your work history?
25      A.  Sure.  How far back would you

Page 34

1 like me to go?
2      Q.  Insurance work history.  You don't
3 look that old so.  Probably not.
4      **A.  I've been working for Resolute**
5 **Management since April of 2016.**
6      Q.  And all on Lamorak matters or
7 difference insureds -- or different insurers?
8      **A.  Different insurers as well.**
9      Q.  And did you start on Lamorak
10 matters for April '16, with Resolute?
11      **A.  Yeah.  There were Lamorak matters**
12 **on which I was working when I started.**
13      Q.  And prior to Resolute?
14      **A.  What was I doing prior to**
15 **Resolute?**
16      Q.  Yep.
17      **A.  I worked for approximately three**
18 **years for a company, Automated Business**
19 **Solutions.**
20      Q.  So not in insurance?
21      **A.  Correct.**
22      Q.  Is Resolute your first insurance
23 job?
24      **A.  Correct.**
25      Q.  God help you.  Just on the

Page 35

1 insurance job, not the Resolute.
2      Can you briefly discuss your
3 educational background?
4      **A.  Sure.  From -- starting from --**
5      Q.  College.  Did you go to college?
6      **A.  I did.**
7      Q.  Where did you graduate from and
8 when?
9      **A.  I graduated from Drexel**
10 **University.  I believe it would have been**
11 **June 2005.**
12      Q.  Any postgraduate?
13      **A.  I did.  Vermont Law School.  I**
14 **would have graduated 2009.**
15      Q.  Did you graduate?
16      **A.  Yes.**
17      Q.  And anything -- did you take any
18 course work, or do anything to prepare you
19 for your insurance job?
20      **A.  Yeah.  I had to -- I took online**
21 **classes in preparation for obtaining an**
22 **adjustor's license.**
23      Q.  And did you obtain your adjustor's
24 license?
25      **A.  Yes.**

Page 36

1      Q.  Congratulations.  Some of the
2 property stuff is kind of crazy.
3 (Exhibit 2, Lamorak Insurance Company's
4 Answer and Affirmative Defenses to First
5 Amended Complaint, marked for
6 identification.)
7      Q.  Ask you to briefly review this
8 document, sir.  And the question is:  Have
9 you seen it before?
10      **A.  Yes.**
11      Q.  Before -- is this one of the
12 documents reviewed in preparation for your
13 deposition today?
14      **A.  Yes, I reviewed this.**
15      Q.  Before your preparation for your
16 deposition today, had you seen this document?
17      **A.  Yes, I had.**
18      Q.  Were you responsible for any of
19 the answers to the allegations in terms of
20 the information?
21      Schulze:  Objection.  Form.
22 BY MR. DUNNE:
23      Q.  Strike that.  Did you provide any
24 information responsive to the allegations in
25 this Complaint?

Page 37

1      Schulze:  Objection.  Foundation.
2 BY MR. DUNNE:
3      Q.  You can answer.
4      Schulze:  Go ahead.
5      **A.  Yeah.  I discussed with counsel**
6 **some of the substance involved in this**
7 **answer.**
8 BY MR. DUNNE:
9      Q.  Did you provide any of the factual
10 information set forth in the answer?
11      Schulze:  Objection.
12 BY MR. DUNNE:
13      Q.  To Counsel?
14      **A.  Yes, I did.**
15      Q.  And what factual information did
16 you provide?
17      **A.  I provided a factual, I would say**
18 **summary of the Ciokajlo claim and the**
19 **ultimate notice -- when we received notice**
20 **that National Surety had filed a complaint**
21 **against Lamorak Insurance Company.**
22      Q.  Can you call your attention to
23 paragraph 7 and specifically Lamorak's
24 answer?
25 (Witness reviewing document.)

Page 38

1    A.  Sure.
2    Q.  And then can I ask you to go to
3 Exhibit A and review Mr. Herbst's testimony?
4         MR. DUNNE:  Oh, it's not attached.
5         MR. SCHULZE:  Objection to form.
6         THE WITNESS:  Would it be all
7    right if we took a short break while
8    you're searching for that?
9         MR. DUNNE:  Sure.
10        THE WITNESS:  Thank you.
11 (Recess taken at 2:52 p.m. to 2:57 p.m.)
12 BY MR. DUNNE:
13   Q.  Looking at Lamorak's answer,
14 sir -- actually, I want you to look at
15 paragraph 19.
16   A.  Nineteen, okay.
17 BY MR. DUNNE:
18   Q.  And let me know when you get a
19 chance to look at it.
20        Sir, have you had a chance to
21 review allegation 19 and Lamorak's answer?
22   A.  I have.
23   Q.  And I think you said earlier that
24 one of the things that you do on behalf of
25 Lamorak is investigate coverage.  Is that a

Page 39

1 fair statement?
2    A.  Yes.
3    Q.  And primarily with regard to
4 asbestos matters?
5    A.  I would say that's a fair
6 characterization.
7    Q.  What percent of your work is
8 asbestos claim versus something else?
9    A.  I'd say perhaps 60 percent of the
10 claims I have are asbestos.
11   Q.  And have you received any
12 on-the-job training at Resolute with regard
13 to the investigation of coverage?
14   A.  Yes.
15   Q.  In your training, have you ever
16 learned anything about a concept called
17 "trigger"?
18   A.  Yes.
19   Q.  Can you explain to me what
20 "trigger" is?
21   A.  My understanding is -- and this is
22 an issue of law, but my understanding is that
23 "trigger" is a term whereby a policy's
24 obligations are initiated based on, I would
25 say, the facts of a claim.

Page 40

1    Q.  And in each case or each claim you
2 review the facts to determine whether or not
3 the coverage may or may not be triggered?
4    A.  Yes.
5    Q.  And every claim is different?
6    A.  Correct.
7    Q.  And while it's maybe an issue of
8 law, it's something you do on a regular
9 basis, as part of your duties and
10 responsibilities to establish if a claim may
11 or may not trigger your client's coverage?
12   A.  Correct.
13   Q.  And do you have an understanding
14 as to whether or not there are different
15 approaches to trigger with regard to asbestos
16 claims?
17   A.  Sure.
18   Q.  And what is your understanding of
19 the trigger methods, if you will, for
20 asbestos claims?
21   A.  My understanding is that it can
22 vary.
23   Q.  Okay.  And how can it vary?
24   A.  My understanding is that there are
25 different theories.  I believe one is called

Page 41

1 a continuous trigger.
2    Q.  And can you describe that, please,
3 how that works?
4    A.  My understanding is that a
5 continuous trigger would be that a date of
6 first exposure would thereby trigger coverage
7 for the policies -- that current policy and
8 the subsequent policies, whether issued by
9 one carrier or multiple carriers.
10   Q.  And is there an end date for the
11 policies that are triggered?
12   A.  It depends.
13   Q.  It depends on what?
14   A.  For instance, if a policy had an
15 asbestos exclusion.
16   Q.  So the policies that would be
17 triggered in that example would be from first
18 exposure to the policy that has an asbestos
19 exclusion?
20   A.  Sure.
21   Q.  And any other approaches to
22 trigger other than continuous?
23   A.  I believe there is a theory.  I
24 think it's called a triple trigger.
25   Q.  All right.  And what is your

Page 42

1  understanding of a "triple trigger"?
2      A.  I believe my understanding is that
3  it is a trigger of exposure -- I want to
4  say -- I mean, I'm not -- you know, I'm not
5  sure if this is -- feels like this is a bit
6  of a law exam, but it's to say injury or
7  manifestation, and to be honest, I can't
8  remember the third trigger.
9      Q.  Okay.  Would it be disease?  Does
10 that sound familiar?
11     A.  Yeah, that sounds familiar.
12     Q.  And what makes it a triple
13 trigger, if you know?
14         MR. SCHULZE:  Objection.  And just
15     for the record, I think it's clear, but
16     these questions are about Mr Gardner
17     personally?
18         MR. DUNNE:  Yeah.  Absolutely.
19     I'm not asking --
20         MR. SCHULZE:  Not Lamorak's
21     understanding of triggering but
22     Mr. Gardner's?
23         MR. DUNNE:  Yeah.
24         THE WITNESS:  My understanding is
25     that the-- each policies -- or all the

Page 43

1      policies during that trigger period
2      would -- it would trigger those policy's
3      obligations.
4  BY MR. DUNNE:
5      Q.  And how is that different, if you
6  know, from a continuous trigger?
7      A.  My understanding is there could be
8  gaps in between coverage, which policies
9  would be obligated to respond.
10     Q.  And we've talked about continuous
11 triple.  Do you have any understanding of any
12 other trigger approaches?
13     A.  I believe there are.  Off the top
14 of my head, I can't recall the specifics as
15 to any others.
16     Q.  Have you also heard the triple
17 trigger called the Raymark trigger?
18     A.  I believe so, yes.
19     Q.  And have you heard it called that
20 in the context of this case, or have you
21 heard about that trigger before this case?
22     A.  I believe I've heard it before
23 this case.
24         MR. DUNNE:  Off the record.
25 (Off-the-record discussion.)

Page 44

1  (Exhibit 3, Bates Nos. NSCLM009436 through
2    -9441, marked for identification.)
3  BY MR. DUNNE:
4      Q.  I'll ask you, have you ever seen
5  this?
6      A.  I have.
7      Q.  For the record, it's a letter
8  dated March 17, 2017, with the National
9  Surety Bates No. 9436.  I ask you to look at
10 page 3.  And if you want to peruse the
11 insurer agreement language.
12 (Witness reviewing document.)
13     A.  Okay.
14     Q.  Have you dealt with policies with
15 an insuring agreement like this?
16     A.  I don't know if it's these exact
17 wording, but yeah, similar wording.
18     Q.  All right.  If you go down to "b."
19     A.  Uh-huh.
20     Q.  Are you familiar with the policy
21 language in b2, which states that "the
22 'bodily injury' and 'property damage' occurs
23 during the policy period"?
24     A.  Yes, I am.
25     Q.  And then go to page 4, the

Page 45

1  definition of "'Body Injury,'" it says,
2  "means bodily injury, sickness or disease..."
3         Do you see that language?
4      A.  Yes, I do.
5      Q.  So when we were talking about
6  triple trigger language, is this your
7  understanding of what the triple trigger
8  language comes from, body injury, sickness or
9  disease?
10         MR. SCHULZE:  Objection to form.
11     A.  I'm not sure what you mean by
12 where it comes from.
13 BY MR. DUNNE:
14     Q.  I'm just asking.  Do you have an
15 understanding that the triple trigger is
16 derived from policy language?
17     A.  Yes.
18     Q.  And I'm just asking if you're
19 aware that the triple trigger policy language
20 that it's derived from is set forth in
21 definition number 3, bodily injury?
22         MR. SCHULZE:  Objection to
23 foundation.
24 BY MR. DUNNE:
25     Q.  Just if you know.

Page 46

1    A.  Yeah.  I believe that that would
2  be found in that language.
3    Q.  So if you could, please go down to
4  second paragraph under "Coverage Analysis."
5  And I want to ask you, if you look in the
6  middle, it talks about bodily injury that is
7  exposure to Resinoid's asbestos-containing
8  product."
9       Do you see that?
10    A.  Yes.
11    Q.  Based on your understanding of the
12  triple trigger and its use of exposure, do
13  you understand bodily injury to mean
14  exposure, as it's set forth here?  Or do you
15  have a different understanding?
16    A.  I'm sorry.  Can you say that
17  again?
18    Q.  Sure.  So we talked about
19  definition of triple trigger equaling bodily
20  injury, sickness or disease.  Is that a fair
21  statement?
22    A.  Yes.
23    Q.  So I'm just trying to get at what
24  each of those terms mean to you.  So I am
25  just trying to understand whether or not you

Page 47

1  understand bodily injury to mean exposure, if
2  you have an understanding?
3    A.  Are you asking me if my
4  understanding is bodily injury means
5  exposure?
6    Q.  Correct.
7    A.  Yeah.  I mean, I suppose that's
8  one interpretation.
9    Q.  Do you know what else bodily
10  injury could mean?
11    A.  I would imagine bodily injury
12  could mean a lot of different things.
13    Q.  For trigger purposes -- strike
14  that.
15       Have you ever applied a triple
16  trigger in any of your claims?
17       MR. SCHULZE:  Objection to form.
18    A.  I don't believe so.
19  BY MR. DUNNE:
20    Q.  Do you recall ever applying --
21  ever having an asbestos claim emanating from
22  an Illinois insured?
23    A.  Are you asking whether I've had a
24  claim where the insured's based in Illinois?
25    Q.  Yes.

Page 48

1    A.  I'm sure I have.
2    Q.  And I'm just trying to see --
3  trying to jog your memory to see if maybe you
4  ever considered applying triple trigger and
5  what that means?
6    A.  Again, I think I've indicated that
7  I have not applied the triple trigger on any
8  claim that I have managed.
9    Q.  And so you don't, as you sit here
10  today -- well, strike that.
11       So looking at paragraph 19 of the
12  Complaint, Exhibit 2, paragraph 19.
13    A.  Okay.
14    Q.  And I'll ask you -- you see
15  Lamorak denied each and every allegation of
16  fact contained in paragraph 19?
17    A.  Yeah, I see where it says that.
18    Q.  And if I ask you to assume that
19  bodily injury means exposure, does Lamorak
20  have any facts that indicate to you that
21  Mr. Ciokajlo was exposed to Resinoid's
22  asbestos-containing products between 1994 and
23  2000?
24       MR. SCHULZE:  Objection to form.
25    A.  Are you asking me whether I am

Page 49

1  aware of any evidence -- trying to think.
2  Can you repeat the question?
3  BY MR. DUNNE:
4    Q.  Sure.  I'm make it easier.  You've
5  handled the Ciokajlo claim for a while?
6    A.  Yes.
7    Q.  And I'm simply asking, are you
8  aware of any facts that would indicate that
9  Mr. Ciokajlo was exposed to
10  asbestos-containing products created by
11  Resinoid between 1994 and 2000?
12    A.  I'm not aware of any specific --
13  I'm not aware that he was exposed to asbestos
14  during that period, no.
15    Q.  And my question is:  You're
16  Lamorak's witness.  Is that Lamorak's
17  position?
18    A.  Yes, that would be Lamorak's
19  position.
20    Q.  And going back to the March
21  letter, Exhibit 3, with regard to sickness.
22    A.  Sorry.  What page are we on?
23    Q.  Page 4, that big paragraph again.
24    A.  Yep.
25    Q.  I want you to assume for my next

Page 50

1  question that sickness equals ill-health or
2  weakened or unsound condition related to
3  asbestos exposure?
4      **A.  Sorry.  Can you say that again?**
5      Q.  Sure.  For my next question, I
6  want to you assume that sickness equals
7  ill-health or a weakened or unsound condition
8  related to an asbestos exposure.
9      **A.  Okay.**
10     Q.  Is Lamorak aware of any facts that
11 would indicate that Mr. Ciokajlo --
12         MR. SCHULZE:  Go off the record.
13 (Off-the-record discussion.)
14         MR. DUNNE:  Back on the record.
15 BY MR. DUNNE:
16     Q.  Start over.  Is Lamorak aware of
17 any facts that would indicate that
18 Mr. Ciokajlo -- thank you -- had any
19 ill-health or weakened or unsound condition
20 related to asbestos during the period 1994 to
21 2000?
22     **A.  Can I --**
23         MR. SCHULZE:  I'm sorry.  I just
24     want to make sure I heard the question
25     exactly right.  Can you just read back

Page 51

1      the question that's pending?
2          MR. DUNNE:  I'll restate it.  I'll
3      do it again.
4  BY MR. DUNNE:
5      Q.  Is Lamorak aware that Mr. Ciokajlo
6  suffered from any ill-health, or weakened, or
7  unsound condition related to asbestos during
8  the period between 1994 and 2000?
9      **A.  Are you asking whether he had any**
10     **symptoms or any -- I'm not sure -- so**
11     **you're -- are you asking whether he had any**
12     **symptoms or any ill-health related to his**
13     **exposure to asbestos?**
14     Q.  I'll ask you a different way.
15         Do you recall reading
16 Mr. Ciokajlo's deposition concerning his
17 mesothelioma?
18     **A.  Yeah, I've read that.**
19     Q.  And didn't he, in essence, testify
20 that he was as healthy as a horse shortly
21 before he was diagnosed with mesothelioma?
22     **A.  I believe, yeah.  I'm not sure he**
23     **used those words, but I believe he testified**
24     **that yeah, he's generally healthy.**
25     Q.  And do you recall when he was

Page 52

1  diagnosed with meso?
2      **A.  I believe he was diagnosed in**
3  **2015.**
4      Q.  So my question -- going back to my
5  question is:  Did Mr. Ciokajlo testify that
6  he had any ill-health or weakened conditions
7  related to asbestos between 1994 and 2000?
8      **A.  I don't recall him testifying to**
9  **that.**
10     Q.  And is Lamorak aware of any facts
11 that would indicate that he suffered from any
12 ill-health or unsound conditions related to
13 asbestos exposure between 1994 and 2000?
14     **A.  I don't believe -- I believe the**
15 **testimony that says that he was diagnosed in**
16 **2015, that probably is all we have.**
17     Q.  All right.  So the answer is no,
18 you're not aware of any facts?
19     **A.  I'm not aware of any additional**
20 **facts, during that period.**
21     Q.  All right.  Sir, if you could turn
22 to your affirmative defenses.
23     **A.  Okay.**
24     Q.  All right.  And turning to the
25 fourth affirmative defense.

Page 53

1      **A.  Okay.**
2      Q.  All right.  Do you have an
3  understanding of what waiver is?
4      **A.  I mean, I have a general**
5  **understanding of the concept.**
6      Q.  What is your general understanding
7  of waiver?
8      **A.  My understanding would be you give**
9  **up a right.**
10     Q.  And is it Lamorak's contention
11 that National Surety gave up a right with
12 regard to seeking reimbursement of the
13 indemnity paid on the Ciokajlo matter?
14         MR. SCHULZE:  Objection to form.
15     **A.  So can you repeat the question?**
16         MR. DUNNE:  Can you read it back,
17     please?
18         THE REPORTER:  "And is it
19     Lamorak's contention that National
20     Surety gave up a right with regard to
21     seeking reimbursement of the indemnity
22     paid on the Ciokajlo matter?"
23         **THE WITNESS:  I'm not quite sure I**
24     **understand the question.**
25 BY MR. DUNNE:

NATIONAL SURETY vs LAMORAK INSURANCE                                    Job 28171
James Gardner on May 23, 2018  30(b)(6), Confidential                  Pages 54..57

Page 54

1    Q.  Well, sure.  So looking at the
2  fourth affirmative defense.
3    **A.  Yes.**
4    Q.  And it says, *"Plaintiff," that's
5  us, National Surety, "claims may be barred,
6  in whole or in part, by the doctrines," and
7  we're going to go through each one of these.
8        And I'm starting with the first
9  one, "Waiver."  And I'm trying to understand
10  whether or not -- we're ten days away from
11  discovery, whether or not Lamorak believes
12  that National Surety waived its ability to
13  seek reimbursement of the indemnity paid on
14  the Ciokajlo case.
15        And then my next question would be
16  based on what facts?
17        So the first question is:  Is that
18  your contention?  Is that Lamorak's
19  contention?
20        MR. SCHULZE:  Objection to form.
21    **A.  This is -- first off, this -- the**
22  **document here was produced by counsel.  I**
23  **provided claim files and claim information**
24  **and the substance that went into this.  I'm**
25  **not certain that is what that**

Page 55

1  affirmative defense was referring to.
2    Q.  Okay.  So what is your
3  understanding that that affirmative defense
4  relates to?
5    **A.  My understanding -- can you repeat**
6  **your prior question regarding reimbursement?**
7    Q.  So can we both agree that it's
8  National Surety's position that it doesn't
9  owe indemnity or defense for the Ciokajlo
10  matter because it didn't trigger the National
11  Surety policies?
12    **A.  That is my understanding, that the**
13  **position -- that is the position that**
14  **National Surety is taking, correct.**
15    Q.  But National Surety contributed to
16  the settlement of the Ciokajlo matter?
17    **A.  Correct.**
18        MR. SCHULZE:  Can I -- I'm sorry
19  to interrupt.  I should have done this
20  at the beginning.  I don't mean to ruin
21  your flow.  But just like we did with
22  Mr. Harris, I want to make a note for
23  the record that this deposition should
24  be --
25        MR. DUNNE:  Confidential.

Page 56

1        MR. SCHULZE:  Confidential
2  subjective to protective order.
3        MR. DUNNE:  So agreed.
4        MR. SCHULZE:  I should have done
5  that a long time ago.  Sorry for doing
6  it until now.
7        MR. DUNNE:  No problem.
8  BY MR. DUNNE:
9    Q.  So we've agreed that National
10  Surety said -- that Ciokajlo may not be
11  covered?
12    **A.  Correct.  That's their position,**
13  **correct.**
14    Q.  And we've looked at the
15  reservation of rights where it said why?
16    **A.  Yes.**
17    Q.  And then National Surety paid some
18  money, contributed toward the settlement?
19    **A.  Correct.**
20    Q.  So my question is simply:  Is it
21  Lamorak's contention that National Surety
22  gave -- in your words, gave up its right to
23  seek reimbursement for the money it paid in
24  settlements and defense of what National
25  Surety contends is an uncovered claim?

Page 57

1        MR. SCHULZE:  Objection to form.
2    **A.  Again, it's not my understanding**
3  **with respect to reimbursement, no.**
4  BY MR. DUNNE:
5    Q.  So it's Lamorak's position that
6  National Surety did not waive its right to
7  seek reimbursement of indemnity?
8    **A.  No, that's not correct.**
9    Q.  Okay.  So I misunderstood your
10  answer?
11    **A.  Correct.**
12    Q.  What is your understanding?
13    **A.  My understanding is that -- and**
14  **I've been called here to provide factual**
15  **basis.  My understanding is that National**
16  **Surety had a practice -- or I should say**
17  **Allianz on behalf of National Surety had**
18  **participated, as a carrier, defending**
19  **Resinoid asbestos claims, under a cost share**
20  **for 14 years or so, without objection.**
21        **They had previously indemnified**
22  **Resinoid on another claim that was located in**
23  **Ohio.  It was actually, I believe the same**
24  **cost share as to indemnity, as the Ciokajlo**
25  **claim, and they did not object to that cost**

Page 58

1  share.
2       The National Surety rep or
3  Allianz's rep did not issue an ROR when the
4  Ciokajlo claim was noticed. I believe the
5  first specific reservation or objection to
6  any matter relating to Ciokajlo took -- did
7  not take place until 2017.
8       My understanding is that National
9  Surety would have known, as far as back as
10  2015, the facts in the Ciokajlo claim with
11  respect to exposure and bodily injury, which
12  is the substance of their argument that they
13  are not responsible now for indemnifying
14  Resinoid.
15       MR. DUNNE:  Can you read that
16  answer back, please?
17       THE REPORTER:  "My understanding
18  is that -- and I've been called here to
19  provide factual basis.  My understanding
20  is that National Surety had a
21  practice -- or I should say Allianz on
22  behalf of National Surety had
23  participated, as a carrier, defending
24  Resinoid asbestos claims, under a cost
25  share for 14 years or so, without

Page 59

1  objection.
2       They had previously indemnified
3  Resinoid on another claim that was
4  located in Ohio.  It was actually, I
5  believe the same cost share as to
6  indemnity, as the Ciokajlo claim, and
7  they did not object to that cost share.
8       The National Surety rep or
9  Allianz's rep did not issue an ROR when
10  the Ciokajlo claim was noticed.  I
11  believe the first specific reservation
12  or objection to any matter relating to
13  Ciokajlo took -- did not take place
14  until 2017.
15       My understanding is that National
16  Surety would have known, as far as back
17  as 2015, the facts in the Ciokajlo claim
18  with respect to exposure and bodily
19  injury, which is the substance of their
20  argument that they are not responsible
21  now for indemnifying Resinoid."
22  BY MR. DUNNE:
23       Q.  And, sir, would your answer change
24  if it were true that the first time National
25  Surety could rule out exposure to

Page 60

1  Resinoid-containing products or Resinoid's
2  products was in March of 2017?
3       MR. SCHULZE:  Objection to form.
4       A.  Are you asking my opinion or
5  Lamorak's?  I'm not sure which entity you're
6  --
7       Q.  Lamorak's.
8       MR. SCHULZE:  Same objection.
9       Go ahead.
10       A.  Lamorak hasn't taken a position as
11  to what would have -- what the result would
12  be today if National Surety had issued an ROR
13  or taken the position in 2015.
14       Q.  Okay.  So let's go back.  I think
15  we confirmed that, in June of 2016, you took
16  over this case?
17       A.  Correct.
18       Q.  And at that time it was in
19  discovery?
20       A.  Correct.
21       Q.  Was anybody asking you for
22  indemnity dollars at that time?
23       A.  No.
24       Q.  Do you have a recollection when
25  somebody started asking for indemnity

Page 61

1  dollars?
2       A.  Well, I mean, what do you mean
3  when you say requesting indemnity dollars?
4       Q.  Well, do you recall when an
5  authority request was made?
6       A.  Yes.
7       Q.  And when was that?
8       A.  I believe the first one would have
9  been December of 2016.
10       Q.  And in your experience as a claims
11  handler, in a case where you've accepted the
12  defense, do you have to make -- when do you
13  make an determination as to whether or not
14  you may or may not owe indemnity?
15       MR. SCHULZE:  Objection.  Form.
16       A.  I mean, when, as the claims
17  handler, you're asking would I make a
18  determination as to whether I owed indemnity?
19       Q.  Correct.
20       A.  I would suppose that depend.
21       Q.  Okay.  What does it depend on?
22       A.  Well, if we determine there was no
23  coverage to begin with and we weren't going
24  to defend a claim, then I suppose we would
25  have then, at that time, determined that we

NATIONAL SURETY vs LAMORAK INSURANCE
James Gardner on May 23, 2018  30(b)(6), Confidential

Job 28171
Pages 62..65

Page 62

1  would not pay indemnity on that claim.
2      Q.  And what about a claim where
3  you're defending under a reservation of
4  rights?
5      A.  I suppose that would depend.
6      Q.  Would be it depend on facts, the
7  facts of the claim?
8      A.  Correct.
9      Q.  And would you agree with me that
10  when you decide indemnity, you base that on
11  the facts of the claim?
12      A.  Correct.
13      Q.  And when you decide defense,
14  that's based on the allegations of the
15  Complaint, generally?
16      A.  I'm sorry.  Say that again.
17      Q.  When you decide defense, it's
18  based, generally, on the allegations of the
19  Complaint?
20      A.  Correct.  I would say that is
21  correct.
22      Q.  So if the facts relevant to
23  indemnity for the Ciokajlo matter weren't
24  conclusively known until 2017, in your
25  experience, would an indemnity decision have

Page 63

1  been made?
2          MR. SCHULZE:  Objection to form.
3      A.  I'm not sure I understand the
4  question.
5  BY MR. DUNNE:
6      Q.  Sure.  We can agree that facts are
7  important for determining whether indemnity
8  is owed?
9      A.  Correct.
10      Q.  And until all the facts relevant
11  to that indemnity decision are known, you
12  can't make a determination as to indemnity;
13  correct?
14      A.  I don't know if I'd say that's
15  correct.
16      Q.  Okay.  What do you not agree with
17  in that sentence?
18      A.  That you would need every single
19  fact of a claim to know whether indemnity
20  would be owed.
21      Q.  Okay.  But for purposes of
22  trigger, all right, if you're having to
23  determine bodily injury, sickness or disease,
24  those are significant relevant facts, the
25  facts of bodily injury, sickness or disease?

Page 64

1      A.  Are you asking if those are
2  relevance facts in any given claim?
3      Q.  No.  In an asbestos claim, if
4  you're going to pay indemnity, you need to
5  determine whether or not bodily injury,
6  sickness or disease happened during your
7  policy period?
8          MR. SCHULZE:  Objection to form
9      and foundation.
10      A.  I suppose that those would be
11  elements that you would consider.
12  BY MR. DUNNE:
13      Q.  Could you make a determination
14  without those elements, facts supporting each
15  of those elements?
16          MR. SCHULZE:  Same objections.
17      A.  Could you -- are you asking
18  whether you could make a determination on
19  indemnity without --
20      Q.  Knowing your policy is triggered.
21      A.  I suppose you could not know.
22      Q.  With regard to the facts
23  supporting Lamorak's waiver contention, I
24  think you mentioned the cost share?
25      A.  Correct.

Page 65

1      Q.  The cost share was with regard to
2  defense; is that correct?
3      A.  There was a cost share with
4  respect to defense and there was a prior cost
5  share with respect to indemnity, and then
6  there was a cost share with respect to
7  indemnity particular to each Ciokajlo claim.
8      Q.  And when you say "a cost share,"
9  not a formal agreement?
10      A.  Correct.
11      Q.  And with regard to the Ciokajlo
12  claim, what cost share are you referring to?
13      A.  I believe Rick Harris suggested, I
14  want to say in or around December 2016, that
15  the carriers agree to a specific cost share
16  for indemnity purposes.  I believe that's my
17  understanding.
18      Q.  But isn't it true that after that
19  cost share was suggested, you suggested a
20  different cost share?
21      A.  I don't know as I suggested a
22  different cost share.  No.
23      Q.  I apologize.  I have only one
24  copy.
25          MR. DUNNE:  Can we take a quick

NATIONAL SURETY vs LAMORAK INSURANCE
James Gardner on May 23, 2018  30(b)(6), Confidential

Job 28171
Pages 66..69

Page 66

1   break?
2        MR. SCHULZE:  Sure.
3   (Recess taken at 3:37 p.m. to 3:38 p.m.)
4        MR. DUNNE:  We can go back on, and
5    I'll jump back in when she comes in.
6   BY MR. DUNNE:
7        Q.  I think one of the other facts
8   that you mentioned to support your waiver
9   contention is that there was a cost share
10  with regard to the Christianson (sic) claim?
11  The Christian -- yeah, Christianson claim?
12       A.  Correct.
13       Q.  I think you said it was another
14  claim.  But now do you recall it was the
15  Christianson claim?
16       A.  Yeah.  I believe that was the name
17  of the Plaintiff.
18       Q.  Okay.  And I think earlier you
19  said that indemnity is dealt with on a
20  claim-by-claim bases?
21       A.  I don't recall saying that.
22       Q.  Would you agree that each claim is
23  dealt with on a claim-by-claim basis?
24       MR. SCHULZE:  For the purposes of
25       indemnification?

Page 67

1        MR. DUNNE:  Just generally.
2        A.  Generally, sure.
3   BY MR. DUNNE:
4        Q.  And for purposes of defense?  We
5   talked about the allegations.
6        A.  Correct.
7        Q.  And for purposes of indemnity, the
8   facts of each case are different; correct?
9        A.  Correct.
10       Q.  And if you knew that the
11  circumstances with regard to the knowledge of
12  when Resinoid stopped manufacturing
13  asbestos-containing products was incomplete
14  at the time of the Christianson matter, would
15  that change your opinion as to whether or not
16  that -- the payment of that claim impacted
17  the waiver case?
18       A.  I'm not sure I understand the
19  question.
20       Q.  Sure.  If you didn't -- is it
21  Lamorak's position that if the facts were not
22  complete at the time of the Christianson
23  settlement to support a denial, that the
24  document was -- that the payment -- strike
25  that.

Page 68

1        Is it Lamorak's position that a
2   payment on a claim where the facts do not
3   support a denial -- well, strike that.  Never
4   mind.
5        As you sit here today, are you
6   aware whether or not Allianz -- sorry --
7   strike that -- National Surety issued a
8   reservation of rights with regard to the
9   Christianson claim?
10       A.  I am not aware if they issued a
11  specific ROR to the Christianson claim.
12  (Exhibit 4, Bates Nos. NSCLM000187 through
13   -0189, marked for identification.)
14       MR. DUNNE:  Thank you.
15  BY MR. DUNNE:
16       Q.  Have you seen that one before?
17       A.  I'm not sure whether I've seen
18  this before.
19       Q.  Okay.  Well, for the record, it's
20  a document dated July 10, 2003, regarding
21  Darryl and Vanessa Christian, National Surety
22  Bates 187 to 189.
23       Can you briefly review this and
24  specifically look at the first paragraph on
25  page 2?

Page 69

1        A.  The first full paragraph on page
2   2?
3        Q.  No.  The first paragraph.
4   Specifically beginning on the fourth line.
5   It says, *"Fireman Fund's Insurance Company's
6   position is that its policy will not respond
7   for damages because of bodily injury,
8   sickness or disease, which actually results
9   during the policies."
10       Did I say that right?
11       A.  Yep.
12       Q.  *"And that will not responded
13  damages because of bodily injury, sickness or
14  disease, which results outside of the policy
15  periods from a cause which takes place during
16  the policy periods."
17       Do you see that language?
18       A.  I see that written here, yes.
19       Q.  And do you understand that
20  language to be a reservation of rights?
21       A.  I'm sorry.  Was that a question?
22       Q.  Yeah.
23       A.  Do I understand that language to
24  be a reservation of rights?
25       Q.  Right.

Page 70

1      A.  That would be my understanding.
2      Q.  Okay.  And that's reserving the
3  right, as we've been talking about, if their
4  policies are not triggered?  In other words,
5  if there's no bodily injury, sickness or
6  disease during the policy period.  Would you
7  agree with me on that?
8      A.  I believe that's what it says
9  here, yep.
10     Q.  Okay.  So have you ever handled a
11 claim where you reserve rights yet you still
12 paid indemnity?
13     A.  Are you asking if I've ever
14 specifically issued a reservation of rights
15 and paid indemnity?
16     Q.  Yeah.  Decided to pay indemnity.
17     A.  I can't think of a specific case,
18 as I sit here.
19     Q.  Does the fact that now you're
20 seeing that National Surety issued a
21 reservation of rights with regard to
22 Christian, changed Lamorak's position with
23 regard to whether or not it participated in
24 the defense and indemnity of the Christianson
25 case without objection?

Page 71

1          MR. SCHULZE:  Objection to form.
2  I don't think that's the record.
3      A.  I would say no.  I believe,
4  notwithstanding, whatever -- I mean, what is
5  contained in this letter, my understanding is
6  National Surety still funded the Christianson
7  claim, in accordance with the cost share that
8  the parties agreed to.
9  (Exhibit 5, Bates Nos. NSCLM009826 through
10 -9826, marked for identification.)
11     Q.  So what I'm showing you that's
12 been marked as Exhibit 5 is an email
13 apparently from you?
14     A.  Yes.  That's correct.
15     Q.  And what date -- when is it dated?
16     A.  It is dated 2/28/2017.
17     Q.  And I think we've established
18 that -- well, maybe we haven't.  Do you
19 recall when the claim was settled?
20     A.  The Ciokajlo claim?
21     Q.  Yeah.
22     A.  I believe it was settled late
23 March 2017.
24     Q.  Okay.  So this is about a month
25 before?

Page 72

1      A.  Yeah, approximately.
2      Q.  And is there a cost share
3  suggested here?
4      A.  There is.
5      Q.  Okay.  And you suggested it;
6  correct?
7      A.  I did.
8      Q.  And is Fireman's Fund
9  participating in this cost share?
10     A.  They are not listed here.
11     Q.  Okay.  So why -- and is this the
12 cost share that should have controlled the
13 allocation in the Ciokajlo matter?
14     A.  No.
15     Q.  And why not?
16     A.  I believe Lamorak has taken the
17 position that Fireman's Fund should have
18 contributed per their time on risk.
19     Q.  Right.  But I think earlier you
20 said that -- strike that.
21         Do you know whether or not
22 Mr. Harris suggested a cost share subsequent
23 to this cost share?
24     A.  Am I aware whether he suggested a
25 cost share subsequent to this?

Page 73

1          I believe we ultimately had an
2  understanding in terms of ultimately funding
3  the cost share -- or excuse me -- ultimately
4  funding the Ciokajlo claim and Fireman's did
5  participate in that.
6      Q.  And that's a written formal
7  agreement; correct?
8      A.  That's correct.
9      Q.  And as you sit here today, you're
10 not aware of Mr. Harris sending a subsequent
11 allocation to this?
12     A.  Are you asking whether Mr. Harris
13 contradicted what was included in my email
14 here?
15     Q.  No.  I think earlier you testified
16 that one of the facts that Lamorak bases its
17 waiver claim is on allocation that Mr. Harris
18 did for this claim.
19     A.  Correct.  Prior to this
20 allocation.
21     Q.  Okay.  So it was prior?
22     A.  To this allocation, correct.
23     Q.  Okay.  And so my question is:  You
24 did a subsequent allocation?  You're saying
25 the one that Mr. Harris did controls.  Why

Page 74

1  doesn't this one control?
2      A.  I believe, as indicated in the
3  letter  -- or excuse me -- the email, that we
4  disagreed with Fireman's position at the
5  time.
6      Q.  And that's its position that its
7  policies weren't triggered?
8      A.  I believe they issued a separate
9  letter in March -- excuse me -- February
10  17 -- I think it was around February 17th,
11  with a position that is separate from the
12  position that they ultimately took in their
13  March 17th letter.
14      Q.  Okay.  And I'm assuming Lamorak
15  also disagrees with the position they
16  ultimately took in their March 17th letter?
17      A.  Correct.
18  (Exhibit 6, Interim Settlement Funding
19   Agreement, marked for identification.)
20      MR. DUNNE:  For the record, this
21      is a document entitled, "Interim
22      Settlement Funding Agreement."
23  BY MR. DUNNE:
24      Q.  Have you ever seen this document
25  before?

Page 75

1      A.  I have.
2      Q.  And can you tell me what this
3  document is?
4      A.  This is an agreement between
5  National Surety and Lamorak to pay shares to
6  fund the Ciokajlo claim.  Or fund the
7  Ciokajlo settlement, I should say.
8      Q.  And who signed it on behalf of
9  Lamorak?
10      A.  That appears it was signed by
11  Robert McCarthy.
12      Q.  And I don't believe -- you said he
13  was your direct supervisor?
14      A.  Not my direct supervisor, no.
15      Q.  So why did Mr. McCarthy sign this
16  document, if you know?
17      A.  I believe we determined he was the
18  appropriate representative to sign the
19  document.
20      Q.  Okay.  Is he the one that decided
21  that you authorize this agreement,
22  ultimately?
23      A.  He's ultimately the one that
24  signed it, correct.
25      Q.  So looking at the first -- strike

Page 76

1  that.
2          Looking at paragraph number 2,
3  "The insurers do not concede liability,
4  coverage or the correctness of any coverage
5  theory" (as read).
6          Do you see that?
7      A.  I do.
8      Q.  Lamorak agreed that by National
9  Surety making a contribution to the Ciokajlo
10  settlement, that nobody was conceding
11  liability coverage or the correctness of any
12  particular coverage theory?
13      A.  Yeah, by signing that.  I mean,
14  the document says what it says.
15      Q.  That's exactly right.  Okay.
16          And if you go down to 3.2, it
17  says, "No Insurer will argue that any Insurer
18  waived any coverage defenses by making
19  payments pursuant to this Agreement"?
20      A.  Yes.  That's what the document
21  says.
22      Q.  So the fact that Allianz
23  contributed to the Ciokajlo matter, is, in
24  fact, that Lamorak's relying on for purposes
25  of its waiver argument?

Page 77

1      MR. SCHULZE:  Objection to form.
2      A.  Can you say that again?
3  BY MR. DUNNE:
4      Q.  Sure.  I may have been mistaken.
5  But I think one of the factors that you
6  pointed to, with regard to the facts
7  supporting the waiver claim, was that Allianz
8  paid indemnity for Ciokajlo and it paid it
9  pursuant to the same cost share as in
10  Christianson.  Is that a fair statement?
11      A.  No.  I mean, I'm not -- I believe
12  what I said is they had agreed to a cost
13  share -- indemnity cost share that they
14  proposed, which was the same as in
15  Christianson.
16      Q.  Okay.  And you believe that that
17  indemnity cost share contradicts this
18  agreement?
19      A.  I mean, the agreement says what it
20  says.  I testified that Allianz and Recaris
21  proposed a cost share for the Ciokajlo claim.
22      Q.  And we've established it -- and,
23  you know, you proposed a subsequent cost
24  share?
25      MR. SCHULZE:  Objection to form.

Page 78

1    **A.  I did propose a subsequent cost**
2  **share once Allianz indicated that they were**
3  **not going to fund the Ciokajlo settlement.**
4    Q.  So why do you contend -- why does
5  Lamorak contend the fact that Mr. Harris put
6  in an email a potential cost share, waives
7  Allianz's ability to seek reimbursement for
8  indemnity, when we have this signed and
9  executed agreement, which says all parties
10  are reserving their rights?
11        MR. SCHULZE:  Object to the form
12    of the question.  Calls for legal
13    conclusions, analysis.
14        You can answer.
15    **A.  Again, I mean, the document speaks**
16  **for itself, says what it says.  I was called**
17  **to testify as to certain facts and one of**
18  **those facts was that certain facts supporting**
19  **the waiver claim, one of those facts is that**
20  **Allianz had proposed the cost share --**
21  **indemnity cost share, was agreeing to pay**
22  **indemnity on the Ciokajlo claim.**
23    Q.  Where does it say -- do you have
24  an email from Mr. Harris saying they agreed
25  to pay indemnity?

Page 79

1    **A.  I believe they agreed to with that**
2  **cost share, with the understanding that we**
3  **were going to pay indemnity on that claim.**
4    Q.  Okay.  Can you find the March
5  37 -- sorry -- the March 17th letter?
6    **A.  Okay.**
7    Q.  We've already talked -- this is a
8  reservation of rights letter.  Do you
9  recognize it as a reservation of rights
10  letter?
11    **A.  The March 17th letter?**
12    Q.  Yeah.
13    **A.  Correct.**
14    Q.  Do you see here or anywhere
15  Allianz agrees to pay indemnity?
16    **A.  Yeah, it's not in here.**
17    Q.  And, in fact, they say payment of
18  indemnity is questionable?
19        MR. SCHULZE:  Object to the form.
20        Do you want to direct him to that
21        language?
22        MR. DUNNE:  Sure.
23  BY MR. DUNNE:
24    Q.  Turning to page 4, the second
25  paragraph, last sentence.  The sentence

Page 80

1  begins "Moreover."
2    **A.  Okay.**
3    Q.  Do you see that language?
4    **A.  I do.**
5    Q.  "For the reasons set forth below,
6  we must advise you that the indemnity for the
7  Underlying Lawsuit," referring to the
8  Ciokajlo matter, "is unlikely based on the
9  facts currently known to FFIC"?  (as read)
10    **A.  Yeah.  That's what it says.**
11    Q.  I promised I'd do it on all of
12  these, so we'll see.
13    Is it Lamorak's contention that
14  the affirmative defense of release applies in
15  this case?
16        MR. DUNNE:  Objection to form.
17    **A.  Again, the document and that**
18  **response was prepared by counsel.  I provided**
19  **counsel with the claims file and facts to**
20  **support what was written in this document.**
21    Q.  Okay.  So I'm just asking you for
22  what facts does Lamorak contend support a
23  defense of release.
24    **A.  I would say the same facts as I**
25  **testified earlier with respect to waiver.**

Page 81

1    Q.  And your same answer for laches
2  and estoppel?
3    **A.  I would say that's fair, correct.**
4    Q.  Okay.  So for the affirmative
5  defenses set forth in the fourth affirmative
6  defensive, we discussed all of the facts that
7  Lamorak contends supports those defenses?
8        MR. SCHULZE:  Object to the form.
9    I don't think --
10        MR. DUNNE:  I mean, I can break
11    them all down.
12        MR. SCHULZE:  No.  I don't think
13    the question -- for all of the facts.  I
14    mean, I don't know that it's fair to
15    have a witness come to a deposition and
16    provide a laundry list of each and every
17    possible fact.  I understand you've
18    asked for facts.  He's given you
19    facts.
20  BY MR. DUNNE:
21    Q.  As you sit here today, are you
22  aware of any other facts that support
23  Lamorak's affirmative defenses, other than
24  those that you stated, of waiver, release,
25  laches or estoppel?

Page 82

1      A.  Yes.  I would say Rick Harris's
2   act of conduct in directing the defense of
3   the Ciokajlo claim.
4      Q.  There's no official cost share in
5   this case; correct?
6         MR. DUNNE:  Objection.  Asked and
7      answered.
8   BY MR. DUNNE:
9      Q.  I think we've talked about that.
10  There's no formal cost share?
11     A.  Correct.
12     Q.  Okay.  So are you aware of
13  anything that determines who controls defense
14  counsel?
15         MR. SCHULZE:  In this matter, in
16     the Ciokajlo case?
17         MR. DUNNE:  In the Resinoid
18     matter.
19     A.  I'm not sure what you mean by "who
20  controls."
21  BY MR. DUNNE:
22     Q.  So with the duty to defend comes
23  the ability to control defense counsel.
24  Wouldn't you agree?
25         MR. SCHULZE:  I'm going to object

Page 83

1   to the form.
2      A.  Yeah, I mean, I believe that
3   that's provided for in policy language.
4      Q.  Okay.  Do you know who appointed
5   defense counsel for Resinoid and specifically
6   Mr. -- first question, do you know who
7   appointed defense counsel for Resinoid?
8         MR. SCHULZE:  For all the claims?
9      A particular claim?
10        MR. DUNNE:  All the claims.
11     A.  Which counsel?  I'm not sure who
12  you're referring to.
13  BY MR. DUNNE:
14     Q.  We'll go with Ohio counsel.
15     A.  I believe that would have been
16  Joey Solomon, my predecessor, recommended
17  Pete Cozza as local counsel for the Ciokajlo
18  claim.
19     Q.  And Mr. Cozza is with Resolute?
20     A.  No.
21     Q.  Who is he with?
22     A.  Dickie McCamey, and I don't
23  remember the third name.
24     Q.  And who is Dickie McCamey in this
25  scheme of Resinoid defense?

Page 84

1      A.  They were local counsel for the
2   Ciokajlo claim.
3      Q.  Dickie McCamey was?
4      A.  Correct.
5      Q.  I thought you said they
6   recommended local counsel for the Ciokajlo
7   claim.
8      A.  I think I said Joey Solomon, my
9   predecessor, recommended Pete Cozza of Dickie
10  McCamey to be local counsel for the Ciokajlo
11  claim.
12     Q.  And who did Joey Solomon work for?
13     A.  He worked for Resolute.
14     Q.  And did Resolute, in fact, hire --
15  did you say Mr. Cozza?
16     A.  Pete Cozza.  Pierre Cozza.  I
17  believe the carriers agreed to retain
18  Mr. Cozza as local counsel.
19     Q.  On Resolute's recommendation?
20     A.  Resolute -- yeah, I mean,
21  Resolute recommended, and I believe the other
22  carriers had worked with him and agreed as
23  well.
24     Q.  Is Dickie McCamey on the Resolute
25  panel?

Page 85

1      A.  I'm not sure what you mean by "the
2   Resolute panel."
3      Q.  Does Resolute hire specific
4   defense firms to defend their asbestos
5   matters involving Resolute insurance?
6      A.  In cases, yes, Resolute will
7   retain attorneys to defend the uninsureds for
8   books of business which we act as -- or
9   Resolute acts as an administrator.
10     Q.  Is asbestos a book of business?
11  Lamorak asbestos business a book of business
12  that you hire defense lawyers for?
13     A.  Yeah.  Resolute will retain
14  defense counsel on behalf of insureds who
15  Lamorak insured.
16     Q.  Okay.  And how do you determine --
17  how does Resolute determine who it hires for
18  defense counsel in any given jurisdiction?
19     A.  Are you asking me generally how we
20  determine defense counsel?
21     Q.  Yeah.
22     A.  In my experience, I would -- if I
23  get a new claim, I would request -- excuse
24  me.  Let me restate that.
25         I would inform our team, which we

NATIONAL SURETY vs LAMORAK INSURANCE
James Gardner on May 23, 2018  30(b)(6), Confidential
Job 28171
Pages 86..89

Page 86

1  have a team, which is called the asbestos
2  strategic units, I would inform them that we
3  have a claim located in a certain
4  jurisdiction. They would then provide me
5  with an attorney or list of attorneys or
6  several names which they would recommend, and
7  then, as practice, I would call them. They
8  would run a conflicts check. And I would
9  also -- you know, again, it's dependent on
10  whether there are other carriers. I would
11  always, as a practice, run by who we
12  recommend by other carriers.
13      Q.  And is Dick & *McCamion, the list
14  provided by your strategic team for Ohio?
15      A.  I'm not aware of any list.
16      Q.  Sorry. I thought you said you
17  just would be provided a list by the
18  strategic teams of lawyers you could contact.
19  I apology if I misheard you.
20      A.  I believe I said: In any given
21  claim, our strategic unit will provide me
22  several different names in that jurisdiction,
23  correct.
24      Q.  Is *Dick & McCamey a firm that
25  Resolute uses to defend asbestos cases in

Page 87

1  Ohio?
2      A.  Among other firms I'm aware of,
3  correct.
4      Q.  I believe you mentioned that there
5  was a national coordinating counsel on that
6  matter?
7      A.  That's correct. Ed Matushek.
8      Q.  And do you know what firm he's
9  with?
10      A.  I believe the firm is called
11  Matushek and Nilles.
12      Q.  Was Mr. Matushek at another firm
13  before Matushek and Nilles, if you know?
14      A.  No. I believe the firm was called
15  Matushek Nilles & Sinars at one point.
16      Q.  And he's national counsel for
17  Resinoid?
18      A.  Correct.
19      Q.  What does that mean?
20      A.  That means he oversees,
21  nationally, all claims filed against
22  Resinoid, asbestos claims.
23      Q.  Do you know if he's national
24  counsel for any other Resinoid's insureds?
25      A.  I'm not aware of. He may be.

Page 88

1      Q.  Do you know how he became national
2  counsel for Resinoid?
3      A.  What do you mean do I know how he
4  became?
5      Q.  How he got the national counsel
6  gig for the Resinoid account.
7      A.  He was hired to be.
8      Q.  Okay. By who?
9      A.  I believe it was Chris Dardis.
10      Q.  Who is Chris Dardis?
11      A.  He works for Resolute.
12      Q.  Do you recall when that was?
13      A.  It probably would have been in and
14  around 2004.
15      Q.  And in 2017 -- sorry. Between
16  approximately 2004 and 2017, Mr. Matushek was
17  coordinating counsel for Resinoid, national
18  coordinating counsel?
19      A.  I believe, yes, he was for that
20  entire period.
21      Q.  And he was hired by Resolute in
22  2004, probably subject to the other carriers'
23  authority?
24      A.  Correct.
25      Q.  And it's your contention that

Page 89

1  Mr. Harris could control Mr. Matushek in
2  2017?
3      MR. SCHULZE:  Objection to form.
4      A.  I don't believe that's what I
5  said.
6      Q.  Okay. Well, I think you said that
7  one of the bases, one of the facts
8  demonstrating waiver was the fact that
9  Mr. Harris controlled Mr. Matushek. Is that
10  an incorrect statement?
11      A.  No, that's not correct.
12      Q.  Okay. Sorry.
13      Can you tell me what about
14  Mr. Harris's conduct, vis-a-vis Mr. Matushek,
15  causes you to believe it supports a waiver
16  argument?
17      A.  He was substantially directing the
18  defense in the Ciokajlo frame.
19      Q.  When you say "substantially
20  directing the defense," what does that mean?
21      A.  He would encourage Mr. Matushek to
22  take certain actions. I believe he was the
23  more vocal of the carriers in how the
24  Ciokajlo claim was defended.
25      Q.  And can you give me something

NATIONAL SURETY vs LAMORAK INSURANCE
James Gardner on May 23, 2018  30(b)(6), Confidential

Job 28171
Pages 90..93

Page 90

1  specific where Mr. Harris directed
2  Mr. Matushek to do something?
3      **A.  I mean, something specific, as I**
4  **sit here today, I believe he directed**
5  **Mr. Matushek to obtain bankruptcy reports.**
6      Q.  Thank you.  Bankruptcy reports on
7  who?  The Plaintiff?
8      **A.  No.  Bankruptcy report meaning**
9  **bankrupt entities where the Plaintiff may**
10  **have made the claims against certain trusts,**
11  **bankruptcy trusts.  Reports I should say.**
12      Q.  And what impact on the defense of
13  Resinoid would that have?
14      **A.  That would allow the carriers to**
15  **assess potential set-offs.**
16      Q.  And that goes to the amount of
17  potential liability; correct?
18      **A.  Ultimate liability, correct.**
19      Q.  And to assess the potential
20  exposure of a claim, you need to determine
21  what the ultimate liability is; isn't that
22  true?
23      **A.  Say that again.**
24      Q.  To assess the potential ultimate
25  exposure -- sorry.  To assess the exposure, a

Page 91

1  claim they present to an insurer, you need to
2  understand what the ultimate liability is
3  against that insured; isn't that true?
4      **A.  Sure.**
5          MR. SCHULZE:  Rory, when we get a
6      chance, we've been going for a while.
7      Can we take a break?
8          MR. DUNNE:  I'm pretty close to
9      being done.  You can take a break, if
10      you want.
11  (Recess taken at 4:10 p.m. to 4:19 p.m.)
12          MR. DUNNE:  Back on the record.
13  BY MR. DUNNE:
14      Q.  Now for the question you've all
15  been waiting for.
16          What is Lamorak's position on
17  which state's law applies to the National
18  Surety policies?
19      **A.  What state law applies to the**
20  **National Surety policies?**
21      Q.  Correct.
22      **A.  My understanding is the National**
23  **Surety policies were issued to Resinoid**
24  **Engineering in Ohio.**
25      Q.  When you say "issued," what do you

Page 92

1  mean?
2      **A.  I believe it says the Resinoid**
3  **address, mailing address on the face of the**
4  **National Surety policies, Resinoid**
5  **Engineering, to an address located in Ohio.**
6      Q.  And on that basis, you contend
7  Ohio law applies to the policy?
8          MR. SCHULZE:  Objection to the
9      question, but go ahead.
10      **A.  That and other factors.**
11  BY MR. DUNNE:
12      Q.  What other factors?
13      **A.  The Ciokajlo claim was filed in**
14  **Ohio.  Mr. Ciokajlo was -- or is an Ohio**
15  **insured.  The allegations with respect to the**
16  **asbestos exposure took place in Ohio at**
17  **Kirkwood's plant, which is also located in**
18  **Ohio.**
19      Q.  Does Lamorak have any evidence
20  that Resinoid actually received the policies
21  in Ohio?  National Surety's policy, sorry.
22      **A.  The National Surety's policy?**
23      Q.  Yes.
24      **A.  All I know is on the mailing**
25  **address for Resinoid indicates Ohio.**

Page 93

1      Q.  Have you ever seen any of National
2  Surety policies produced by Resinoid?
3      **A.  I'm not sure what you mean by**
4  **that.**
5      Q.  Has defense counsel ever provided
6  with you the National Surety policies
7  provided to him by Resinoid?
8          MR. SCHULZE:  I'm going to object
9      to the extent that that calls for any
10      information you obtained directly from
11      counsel or any attorney-client
12      communications, but otherwise you can
13      answer.
14          MR. DUNNE:  When you say
15      "counsel," you mean you?  Not defense
16      counsel.
17          MR. SCHULZE:  Did I say defense
18      counsel?  I didn't mean to --
19          MR. DUNNE:  No, you didn't.  But
20      my question was defense counsel.
21          MR. SCHULZE:  Okay.  I thought you
22      meant -- then I misunderstood the
23      question.  So anyway, objection to form.
24      I thought you meant -- coverage counsel
25      in this case.

Page 94

1       MR. DUNNE: I'll rephrase.
2   BY MR. DUNNE:
3       Q.   Have you ever been provided by
4   Mr. Matushek or local counsel with National
5   Surety's policy provided to them by Resinoid?
6       A.   I don't believe so.
7       Q.   So if Resinoid National Surety --
8   strike that.
9            You said that Mr. -- I think you
10  said that -- did you say -- strike that.
11           Who did you say is an Ohio
12  insured?  Or did you say one of the factors
13  was somebody was an Ohio insured?
14      A.   I don't believe I said that.  No.
15      Q.   Sorry.  If you can restate.  And I
16  apologize.
17           I've got the first factor -- fact
18  as to why Ohio law applies, and that is, the
19  policy was issued to an address, at least you
20  believe, to an address in Ohio; correct?
21      A.   Correct.
22      Q.   What other factors?
23      A.   The Plaintiff, Mr. Ciokajlo, is an
24  Ohio resident.  I believe the exposure took
25  place at Kirkwood Industries, I believe it

Page 95

1   is, which is located in Ohio.  The Complaint
2   was filed in Ohio.  And I believe -- you
3   know, we still are, in fact, discovering this
4   case.  So I believe we still are, you know,
5   reviewing all the documents and analyzing all
6   the facts.  So, you know, those are the facts
7   that I am testifying as to today.
8       Q.   And did Lamorak consider the fact
9   that the National Surety polices were issued
10  to a broker in Chicago?
11           MR. DUNNE: Objection.  Objection.
12      Foundation.
13      A.   What do you mean when say, "Did
14  Lamorak consider that?"
15      Q.   Does that plan, during your
16  consideration of whether Ohio law applies?
17           MR. SCHULZE: I'm going to object
18      to the extent that that's seeking legal
19      analysis.
20           MR. DUNNE: Right.
21      A.   I mean, as the question was, what
22  were the factors in Lamorak's determination
23  that Ohio law applies, I testified that,
24  again, Plaintiff was -- is an Ohio insurer --
25  or Ohio resident.  The Complaint was filed in

Page 96

1   Ohio.  Kirkwood Industries is located in
2   Ohio, where the exposure took place, and the
3   policy, the National Surety policies were
4   issued to Resinoid Engineering in Ohio.
5       Q.   Does it impact Lamorak's
6   contention that the policies -- the National
7   Surety policies were issued to a broker in
8   Illinois?
9            MR. SCHULZE. Objection to form.
10      A.   I don't believe Lamorak has taken
11  a position on that.
12      Q.   And is it important to Lamorak
13  where the insured is incorporated, for the
14  purposes of choice of law?
15           MR. SCHULZE: I'm going to object
16      again to the extent this is calling for
17      Lamorak's legal analysis.
18      A.   And, again, I mean, the question
19  was with respect to the Ohio -- application
20  of Ohio law that, is what I testified to.
21  BY MR. DUNNE:
22      Q.   So Lamorak didn't consider --
23  doesn't consider a factor for that analysis,
24  the fact that the policy -- National Surety
25  policies were issued to a broker in Chicago.

Page 97

1            MR. SCHULZE:  Same objection as to
2       Lamorak's legal analysis as to the
3       choice of law factors.
4       A.   Again, I'm testifying as to the
5   facts.  The applicability of law as to the
6   policies, that's something that's up to
7   counsel's determination.
8   BY MR. DUNNE:
9       Q.   Okay.  So Lamorak doesn't consider
10  the fact that the policies were issued to a
11  broker in Chicago important for the choice of
12  law -- its choice of you law contention?
13           MR. SCHULZE: Objection.
14      Foundation.  And the same objection for
15      seeking Lamorak's legal analysis.
16           MR. DUNNE: Sure.
17  BY MR. DUNNE:
18      Q.    It's not something -- it's not
19  one of the facts Lamorak is considering right
20  now.  Is that a fair statement?
21           MR. SCHULZE:  Same objection.
22      Q.   One way or another, you just
23  haven't considered it?
24      A.   That is not a factor in Lamorak's
25  assessments -- or the factual assessments

NATIONAL SURETY vs LAMORAK INSURANCE
James Gardner on May 23, 2018  30(b)(6), Confidential

Job 28171
Pages 98..101

Page 98

1  that go into Lamorak's determination of Ohio
2  law.
3      Q.  And same answer for the fact that,
4  in 1994 through 2000, Resinoid was an
5  Illinois corporation with its corporate and
6  registered office in Skokie, Illinois?
7      MR. SCHULZE:  Objection. Form.
8      Foundation.  And the same prior
9      objection with respect to question
10     seeking Lamorak's legal analysis of the
11     choice of law issue.
12         Go ahead.  You can answer, if you
13     can.
14     A.  Again, I was asked to testify as
15  to what facts support Lamorak's contention of
16  Ohio -- the application of how law, which,
17  again, were -- we have a Plaintiff, resident
18  of Ohio, a Complaint was filed in Ohio,
19  Kirkwood Industries was located in Ohio, and
20  the policies were issued to Resinoid in Ohio.
21  BY MR. DUNNE:
22     Q.  Well, I mean, we've established
23  that Lamorak believes they were sent to an
24  address that's on the policies, in Ohio?
25     A.  I mean the policy says what it

Page 99

1  says.  Correct.
2      Q.  So I'm going to show you just --
3  let me ask you this.  Do you remember what
4  the address on the National Surety policies
5  is?
6      A.  Do I specifically recall?  No.
7      Q.  So I'm going to show you what's
8  previously been marked Harris 19, which I'll
9  tell you, and your counsel can tell
10 otherwise, is the National Surety policy from
11 '99 for 2000, August 1 inception date.
12         Do you see that the address on
13 that document?
14     A.  Which address?
15     Q.  The Resinoid address.
16     A.  Yeah.  I see the address.
17     Q.  And I'm going show you what's been
18 marked as Harris 20, same address.
19     A.  Which address?  The address at the
20 top?
21     Q.  Yes, the Resinoid address.  It was
22 sent to --
23     A.  Resinoid Engineering P.O. Box
24 2264, Newark, Ohio.
25     Q.  Right.  Same address?

Page 100

1      A.  Yes.
2      Q.  Okay.  The letter was sent in May;
3  right?
4      A.  Fireman's Funds letter?
5      Q.  Yeah.
6      A.  Yeah, that's correct.
7      Q.  That's before the effective date
8  of that policy; correct?
9      A.  The inception date on this policy
10 is 8/1/99  So yes, the letter would have been
11 before this policy.
12     Q.  Okay.  Now I'll direct to you the
13 last page of the letter.  Okay?  And it
14 says -- shows that that letter sent to that
15 address in May of '99 was returned as an
16 undeliverable?
17     MR. SCHULZE:  Objection to form
18     and foundation.
19     A.  I don't see that it was returned
20 as undeliver --
21     Q.  Right there.
22     A.  Oh.  Okay.  Yeah, I mean, it says
23 forwarding time, some shortened
24 abbreviations.  Yeah, there's a stamp there.
25     Q.  And it shows a Hebron address not

Page 101

1  a Newark address?
2      A.  Correct.  Hebron, Ohio.
3      MR. DUNNE:  Okay.  All right.
4      That's all I have.
5      THE REPORTER:  This is also
6      confidential?
7      MR. DUNNE:  Yes.
8      MR. SCHULZE:  Oh, Absolutely.
9      THE REPORTER:  Pursuant to the
10     protective order?
11     MR. SCHULZE:  Pursuant to the
12     protective.  We'll reserve.
13     Confidential pursuant to protective
14     order.  Parties agreeing on
15     stipulations.
16 (Deposition concluded at 4:31 p.m.)

NATIONAL SURETY vs LAMORAK INSURANCE
James Gardner on May 23, 2018  30(b)(6), Confidential

Job 28171
Pages 102..104

Page 102

```
 1   COMMONWEALTH OF MASSACHUSETTS
 2   SUFFOLK, SS.
 3
 4        I, Sandra A. Deschaine, Registered
     Professional Reporter and Notary Public
 5   within and for the Commonwealth of
     Massachusetts at large, do hereby certify
 6   that the deposition of James M. Gardner, in
     the matter of National Surety Corporation,
 7   vs. Lamorak Insurance Company, at the offices
     Hinshaw & Culbertson, LLP, 28 State Street,
 8   Boston, Massachusetts, on May 23, 2018, taken
     and transcribed by me; that the witness
 9   provided satisfactory evidence of
     identification as prescribed by Executive
10   Order 455 (03-13) issued by the Governor of
     the Commonwealth of Massachusetts; that the
11   transcript produced by me is a true record of
     the proceedings to the best of my ability;
12   that the witness is reading and signing; that
     I am neither counsel for, related to, nor
13   employed by any of the parties to the action
     in which this deposition was taken, and
14   further that I am not a relative or employee
     of any attorney or counsel employed by the
15   parties thereto, nor financially or otherwise
     interested in the outcome of the action, on
16   this 12th day of June 2018.
17
18
19
20   _____
     Sandra A. Deschaine
21
     Registered Professional Reporter
22
23
     My Commission Expires:
24   July 5, 2024
25
```

Page 103

```
 1               SIGNATURE PAGE
 2   NATIONAL SURETY CORPORATION VS. LAMORAK
 3              INSURANCE COMPANY
 4      JAMES M. GARDNER - MAY 23, 2018
 5
 6     I, the undersigned, declare under penalty
 7   of perjury that I have read the foregoing
 8   transcript, and I have made any corrections,
 9   additions or deletions that I was desirous
10   of making; that the foregoing is a true and
11   correct transcript of my testimony contained
12   therein.
13
14      Executed this_____day of
15      _____,
16
17   at_____, _____.
18        (CITY)          (STATE)
19
20   ---------------------------
21        JAMES M. GARDNER
22
23
24
25
```

Page 104

```
 1               ERRATA SHEET
 2   NATIONAL SURETY CORPORATION VS. LAMORAK
 3              INSURANCE COMPANY
 4      JAMES M. GARDNER - MAY 23, 2018
 5   Page| Line| Change/Correction
 6   ___|____|_____
 7   ___|____|_____
 8   ___|____|_____
 9   ___|____|_____
10   ___|____|_____
11   ___|____|_____
12   ___|____|_____
13   ___|____|_____
14   ___|____|_____
15   ___|____|_____
16   ___|____|_____
17   ___|____|_____
18   ___|____|_____
19   ___|____|_____
20   ___|____|_____
21   ___|____|_____
22   ___|____|_____
23   ___|____|_____
24   ___|____|_____
25
```



NATIONAL SURETY vs LAMORAK INSURANCE
James Gardner on May 23, 2018  30(b)(6), Confidential

Job 28171
Index: after..authority

**after** 23:15 65:18

**again** 9:21 16:9 46:17 48:6 49:23 50:4 51:3 57:2 62:16 77:2 78:15 80:17 86:9 90:23 95:24 96:16,18 97:4 98:14,17

**against** 9:17 37:21 87:21 90:10 91:3

**ago** 7:5 56:5

**agree** 55:7 62:9 63:6,16 65:15 66:22 70:7 82:24

**agreed** 56:3,9 71:8 76:8 77:12 78:24 79:1 84:17,22

**agreed-upon** 33:12

**agreeing** 78:21 101:14

**agreement** 44:11,15 65:9 73:7 74:19, 22 75:4,21 76:19 77:18,19 78:9

**agreements** 32:11,13

**agrees** 79:15

**ahead** 8:25 37:4 60:9 92:9 98:12

**allegation** 38:21 48:15

**allegations** 36:19,24 62:14,18 67:5 92:15

**Allianz** 23:7 57:17 58:21 68:6 76:22 77:7,20 78:2,20 79:15

**Allianz's** 58:3 59:9 78:7

**allocation** 30:22 31:8 72:13 73:11,17, 20,22,24

**allow** 90:14

**already** 16:23 79:7

**also** 8:3 9:14 20:9 43:16 74:15 86:9 92:17 101:5

**although** 11:21

**always** 86:11

**Amended** 36:5

**among** 8:19 87:2

**amount** 90:16

**analysis** 46:4 78:13 95:19 96:17,23 97:2,15 98:10

**analyzed** 20:15

**analyzing** 95:5

**and/or** 17:12,13

**another** 33:9 57:22 59:3 66:13 87:12 97:22

**answer** 5:19 6:2,8 19:16 36:4 37:3,7, 10,24 38:13,21 52:17 57:10 58:16 59:23 78:14 81:1 93:13 98:3,12

**answered** 82:7

**answering** 8:21

**answers** 5:18 36:19

**any** 5:23 15:18 16:13,15,16,19,22 17:16,23 19:3,18 20:24 21:6 22:24 24:1,10 25:8,23 26:17 27:23 28:16,24 30:2,9,15 31:12 32:21 33:5,14,18 35:12,17 36:18,23 37:9 39:11 41:21 43:11,15 47:16 48:7,20 49:1,8,12 50:10,17,18 51:6,9,10,11,12 52:6,10, 11,18,19 58:6 59:12 64:2 76:4,11,17, 18 81:22 85:18 86:15,20 87:24 92:19 93:1,9,11

**anybody** 8:5 9:20 18:21 19:9 21:3,7 22:1,17 25:19 60:21

**anyone** 24:10

**anything** 12:20 18:12 35:17,18 39:16 82:13

**anyway** 93:23

**anywhere** 79:14

**apologize** 24:6 65:23 94:16

**apology** 86:19

**apparently** 71:13

**appears** 75:10

**applicability** 97:5

**applicable** 21:4,8,11,12,16 23:8

**application** 20:17 96:19 98:16

**applied** 22:13 24:1 26:2 47:15 48:7

**applies** 27:5,8,13 28:6 80:14 91:17, 19 92:7 94:18 95:16,23

**apply** 14:13 21:19

**applying** 29:3 47:20 48:4

**appointed** 83:4,7

**approaches** 40:15 41:21 43:12

**appropriate** 75:18

**approximately** 13:7 34:17 72:1 88:16

**April** 34:5,10

**are** 6:9,15 7:22 9:22 10:18 12:5 13:17,

23 14:3 15:4,5 17:20 18:13,15 27:9,10 28:20 32:10,17 39:10,24 40:14,24 41:11 42:16 43:13 44:20 47:3,23 48:25 49:7,22 51:9,11 58:13 59:20 60:4 63:6,11,24 64:1,17 65:12 67:8 68:5 70:4,13 72:10 73:12 78:10 81:21 82:12 85:19 86:10 95:3,4,6

**areas** 9:17

**argue** 76:17

**argument** 58:12 59:20 76:25 89:16

**around** 12:17 24:4 31:5 65:14 74:10 88:14

**asbestos** 9:12,13 11:11,14 18:8 29:12 31:18 39:4,8,10 40:15,20 41:15, 18 47:21 49:13 50:3,8,20 51:7,13 52:7,13 57:19 58:24 64:3 85:4,10,11 86:1,25 87:22 92:16

**asbestos-containing** 46:7 48:22 49:10 67:13

**ask** 6:2,4 36:7 38:2 44:4,9 46:5 48:14, 18 51:14 99:3

**asked** 32:15 81:18 82:6 98:14

**asking** 6:16 26:17 27:9,10 28:20 42:19 45:14,18 47:3,23 48:25 49:7 51:9,11 60:4,21,25 61:17 64:1,17 70:13 73:12 80:21 85:19

**aspect** 29:17

**assess** 14:3 18:9 90:15,19,24,25

**assessment** 21:19,21,24

**assessments** 29:20 97:25

**assigned** 12:16 15:22

**assume** 6:7 48:18 49:25 50:6

**assuming** 74:14

**attached** 38:4

**attention** 37:22

**attorney** 86:5

**attorney-client** 26:18 93:11

**attorneys** 85:7 86:5

**audible** 5:18

**audibly** 5:19

**August** 99:11

**authority** 9:16 10:5,6,16,24 11:1,5, 18,20,25 12:2 61:5 88:23

authorize 75:21

Automated 34:18

available 7:18

aware 17:20 45:19 49:1,8,12,13
50:10,16 51:5 52:10,18,19 68:6,10
72:24 73:10 81:22 82:12 86:15 87:2,
25

away 54:10

**B**

b2 44:21

back 23:2 33:25 49:20 50:14,25 52:4
53:16 58:9,16 59:16 60:14 66:4,5
91:12

background 32:16 35:3

bankrupt 90:9

bankruptcy 90:5,6,8,11

barred 54:5

base 62:10

based 20:18 21:22 30:24 39:24 46:11
47:24 54:16 62:14,18 80:8

bases 66:20 73:16 89:7

basically 29:1

basis 21:23 27:11 40:9 57:15 58:19
66:23 92:6

Bates 44:1,9 68:12,22 71:9

became 88:1,4

because 6:6 55:10 69:7,13

become 12:14

been 5:2,13 6:25 17:23,25 18:1,5 20:1
23:5,12 24:15 25:3,4 30:1 34:4 35:10
57:14 58:18 61:9 63:1 70:3 71:12 77:4
83:15 88:13 91:6,15 94:3 99:8,17
100:10

before 5:13 7:3 15:19 25:16,17 36:9,
11,15 43:21,22 51:21 68:16,18 71:25
74:25 87:13 100:7,11

begin 61:23

beginning 55:20 69:4

begins 80:1

behalf 8:21 9:8,11 38:24 57:17 58:22
75:8 85:14

being 7:6,12 9:22 23:2,5 91:9

belief 23:25

believe 10:15,25 11:7,20 13:3,9
14:19,24 17:22 19:13,15 20:8,9,13
21:17 22:12 23:6 24:4,15 25:2,25
26:6,7 27:16 29:9,15,19,20 30:1,4,5,
18 31:5,14 33:8 35:10 40:25 41:23
42:2 43:13,18,22 46:1 47:18 51:22,23
52:2,14 57:23 58:4 59:5,11 61:8
65:13,16 66:16 70:8 71:3,22 72:16
73:1 74:2,8 75:12,17 77:11,16 79:1
83:2,15 84:17,21 86:20 87:4,10,14
88:9,19 89:4,15,22 90:4 92:2 94:6,14,
20,24,25 95:2,4 96:10

believes 27:7 54:11 98:23

below 80:5

between 8:17 9:5 14:21 15:5,10 16:8
17:17 23:2 43:8 48:22 49:11 51:8
52:7,13 75:4 88:15

big 49:23

bit 33:23 42:5

Bob 11:17,24

bodily 44:22 45:2,21 46:6,13,19 47:1,
4,9,11 48:19 58:11 59:18 63:23,25
64:5 69:7,13 70:5

body 45:1,8

book 85:10,11

books 85:8

borne 32:9

both 6:9 25:5 55:7

Box 99:23

break 5:24,25 6:3 38:7 66:1 81:10
91:7,9

briefed 18:24

briefly 12:3 18:23 33:23 35:2 36:7
68:23

broker 27:21 95:10 96:7,25 97:11

Bud 19:2

Budlong 10:23 18:25

business 34:18 85:8,10,11

**C**

call 32:24 37:22 86:7

called 31:13 39:16 40:25 41:24 43:17,
19 57:14 58:18 78:16 86:1 87:10,14

calling 96:16

calls 78:12 93:9

came 19:14

can 7:8 8:16,25 9:1 12:3 14:16 20:12
22:6 24:7 33:9,23 35:2 37:3,22 38:2
39:19 40:21,23 41:2 46:16 49:2 50:4,
22,25 53:15,16 55:5,7,18 58:15 63:6
65:25 66:4 68:23 75:2 77:2 78:14 79:4
81:10 89:13,25 91:7,9 93:12 94:15
98:12,13 99:9

can't 5:21 42:7 43:14 63:12 70:17

capacity 6:10,11 8:14

Carol 8:7,9,10,12

carrier 30:8 32:9 33:12 41:9 57:18
58:23

carrier's 30:24

carriers 30:17 31:9 41:9 65:15 84:17,
22 86:10,12 89:23 90:14

carriers' 88:22

case 6:18 10:9,11 12:11,15 17:21
22:14 29:25 32:22,25 40:1 43:20,21,
23 54:14 60:16 61:11 67:8,17 70:17,
25 80:15 82:5,16 93:25 95:4

cases 31:19 85:6 86:25

cause 69:15

causes 89:15

certain 9:12,14,15 14:12 54:25 78:17,
18 86:3 89:22 90:10

certainly 26:22

chance 38:19,20 91:6

change 59:23 67:15

changed 70:22

characterization 39:6

check 86:8

Chicago 95:10 96:25 97:11

choice 24:11 25:11,20 26:14 27:2,4
28:15 96:14 97:3,11,12 98:11

Chris 11:3,16,17 88:9,10

Christian 66:11 68:21 70:22

NATIONAL SURETY vs LAMORAK INSURANCE
James Gardner on May 23, 2018  30(b)(6), Confidential

Job 28171
Index: Christianson..coverage

**Christianson** 66:10,11,15 67:14,22 68:9,11 70:24 71:6 77:10,15

**Ciakajlo** 77:21

**Ciokajlo** 10:19,22 11:13,23 12:11,15, 20 13:4 21:13 22:1,3,23 24:13,23 29:16,17 30:10,12 33:11 37:18 48:21 49:5,9 50:11,18 51:5 52:5 53:13,22 54:14 55:9,16 56:10 57:24 58:4,6,10 59:6,10,13,17 62:23 65:7,11 71:20 72:13 73:4 75:6,7 76:9,23 77:8 78:3, 22 80:8 82:3,16 83:17 84:2,6,10 89:18,24 92:13,14 94:23

**Ciokajlo's** 51:16

**Ciokajlo-resinoid** 10:9 16:1

**circumstances** 67:11

**claim** 11:8 12:25 13:4 20:8,11 21:2 22:18,20,23 23:1 28:16,20 29:16,18, 21,24 30:7,10,12 33:11,17 37:18 39:8, 25 40:1,5,10 47:21,24 48:8 49:5 54:23 56:25 57:22,25 58:4,10 59:3,6,10,17 61:24 62:1,2,7,11 63:19 64:2,3 65:7, 12 66:10,11,14,15,22 67:16 68:2,9,11 70:11 71:7,19,20 73:4,17,18 75:6 77:7,21 78:19,22 79:3 82:3 83:9,18 84:2,7,11 85:23 86:3,21 89:24 90:20 91:1 92:13

**claim-by-claim** 66:20,23

**claims** 9:10,12,13,14,15,17,21 11:11 12:8 13:18,21,25 14:1,3,5,13 18:3,8, 10,13 19:14,21,22,24 20:15,18 23:6, 10 39:10 40:16,20 47:16 54:5 57:19 58:24 61:10,16 80:19 83:8,10 87:21, 22 90:10

**classes** 35:21

**Clayton** 10:23 18:24

**clear** 6:5,6,15 27:10 42:15

**client's** 40:11

**close** 91:8

**college** 35:5

**come** 32:1 81:15

**comes** 45:8,12 66:5 82:22

**communications** 26:18 93:12

**companies** 16:14

**company** 6:22 34:18 37:21

**Company's** 36:3 69:5

**complaint** 19:16,17 36:5,25 37:20 48:12 62:15,19 95:1,25 98:18

**complete** 67:22

**concede** 76:3

**conceding** 76:10

**concept** 39:16 53:5

**concerning** 17:16 18:18 20:12 21:3,8 22:25 24:12 51:16

**concluded** 101:16

**conclusions** 78:13

**conclusively** 62:24

**condition** 50:2,7,19 51:7

**conditions** 52:6,12

**conduct** 82:2 89:14

**confidential** 55:25 56:1 101:6,13

**confirm** 22:1

**confirmed** 23:24 60:15

**conflicts** 86:8

**confused** 15:17

**Congratulations** 36:1

**consider** 64:11 95:8,14 96:22,23 97:9

**consideration** 95:16

**considered** 48:4 97:23

**considering** 97:19

**consultation** 14:4

**contact** 9:20 86:18

**contained** 48:16 71:5

**contend** 78:4,5 80:22 92:6

**contends** 56:25 81:7

**contention** 53:10,19 54:18,19 56:21 64:23 66:9 80:13 88:25 96:6 97:12 98:15

**context** 43:20

**continuous** 41:1,5,22 43:6,10

**contradicted** 73:13

**contradicts** 77:17

**contributed** 55:15 56:18 72:18 76:23

**contribution** 76:9

**control** 74:1 82:23 89:1

**controlled** 72:12 89:9

**controls** 73:25 82:13,20

**conversation** 23:20 26:9

**conversations** 21:6 23:22 24:14 25:24

**coordinating** 29:11 87:5 88:17,18

**copy** 65:24

**core** 18:15

**corporate** 6:10 98:5

**corporation** 98:5

**correct** 8:11 10:17 11:15 13:6,19,22 15:24 16:2,6 17:5,19 18:11 19:8 20:3 22:11,15 23:18 24:19 27:22,24 28:7 29:4,7 31:11 34:21,24 40:6,12 47:6 55:14,17 56:12,13,19 57:8,11 60:17, 20 61:19 62:8,12,20,21 63:9,13,15 64:25 65:2,10 66:12 67:6,8,9 71:14 72:6 73:7,8 74:8 79:19,22 74:17 79:13 81:3 82:5,11 84:4 86:23 87:3,7,18 88:24 89:11 90:17,18 91:21 94:20,21 99:1 100:6,8 101:2

**correctly** 10:25 11:7 20:16

**correctness** 76:4,11

**correspondence** 20:10,20,25 29:6

**corresponding** 21:2

**cost** 30:8,11,16,23 31:3,4,6,8,13,21 32:1,6,17,24,25 33:10 57:19,24,25 58:24 59:5,7 64:24 65:1,3,4,6,8,12,15, 19,20,22 66:9 71:7 72:2,9,12,22,23,25 73:3 77:9,12,13,17,21,23 78:1,6,20,21 79:2 82:4,10

**could** 5:9 20:22 43:7 46:3 47:10,12 52:21 59:25 64:13,17,18,21 86:18 89:1

**counsel** 5:15 8:2,6,11,13,14 14:4 19:13 29:12 37:5,13 54:22 80:18,19 82:14,23 83:5,7,11,14,17 84:1,6,10,18 85:14,18,20 87:5,16,24 88:2,5,17,18 93:5,11,15,16,18,20,24 94:4 99:9

**counsel's** 97:7

**course** 35:18

**coverage** 14:2,6,11 15:12,13,23,25 16:8,16,19 18:9,10 21:12 22:14,23 23:17 24:2 25:11,17 38:25 39:13 40:3, 11 41:6 43:8 46:4 61:23 76:4,11,12,18

NATIONAL SURETY vs LAMORAK INSURANCE
James Gardner on May 23, 2018 30(b)(6), Confidential

Job 28171
Index: covered..duty

93:24

covered 14:3,4 56:11

Cozza 83:17,19 84:9,15,16,18

crazy 36:2

created 49:10

current 10:6 41:7

currently 80:9

**D**

damage 44:22

damages 69:7,13

Dardis 11:3 88:9,10

Darryl 68:21

date 41:5,10 71:15 99:11 100:7,9

dated 44:8 68:20 71:15,16

days 54:10

dealt 44:14 66:19,23

December 61:9 65:14

decide 62:10,13,17

decided 70:16 75:20

decision 62:25 63:11

defend 61:24 82:22 85:4,7 86:25

defended 89:24

defending 57:18 58:23 62:3

defense 30:14,20,21 32:6,25 52:25
54:2 55:1,3,9 56:24 61:12 62:13,17
65:2,4 67:4 70:24 80:14,23 82:2,13,23
83:5,7,25 85:4,12,14,18,20 89:18,20
90:12 93:5,15,17,20

defenses 36:4 52:22 76:18 81:5,7,23

defensive 81:6

definition 45:1,21 46:19

demonstrating 89:8

denial 67:23 68:3

denied 48:15

dep 18:19 25:6

depend 10:1 15:16 61:20,21 62:5,6

dependent 86:9

depends 9:24 11:8 15:7 41:12,13

Deponent 5:1

deposed 5:13

deposition 6:21 8:1,3,20 18:22 19:1,
12,15 26:11,20 28:19 36:13,16 51:16
55:23 81:15 101:16

depositions 5:17

derived 45:16,20

describe 12:4 14:16 41:2

detailed 26:9

details 25:23

determination 61:13,18 63:12 64:13,
18 95:22 97:7 98:1

determine 40:2 61:22 63:23 64:5
85:16,17,20 90:20

determined 61:25 75:17

determines 82:13

determining 63:7

diagnosed 51:21 52:1,2,15

Dick 86:13,24

Dickie 83:22,24 84:3,9,24

did 6:16 7:25 11:24 12:1,14 15:13,18
16:7,15,21 17:1,2,15 18:21 19:2,5,11,
18,20 22:1 25:5,7,9,18 26:4 34:9 35:5,
6,7,13,15,17,23 36:23 37:9,14,15 52:5
55:21 57:6,25 58:3,6 59:7,9,13 69:10
72:7 73:4,18,24,25 75:15 78:1 84:12,
14,15 93:17 94:10,11,12 95:8,13

didn't 16:18 51:19 55:10 67:20 93:18,
19 96:22

difference 34:7

different 25:3 34:7,8 40:5,14,25 43:5
46:15 47:12 51:14 65:20,22 67:8
86:22

direct 12:7 13:17,21,25 18:13 75:13,
14 79:20 100:12

directed 90:1,4

directing 82:2 89:17,20

directly 93:10

disagreed 74:4

disagrees 74:15

discovering 95:3

discovery 13:3 54:11 60:19

discuss 8:3 35:2

discussed 20:14 23:5 26:7 29:14
37:5 81:6

discusses 29:2

discussing 22:16 29:15,19

discussion 20:17 23:15 43:25 50:13

discussions 22:25 24:5,10

disease 42:9 45:2,9 46:20 63:23,25
64:6 69:8,14 70:6

divulge 26:17

doctrines 54:6

document 7:2 28:14 31:12,15 32:22
36:8,16 37:25 44:12 54:22 67:24
68:20 74:21,24 75:3,16,19 76:14,20
78:15 80:17,20 99:13

documents 8:4 19:11,14 33:19 36:12
95:5

dollars 10:3 11:9 60:22 61:1,3

down 5:18,21 13:16 24:9 44:18 46:3
76:16 81:11

Drexel 35:9

driver's 5:3

duly 5:4

DUNNE 5:8 6:24 8:23 9:2,3,25 26:24
30:15,19 36:22 37:2,8,12 38:4,9,12,17
42:18,23 43:4,24 44:3 45:13,24 47:19
49:3 50:14,15 51:2,4 53:16,25 55:25
56:3,7,8 57:4 58:15 59:22 63:5 64:12
65:25 66:4,6 67:1,3 68:14,15 74:20,23
77:3 79:22,23 80:16 81:10,20 82:6,8,
17,21 83:10,13 91:8,12,13 92:11
93:14,19 94:1,2 95:11,20 96:21 97:8,
16,17 98:21 101:3,7

Dunne's 26:16

during 8:6 12:11 21:25 25:18 43:1
44:23 49:14 50:20 51:7 52:20 64:6
69:9,15 70:6 95:15

duties 12:4 13:23 18:13 40:9

duty 82:22

## E

eagerness 29:21

earlier 33:23 38:23 66:18 72:19 73:15 80:25

easier 49:4

Ed 29:10,19 87:7

educational 32:15 35:3

effect 27:17

effective 100:7

elements 64:11,14,15

else 8:5 18:12,21 19:9 24:11 39:8 47:9

email 20:9 29:6,9,13,22,23 30:4,6 31:5 33:4,9 71:12 73:13 74:3 78:6,24

emails 30:2 33:5,14,16

emanating 47:21

employee 9:6

encourage 89:21

end 17:8 41:10

Engineering 12:17 27:18 91:24 92:5 96:4 99:23

Engineering's 29:11

ensued 23:15

entail 16:25 17:7

entire 12:11 88:20

entirely 11:21

entities 17:12,13 90:9

entitled 74:21

entity 60:5

equaling 46:19

equals 50:1,6

essence 28:25 51:19

establish 40:10

established 71:17 77:22 98:22

estoppel 81:2,25

evaluation 15:13

ever 5:12 22:16 26:4 27:19 31:14 39:15 44:4 47:15,20,21 48:4 70:10,13 74:24 93:1,5 94:3

every 40:5 48:15 63:18 81:16

evidence 49:1 92:19

exact 44:16

exactly 27:15 50:25 76:15

exam 42:6

examination 5:7 7:9

examined 5:5

example 41:17

exception 5:25

exclusion 41:15,19

excuse 8:12 11:5 24:3 73:3 74:3,9 85:23

executed 78:9

exhibit 6:21 7:1 28:13 36:3 38:3 44:1 48:12 49:21 68:12 71:9,12 74:18

exist 16:23

experience 32:10 61:10 62:25 85:22

explain 8:16 39:19

explaining 26:5

exposed 48:21 49:9,13

exposure 41:6,18 42:3 46:7,12,14 47:1,5 48:19 50:3,8 51:13 52:13 58:11 59:18,25 90:20,25 92:16 94:24 96:2

extent 8:20 14:2 26:20 93:9 95:18 96:16

## F

face 92:3

fact 18:25 22:2 48:16 63:19 70:19 76:22,24 78:5 79:17 81:17 84:14 89:8 94:17 95:3,8 96:24 97:10 98:3

factor 94:17 96:23 97:24

factors 77:5 92:10,12 94:12,22 95:22 97:3

facts 27:23 39:25 40:2 48:20 49:8 50:10,17 52:10,18,20 54:16 58:10 59:17 62:6,7,11,22 63:6,10,24,25 64:2,14,22 66:7 67:8,21 68:2 73:16 77:6 78:17,18,19 80:9,19,22,24 81:6, 13,18,19,22 89:7 95:6 97:5,19 98:15

factual 27:10,11 37:9,15,17 57:14 58:19 97:25

fair 14:14 15:6 39:1,5 46:20 77:10 81:3,14 97:20

familiar 32:17 42:10,11 44:20

February 25:4 74:9,10

feels 42:5

FFIC 80:9

file 17:25 18:2 19:15,21,24 20:8,11 22:10 23:2 28:16,21 33:17 80:19

filed 37:20 87:21 92:13 95:2,25 98:18

files 54:23

final 31:8

finalizing 31:6

find 79:4

Fireman 69:5

Fireman's 21:18 23:7,16 24:21 72:8, 17 73:4 74:4 100:4

firm 86:24 87:8,10,12,14

firms 85:4 87:2

first 5:2 23:4 34:22 36:4 41:6,17 54:8, 17,21 58:5 59:11,24 61:8 68:24 69:1,3 75:25 83:6 94:17

flow 55:21

follows 5:5

forgot 13:11

form 9:23 22:5 27:25 32:3 36:21 38:5 45:10 47:17 48:24 53:14 54:20 57:1 60:3 61:15 63:2 64:8 71:1 77:1,25 78:11 79:19 80:16 81:8 83:1 89:3 93:23 96:9 98:7 100:17

formal 31:12,15 65:9 73:6 82:10

formalized 32:11,13

forms 32:2,5

forth 7:14 37:10 45:20 46:14 80:5 81:5

forwarding 100:23

found 46:2

foundation 37:1 45:23 64:9 95:12 97:14 98:8 100:18

fourth 52:25 54:2 69:4 81:5

frame 25:18 89:18

full 9:16 69:1

functions 18:16

fund 21:18 23:16 72:8,17 75:6 78:3

Fund's 69:5

funded 71:6

funding 73:2,4 74:18,22

Funds 24:21 100:4

future 30:9

### G

gaps 43:8

Gardner 5:1,11,12 7:1 42:16

Gardner's 42:22

gave 53:11,20 56:22

general 8:24 14:20,22,25 53:4,6

generally 8:3 18:24 26:6,7 51:24
62:15,18 67:1,2 85:19

gig 88:6

give 53:8 89:25

given 64:2 81:18 85:18 86:20

God 34:25

graduate 35:7,15

graduated 35:9,14

Griffin 8:8,9,10,12 18:20

Grunts 5:20

guess 21:18

### H

Hall 20:21

handle 9:10,12,14

handled 9:22 13:4 23:2 31:16,18 49:5
70:10

handler 20:15 23:7 61:11,17

handler's 23:11

handlers 29:24

handling 12:11 21:2,25

happened 64:6

happening 19:7

Harris 23:13,23 24:10 25:22 29:10
30:6 33:4,10 55:22 65:13 72:22 73:10,
12,17,25 78:5,24 89:1,9 90:1 99:8,18

Harris's 82:1 89:14

hazard 9:15

hazardous 9:14

he 11:1,8,20 26:4,6 49:13 51:9,11,19,
20,21,22,23,25 52:2,6,11,15 72:24
75:12,17,20 83:21 84:13 87:20,25
88:1,3,5,7,11,19,21 89:17,21,22 90:4

he's 51:24 75:23 81:18 87:8,16,23

head 5:21 43:14

health 9:15

healthy 51:20,24

heard 27:19,22 43:16,19,21,22 50:24

Hebron 100:25 101:2

help 34:25

Herbst's 38:3

here 5:22 6:9 7:6,12,22 11:22 28:25
46:14 48:9 54:22 57:14 58:18 68:5
69:18 70:9,18 72:3,10 73:9,14 79:14,
16 81:21 90:4

him 11:2,4 19:6 26:5,9 52:8 79:20
84:22 93:7

hire 84:14 85:3,12

hired 88:7,21

hires 85:17

his 5:3 10:24 11:5,18 51:12,16

history 33:24 34:2

honest 42:7

horse 51:20

### I

identification 6:23 36:6 44:2 68:13
71:10 74:19

identified 5:2

ill-health 50:1,7,19 51:6,12 52:6,12

Illinois 24:1 26:2 27:5,7,13,18,21 28:6
47:22,24 96:8 98:5,6

imagine 47:11

impact 14:1 90:12 96:5

impacted 67:16

important 63:7 96:12 97:11

in-house 8:11

in-person 8:13

inception 99:11 100:9

include 17:11

included 73:13

incomplete 67:13

incorporated 96:13

incorrect 89:10

indemnification 66:25

indemnified 57:21 59:2

indemnifying 58:13 59:21

indemnity 30:14 53:13,21 54:13 55:9
57:7,24 59:6 60:22,25 61:3,14,18
62:1,10,23,25 63:7,11,12,19 64:4,19
65:5,7,16 66:19 67:7 70:12,15,16,24
77:8,13,17 78:8,21,22,25 79:3,15,18
80:6

indicate 5:24 27:24 48:20 49:8 50:11,
17 52:11

indicated 17:15 48:6 74:2 78:2

indicates 92:25

individual 6:10

Industries 94:25 96:1 98:19

inform 85:25 86:2

informal 32:25

information 7:17 16:22 17:10,16,21,
24 18:3,4,6 19:3,17,22 20:5 28:17
36:20,24 37:10,15 54:23 93:10

initiated 17:4 39:24

injury 42:6 44:22 45:2,8,21 46:6,13,
20 47:1,4,10,11 48:19 58:11 59:19
63:23,25 64:5 69:7,13 70:5

Injury,' 45:1

instance 41:14

insurance 6:22 8:15 9:9,13 14:12
21:12 34:2,20,22 35:1,19 36:3 37:21
69:5 85:5

**insured** 14:17 47:22 85:15 91:3 92:15 94:12,13 96:13

**insured's** 17:11 47:24

**insureds** 34:7 85:14 87:24

**insurer** 17:17 44:11 76:17 91:1 95:24

**insurers** 34:7,8 76:3

**insuring** 44:15

**Interim** 74:18,21

**interpretation** 24:12 26:3 47:8

**interrupt** 55:19

**investigate** 15:13 16:7,10 38:25

**investigation** 11:11 14:7,9 39:13

**involved** 10:8,19,21 12:14 29:24 37:6

**involvement** 15:18

**involves** 17:9

**involving** 33:5 85:5

**issue** 22:17 23:5 24:12 25:11,20 26:14 39:22 40:7 58:3 59:9 98:11

**issued** 14:19,23 15:9 16:7,10,11,13 23:7 24:21 25:2 27:21 41:8 60:12 68:7,10 70:14,20 74:8 91:23,25 94:19 95:9 96:4,7,25 97:10 98:20

**issues** 20:14 21:12 22:14 23:17 24:2

**issuing** 22:23

**items** 7:13,21,23

## J

**James** 5:1,11

**Jason** 8:7

**job** 34:23 35:1,19

**Joey** 83:16 84:8,12

**jog** 48:3

**July** 68:20

**jump** 66:5

**June** 12:18,19,25 13:2,20 15:19 25:18 35:11 60:15

**jurisdiction** 85:18 86:4,22

## K

**kind** 32:21 36:2

**Kirkwood** 94:25 96:1 98:19

**Kirkwood's** 92:17

**knew** 67:10

**know** 5:24 6:6 10:11 11:6,19 13:14 15:11 16:10 31:6,7 38:18 42:4,13 43:6 44:16 45:25 47:9 63:14,19 64:21 65:21 72:21 75:16 77:23 81:14 83:4,6 86:9 87:8,13,23 88:1,3 92:24 95:3,4,6

**Knowing** 64:20

**knowledge** 67:11

**known** 7:18 16:23 58:9 59:16 62:24 63:11 80:9

## L

**laches** 81:1,25

**Lamorak** 6:11,21 7:18 8:15,17,22 9:5, 9,11,13,17,20,21 14:18,24 16:13,17 17:17,20 27:23 34:6,9,11 36:3 37:21 38:25 48:15,19 50:10,16 51:5 52:10 54:11 60:10 72:16 73:16 74:14 75:5,9 76:8 78:5 80:22 81:7 85:11,15 92:19 95:8,14 96:10,12,22 97:9,19 98:23

**Lamorak's** 6:17 7:7,13,16 8:10 28:11 37:23 38:13,21 42:20 49:16,18 53:10, 19 54:18 56:21 57:5 60:5,7 64:23 67:21 68:1 70:22 76:24 80:13 81:23 91:16 95:22 96:5,17 97:2,15,24 98:1, 10,15

**language** 44:11,21 45:3,6,8,16,19 46:2 69:17,20,23 79:21 80:3 83:3

**last** 79:25 100:13

**late** 13:9 71:22

**laundry** 81:16

**law** 20:18 21:4,8,11,16,19,20 22:13 23:9,25 24:1,12 25:11,20 26:2,14 27:2,4,5,8,13 28:6,15 29:2 35:13 39:22 40:8 42:6 91:17,19 92:7 94:18 95:16,23 96:14,20 97:3,5,12 98:2,11, 16

**Lawsuit** 80:7

**lawyers** 85:12 86:18

**leader** 10:22

**learned** 26:12 39:16

**least** 94:19

**led** 22:12

**legal** 78:12 95:18 96:17 97:2,15 98:10

**letter** 23:16 24:22 26:8 44:7 49:21 71:5 74:3,9,13,16 79:5,8,10,11 100:2, 4,10,13,14

**letters** 25:6

**level** 10:2 11:19

**liability** 14:3 18:9 76:3,11 90:17,18, 21 91:2

**license** 5:4 35:22,24

**like** 15:15 32:22 34:1 42:5 44:15 55:21

**likely** 18:5

**limit** 11:10

**line** 69:4

**list** 81:16 86:5,13,15,17

**listed** 72:10

**litigation** 25:12,13,17 27:5

**little** 7:5 33:22

**local** 83:17 84:1,6,10,18 94:4

**locate** 16:21

**located** 57:22 59:4 86:3 92:5,17 95:1 96:1 98:19

**long** 5:22 19:2 56:5

**look** 13:14 19:11 25:5 34:3 38:14,19 44:9 46:5 68:24

**looked** 15:23,25 20:5 56:14

**looking** 7:21 33:6,20 38:13 48:11 54:1 75:25 76:2

**lot** 9:1 47:12

## M

**made** 61:5 63:1 90:10

**mailing** 92:3,24

**Maine** 5:3

**make** 6:14 49:4 50:24 55:22 61:12,13, 17 63:12 64:13,18

NATIONAL SURETY vs LAMORAK INSURANCE
James Gardner on May 23, 2018 30(b)(6), Confidential

Job 28171
Index: makes..occurred

makes 11:11 42:12

making 76:9,18

managed 48:8

Management 34:5

Management's 8:13

manager 12:7 13:17,21,24 18:12

manifestation 42:7

manufacturing 67:12

March 13:10 23:6 25:1,4,18 44:8 49:20 60:2 71:23 74:9,13,16 79:4,5,11

marked 6:22,25 36:5 44:2 68:13 71:10,12 74:19 99:8,18

matter 8:24 10:20 11:14,24 12:21 14:11 16:1 21:13 22:1,4 24:13,23 53:13,22 55:10,16 58:6 59:12 62:23 67:14 72:13 76:23 80:8 82:15,18 87:6

matters 7:8 10:22 29:12 34:6,10,11 39:4 85:5

Matushek 29:10,23 33:4,5 87:7,11, 12,13,15 88:16 89:1,9,14,21 90:2,5 94:4

Matushek's 29:20

maybe 15:17 40:7 48:3 71:18

Mccamey 83:22,24 84:3,10,24 86:24

Mccamion 86:13

Mccarthy 11:17,24 75:11,15

me 6:6 8:11,12,18 11:5 12:4 13:14 19:13 24:3,19 27:9 34:1 38:18 39:19 47:3 48:25 62:9 70:7 73:3 74:3,9 75:2 85:19,24 86:4,21 89:13,25 99:3

mean 9:10 12:22 14:8 15:8,15 16:9,19 18:23 30:14 32:4,8,12 42:4 45:11 46:13,24 47:1,7,10,12 53:4 55:20 61:2,16 71:4 76:13 77:11,19 78:15 81:10,14 82:19 83:2 84:20 85:1 87:19 88:3 89:20 90:3 92:1 93:3,15,18 95:13,21 96:18 98:22,25 100:22

meaning 18:2 90:8

means 45:2 47:4 48:5,19 87:20

meant 93:22,24

meeting 8:6

memorialized 31:24

memory 13:13 48:3

mention 13:12

mentioned 64:24 66:8 87:4

meso 52:1

mesothelioma 51:17,21

met 8:2

methods 40:19

middle 46:6

million 10:15 11:9,21

mind 68:4

misheard 86:19

missing 15:5,8

mistaken 77:4

misunderstood 57:9 93:22

money 56:18,23

month 71:24

more 9:1 19:6 89:23

Moreover 80:1

mouthful 12:9

multiple 41:9

## N

name 5:9 17:11 20:22 23:11 66:16 83:23

names 86:6,22

national 19:18,23 20:2,4,18 21:3,7, 17,20 22:2,9,17 23:25 24:11 25:19 26:1,12 27:1,7,20 28:5,14,17,22,23 29:6,11 33:7,18 37:20 44:8 53:11,19 54:5,12 55:8,10,14,15 56:9,17,21,24 57:6,15,17 58:2,8,20,22 59:8,15,24 60:12 68:7,21 70:20 71:6 75:5 76:8 87:5,16,23 88:1,5,17 91:17,20,22 92:4,21,22 93:1,6 94:4,7 95:9 96:3,6, 24 99:4,10

nationally 87:21

need 5:19,23,25 6:3 63:18 64:4 90:20 91:1

negotiating 16:4

Never 68:3

new 85:23

Newark 99:24 101:1

next 11:2 49:25 50:5 54:15

Nilles 87:11,13,15

Nineteen 38:16

nobody 76:10

nods 5:21

nos 5:20 44:1 68:12 71:9

Notary 5:4

notation 22:9

note 21:15 29:1 55:22

noted 16:3

notes 20:8,12 22:20 28:21,24 33:17

notice 6:21 19:4,16 37:19

noticed 58:4 59:10

notwithstanding 71:4

NSCLM000187 68:12

NSCLM009436 44:1

NSCLM009826 71:9

number 10:14 45:21 76:2

numbers 17:14

## O

object 57:25 59:7 78:11 79:19 81:8 82:25 93:8 95:17 96:15

objection 8:19 9:23 22:5 27:25 30:13 32:3 36:21 37:1,11 38:5 42:14 45:10, 22 47:17 48:24 53:14 54:20 57:1,20 58:5 59:1,12 60:3,8 61:15 63:2 64:8 70:25 71:1 77:1,25 80:16 82:6 89:3 92:8 93:23 95:11 96:9 97:1,13,14,21 98:7,9 100:17

objections 64:16

obligated 43:9

obligations 39:24 43:3

obtain 19:3 35:23 90:5

obtained 93:10

obtaining 35:21

occurred 24:25

NATIONAL SURETY vs LAMORAK INSURANCE
James Gardner on May 23, 2018 30(b)(6), Confidential
Job 28171
Index: occurs..problem

occurs 44:22

off-the-record 43:25 50:13

office 98:6

official 82:4

Ohio 20:17 21:19 22:13 23:25 29:2 57:23 59:4 83:14 86:14 87:1 91:24 92:5,7,14,16,18,21,25 94:11,13,18,20,24 95:1,2,16,23,24,25 96:1,2,4,19,20 98:1,16,18,19,20,24 99:24 101:2

on-the-job 39:12

once 78:2

one 5:25 13:11 15:21 25:3,4 28:9 29:1,7,8 30:3 36:11 38:24 40:25 41:9 47:8 54:7,9 61:8 65:23 66:7 68:16 73:16,25 74:1 75:20,23 77:5 78:17,19 87:15 89:7 94:12 97:19,22

ones 25:3

online 35:20

only 33:8 65:23

operating 30:17

operations 27:18

opinion 60:4 67:15

order 19:3 56:2 101:10,14

other 5:17 9:15 16:22 24:1 28:13,16 30:2,3 31:18 33:5,9,14,18 41:21,22 43:12 66:7 70:4 81:22,23 84:21 86:10,12 87:2,24 88:22 92:10,12 94:22

others 43:15

otherwise 93:12 99:10

our 5:18 8:14 17:9 85:25 86:21

out 59:25

outside 69:14

over 5:16 12:21 13:1,2 17:3 50:16 60:16

oversees 87:20

owe 55:9 61:14

owed 61:18 63:8,20

own 7:19

---
P
---

p.m. 38:11 66:3 91:11 101:16

P.O. 99:23

page 7:9 44:10,25 49:22,23 68:25 69:1 79:24 100:13

paid 53:13,22 54:13 56:17,23 70:12,15 77:8

panel 84:25 85:2

paragraph 37:23 38:15 46:4 48:11,12,16 49:23 68:24 69:1,3 76:2 79:25

part 14:6 15:12 40:9 54:6

participate 73:5

participated 57:18 58:23 70:23

participating 72:9

particular 65:7 76:12 83:9

parties 32:19 71:8 78:9 101:14

pay 14:4 18:10 62:1 64:4 70:16 75:5 78:21,25 79:3,15

payment 67:16,24 68:2 79:17

payments 76:19

pending 6:1 51:1

percent 39:7,9

percentages 31:10

perhaps 39:9

period 12:12 14:25 15:10,14,16 31:1 43:1 44:23 49:14 50:20 51:8 52:20 64:7 70:6 88:20

periods 69:15,16

permanent 17:10

personal 7:19

personally 42:17

peruse 44:10

Pete 83:17 84:9,16

phase 13:3

Pierre 84:16

place 58:7 59:13 69:15 92:16 94:25 96:2

Plaintiff 54:4 66:17 90:7,9 94:23 95:24 98:17

plan 5:22 95:15

plant 92:17

please 5:9,24 6:3,6 41:2 46:3 53:17 58:16

point 15:3 24:21 25:8 87:15

pointed 77:6

polices 95:9

policies 14:7,9,12,19,22,25 15:4,9 16:4,13,16 17:17 20:7,19 21:20 26:3 27:14,20 33:19 41:7,8,11,16 42:25 43:1,8 44:14 55:11 69:9 70:4 74:7 91:18,20,23 92:4,20 93:2,6 96:3,6,7,25 97:6,10 98:20,24 99:4

policy 16:12,14,21,22,24 17:1,4,6,8,13,24 18:3,6 19:17 24:12 41:7,14,18 44:20,23 45:16,19 64:7,20 69:6,14,16 70:6 83:3 92:7,21,22 94:5,19 96:3,24 98:25 99:10 100:8,9,11

policy's 39:23 43:2

position 6:17 22:3 26:1,13 27:1,4,20 28:5 49:17,19 55:8,13 56:12 57:5 60:10,13 67:21 68:1 69:6 70:22 72:17 74:4,6,11,12,15 91:16 96:11

positions 7:13

possible 81:17

postgraduate 35:12

potential 29:2 78:6 90:15,17,19,24

potentially 14:13 25:1

practice 57:16 58:21 86:7,11

predecessor 83:16 84:9

preparation 18:19,22 25:6 26:11,19 28:18 33:6 35:21 36:12,15

prepare 7:25 19:12 35:18

prepared 7:22 80:18

present 8:6 91:1

presented 7:6,12

pressing 12:20,23

pretty 91:8

previously 16:17 57:21 59:2 99:8

primarily 39:3

prior 34:13,14 55:6 65:4 73:19,21 98:8

probably 12:17 34:3 52:16 88:13,22

problem 56:7

produce 16:15

produced 17:21,23 18:1 20:1 54:22 93:2

product 46:8

production 5:3 19:19

products 48:22 49:10 60:1,2 67:13

progressed 30:7

promised 80:11

property 36:2 44:22

propose 78:1

proposed 77:14,21,23 78:20

protective 56:2 101:10,12,13

provide 7:12 26:22 36:23 37:9,16 57:14 58:19 81:16 86:4,21

provided 19:13 31:10 37:17 54:23 80:18 83:3 86:14,17 93:5,7 94:3,5

providing 17:9 31:7 33:11

Public 5:4

purposes 47:13 63:21 65:16 66:24 67:4,7 76:24 96:14

pursuant 76:19 77:9 101:9,11,13

purview 7:19

put 30:8 78:5

**Q**

question 6:1,2,5 22:6 24:7,17 25:8,16 28:2 36:8 49:2,15 50:1,5,24 51:1 52:4, 5 53:15,24 54:15,17 55:6 56:20 63:4 67:19 69:21 73:23 78:12 81:13 83:6 91:14 92:9 93:20,23 95:21 96:18 98:9

questionable 79:18

questions 5:19 6:4,15 11:10 42:16

quick 65:25

quite 24:16 53:23

**R**

Raymark 43:17

read 50:25 51:18 53:16 58:15 76:5 80:9

reading 51:15

reason 28:11

reasonably 7:18

reasons 28:9 80:5

recall 10:25 11:7 12:24 13:7 14:21 20:4,7,12,13,16,21,22,24 21:1,6,15, 21,23 22:16 23:4,10,21,22,23 24:9,20 25:2,23 26:5 28:23 29:1,8,9,13 30:2, 23 31:1 33:6,9,15,19 43:14 47:20 51:15,25 52:8 61:4 66:14,21 71:19 88:12 99:6

recalled 29:7

Recaris 77:20

received 23:15 37:19 39:11 92:20

recent 22:24

recess 38:11 66:3 91:11

recitals 32:18

recognize 31:21 79:9

recollection 60:24

recommend 86:6,12

recommendation 84:19

recommended 83:16 84:6,9,21

record 5:10 42:15 43:24 44:7 50:12, 14 55:23 68:19 71:2 74:20 91:12

records 17:9

referring 55:1 65:12 80:7 83:12

regard 6:17 7:13 11:23 14:10 15:3 18:7 22:3 23:17 24:22 26:13 27:1 39:3,12 40:15 49:21 53:12,20 64:22 65:1,11 66:10 67:11 68:8 70:21,23 77:6

regarding 55:6 68:20

registered 98:6

regular 40:8

regulations 5:17 13:12

reimbursement 53:12,21 54:13 55:6 56:23 57:3,7 78:7

related 50:2,8,20 51:7,12 52:7,12

relates 55:4

relating 58:6 59:12

relationship 8:17 9:5

release 80:14,23 81:24

relevance 64:2

relevant 62:22 63:10,24

relying 76:24

remember 23:19 28:16 42:8 83:23 99:3

rep 58:2,3 59:8,9

repeat 22:6 24:7 49:2 53:15 55:5

rephrase 8:23 9:2 94:1

report 90:8

REPORTER 53:18 58:17 101:5,9

reports 90:5,6,11

representative 75:18

representatives 33:12

request 17:9 61:5 85:23

requesting 61:3

reservation 23:8,16 24:22 26:8 56:15 58:5 59:11 62:3 68:8 69:20,24 70:14, 21 79:8,9

reserve 70:11 101:12

reserving 70:2 78:10

resident 94:24 95:25 98:17

Resinoid 14:13 15:4,19 20:18 27:17 29:11 49:11 57:19,22 58:14,24 59:3, 21 67:12 82:17 83:5,7,25 87:17,22 88:2,6,17 90:13 91:23 92:2,4,20,25 93:2,7 94:5,7 96:4 98:4,20 99:15,21, 23

Resinoid's 46:7 48:21 60:1 87:24

Resinoid-ciokajlo 29:25

Resinoid-containing 60:1

Resolute 8:12,17 9:5,7,20,22 12:6, 12,16 14:10 34:4,10,13,15,22 35:1 39:12 83:19 84:13,14,20,21,24 85:2,3, 5,6,9,13,17 86:25 88:11,21

Resolute's 84:19

resolution 10:19 13:5 23:1

resolve 9:21

resolved 13:8,9

resolving 29:24

respect 17:24 23:8 30:9 33:10 57:3 58:11 59:18 65:4,5,6 80:25 92:15 96:19 98:9

respond 43:9 69:6

responded 69:12

responding 29:22

response 80:18

responsibilities 12:5 13:24 18:14 40:10

responsible 12:10 14:11 36:18 58:13 59:20

responsive 19:3 36:24

restate 51:2 85:24 94:15

result 60:11

results 69:8,14

retain 84:17 85:7,13

returned 100:15,19

reveal 16:18

review 7:8 8:3 14:1,6 18:8 19:18 36:7 38:3,21 40:2 68:23

reviewed 19:15 28:18 29:5 36:12,14

reviewing 37:25 44:12 95:5

Rich 25:21

Richard 23:12 24:10

Rick 29:10 30:6 33:10 65:13 82:1

right 8:5 12:3 18:17 29:1 38:7 41:25 44:18 50:25 52:17,21,24 53:2,9,11,20 56:22 57:6 63:22 69:10,25 70:3 72:19 76:15 95:20 97:19 99:25 100:3,21 101:3

rights 23:16 24:22 26:8 56:15 62:4 68:8 69:20,24 70:11,14,21 78:10 79:8, 9

risk 30:25 72:18

Robert 75:11

ROR 58:3 59:9 60:12 68:11

Rory 91:5

ruin 55:20

rule 59:25

rules 5:16 13:12

run 16:12 86:8,11

Ryan 12:2

---

**S**

---

said 15:15,22 18:8 19:21 24:18,25 29:5 38:23 56:10,15 66:13,19 72:20 75:12 77:12 84:5,8 86:16,20 89:5,6 94:9,10,14

same 57:23 59:5 60:8 64:16 77:9,14 80:24 81:1 97:1,14,21 98:3,8 99:18,25

satisfactorily 5:2

saw 22:9

say 16:18 18:15 31:6 32:8 37:17 39:5, 9,25 42:4,6 46:16 50:4 57:16 58:21 61:3 62:16,20 63:14 65:8,14 69:10 71:3 75:7 77:2 78:23 79:17 80:24 81:3 82:1 84:15 89:19 90:11,23 91:25 93:14,17 94:10,11,12 95:13

saying 21:16 66:21 73:24 78:24

says 45:1 48:17 52:15 54:4 69:5 70:8 76:14,17,21 77:19,20 78:9,16 80:10 92:2 98:25 99:1 100:14,22

scheme 83:25

School 35:13

Schulze 8:7,18,24 9:23 18:20 22:5,7 26:16 27:25 28:3 30:13 32:3 36:21 37:1,4,11 38:5 42:14,20 45:10,22 47:17 48:24 50:12,23 53:14 54:20 55:18 56:1,4 57:1 60:3,8 61:15 63:2 64:8,16 66:2,24 71:1 77:1,25 78:11 79:19 81:8,12 82:15,25 83:8 89:3 91:5 92:8 93:8,17,21 95:17 96:9,15 97:1, 13,21 98:7 100:17 101:8,11

search 16:12,15,21,24 17:1,4,6,8

searches 17:24

searching 38:8

second 46:4 79:24

see 45:3 46:9 48:2,3,14,17 69:17,18 76:6 79:14 80:3,12 99:12,16 100:19

seeing 70:20

seek 54:13 56:23 57:7 78:7

seeking 53:12,21 95:18 97:15 98:10

seen 7:2 31:24 36:9,16 44:4 68:16,17 74:24 93:1

sending 73:10

sent 29:23 98:23 99:22 100:2,14

sentence 63:17 79:25

separate 74:8,11

serving 8:14

set 7:14 37:10 45:20 46:14 80:5 81:5

set-offs 90:15

settle 9:17 29:21

settled 10:12 71:19,22

settlement 10:2,4,6,9 11:25 12:1 55:16 56:18 67:23 74:18,22 75:7 76:10 78:3

settlements 30:9 56:24

several 86:6,22

Shannon 20:21

share 30:9,11,16,23 31:3,4,7,8,13,22 32:1,24 33:1,11 57:19,24 58:1,25 59:5,7 64:24 65:1,3,5,6,8,12,15,19,20, 22 66:9 71:7 72:2,9,12,22,23,25 73:3 77:9,13,17,21,24 78:2,6,20,21 79:2 82:4,10

shares 32:6,9,17 33:13 75:5

she 5:21 8:13 66:5

She's 5:18

short 38:7

shortened 100:23

shortly 51:20

should 30:8 33:22 55:19,23 56:4 57:16 58:21 72:12,17 75:7 90:11

show 99:2,7,17

showing 6:25 71:11

shows 100:14,25

sic 66:10

sickness 45:2,8 46:20 49:21 50:1,6 63:23,25 64:6 69:8,13 70:5

sign 75:15,18

signatures 32:18

signed 75:8,10,24 78:8

significant 63:24

signing 76:13

similar 44:17

simply 49:7 56:20

Sinars 87:15

since 30:18 34:5

single 63:18

sir 7:2 36:8 38:14,20 52:21 59:23

sit 7:22 11:22 28:25 48:9 68:5 70:18 73:9 81:21 90:4

Skokie 98:6

sole 28:11

Solomon 83:16 84:8,12

Solutions 34:19

some 5:16 8:4 19:22 20:7,8,9,14,17 22:9 23:7 24:21 29:5 36:1 37:6 56:17 100:23

somebody 60:25 94:13

something 6:16 13:13 27:16 39:8 40:8 89:25 90:2,3 97:6,18

sorry 20:25 33:7 46:16 49:22 50:4,23 55:18 56:5 62:16 68:6 69:21 79:5 86:16 88:15 89:12 90:25 92:21 94:15

sound 42:10

sounds 42:11

speaks 78:15

specialist 17:10

specific 9:1 17:13 22:18,22 49:12 58:5 59:11 65:15 68:11 70:17 85:3 90:1,3

specifically 20:6 24:9 28:15 37:23 68:24 69:4 70:14 83:5 99:6

specifics 28:24 43:14

stamp 100:24

start 34:9 50:16

started 34:12 60:25

starting 35:4 54:8

state 5:9 91:19

state's 91:17

stated 81:24

statement 14:14 15:6 39:1 46:21 77:10 89:10 97:20

states 44:21

still 13:3 24:16 70:11 71:6 95:3,4

stipulations 101:15

stopped 67:12

strategic 86:2,14,18,21

strike 12:5 14:16 16:25 20:25 24:19 25:9 28:9,12 31:2,16 32:14 36:23 47:13 48:10 67:24 68:3,7 72:20 75:25 94:8,10

stuff 36:2

subject 88:22

subjective 56:2

subsequent 41:8 72:22,25 73:10,24 77:23 78:1

substance 23:22 25:25 37:6 54:24 58:12 59:19

substantially 89:17,19

suffered 51:6 52:11

suffices 5:21

suggested 65:13,19,21 72:3,5,22,24

suggesting 30:7

summary 37:18

supervisor 18:24 75:13,14

supervisors 10:18,21

support 66:8 67:23 68:3 80:20,22 81:22 98:15

supporting 64:14,23 77:7 78:18

supports 81:7 89:15

suppose 47:7 61:20,24 62:5 64:10,21

supposed 27:17

sure 5:15 6:14 11:12,21 12:22 14:8, 10,15 15:7 16:9 21:14 22:8 24:8,16,18 26:8,16 28:1,4 32:4,12,14 33:25 35:4 38:1,9 40:17 41:20 42:5 45:11 46:18 48:1 49:4 50:5,24 51:10,22 53:23 54:1 60:5 63:3,6 66:2 67:2,18,20 68:17 77:4 79:22 82:19 83:11 85:1 91:4 93:3 97:16

Surety 19:19,23 20:2,19 21:3,7,20 22:2,10,17 24:11 25:19 26:1 27:7 28:14,17 29:6 33:7,18 37:20 44:9 53:11,20 54:5,12 55:11,14,15 56:10, 17,21,25 57:6,16,17 58:2,9,20,22

59:8,16,25 60:12 68:7,21 70:20 71:6 75:5 76:9 91:18,20,23 92:4 93:2,6 94:7 95:9 96:3,7,24 99:4,10

Surety's 21:18 23:25 26:13 27:1,20 28:5,22,23 55:8 92:21,22 94:5

Surety-produced 20:5

sworn 5:4

symptoms 51:10,12

---

T

take 5:21,23,25 6:3 35:17 58:7 59:13 65:25 89:22 91:7,9

taken 38:11 60:10,13 66:3 72:16 91:11 96:10

takes 69:15

taking 5:18 18:25 26:1 55:14

talk 18:21 19:2 25:19

talked 18:18 25:21 28:14 33:3,16 43:10 46:18 67:5 79:7 82:9

talking 21:10,11 22:24 23:1 26:21 45:5 70:3

talks 46:6

tangent 13:16

team 10:22 85:25 86:1,14

teams 86:18

tell 75:2 89:13 99:9

telling 19:6

ten 54:10

term 31:21 39:23

terms 6:15 32:18 36:19 46:24 73:2

test 13:13

testified 5:5 22:8 51:23 73:15 77:20 80:25 95:23 96:20

testify 7:17,23 51:19 52:5 78:17 98:14

testifying 52:8 95:7 97:4

testimony 26:22 38:3 52:15

the-- 42:25

theories 40:25

theory 41:23 76:5,12

**thereabouts** 30:18

**things** 5:17 13:11 15:21 38:24 47:12

**think** 11:8 15:22 18:7,17 20:16 22:8 23:4 24:3,4,18,25 29:5 33:3,21 38:23 41:24 42:15 48:6 49:1 60:14 64:24 66:7,13,18 70:17 71:2,17 72:19 73:15 74:10 77:5 81:9,12 82:9 84:8 89:6 94:9

**third** 42:8 83:23

**third-party** 9:8

**thought** 22:13 84:5 86:16 93:21,24

**three** 34:17

**through** 7:14,21 15:1,2 18:18 33:23 44:1 54:7 68:12 71:9 98:4

**time** 5:23 15:16 20:15 23:4 25:18 30:25 31:2 56:5 59:24 60:18,22 61:25 67:14,22 72:18 74:5 100:23

**title** 12:6

**today** 5:23 6:9 7:7,12,22 8:1 18:19,22 19:1,12 25:6 26:12 36:13,16 48:10 60:12 68:5 73:9 81:21 90:4 95:7

**together** 30:8

**told** 5:16

**Tom** 12:2

**top** 43:13 99:20

**topics** 8:20 19:4

**toward** 56:18

**track** 24:8

**training** 39:12,15

**trigger** 39:17,20,23 40:11,15,19 41:1, 5,6,22,24 42:1,3,8,13 43:1,2,6,12,17, 21 45:6,7,15,19 46:12,19 47:13,16 48:4,7 55:10 63:22

**triggered** 40:3 41:11,17 64:20 70:4 74:7

**triggering** 42:21

**triple** 41:24 42:1,12 43:11,16 45:6,7, 15,19 46:12,19 47:15 48:4,7

**true** 59:24 65:18 90:22 91:3

**trusts** 90:10,11

**turn** 52:21

**turning** 52:24 79:24

**two** 25:3

**type** 11:8

## U

**Uh-huh** 44:19

**ultimate** 12:1 37:19 90:18,21,24 91:2

**ultimately** 73:1,2,3 74:12,16 75:22,23

**uncovered** 56:25

**undeliver** 100:20

**undeliverable** 100:16

**under** 14:11 30:17 46:4 57:19 58:24 62:3

**underlying** 21:13 80:7

**understand** 6:12 7:11,16 9:19 11:13 23:14 24:17 25:15 28:1,4 46:13,25 47:1 53:24 54:9 63:3 67:18 69:19,23 81:17 91:2

**understanding** 9:4,6 17:22 19:25 25:10 26:25 27:3,6 28:8,11 39:21,22 40:13,18,21,24 41:4 42:1,2,21,24 43:7,11 45:7,15 46:11,15 47:2,4 53:3, 5,6,8 55:3,5,12 57:2,12,13,15 58:8,17, 19 59:15 65:17 70:1 71:5 73:2 79:2 91:22

**understood** 6:7,19 13:15

**underwriting** 17:11,12

**uninsureds** 85:7

**unit** 86:21

**units** 86:2

**University** 35:10

**unlikely** 80:8

**unsound** 50:2,7,19 51:7 52:12

**until** 13:5 56:6 58:7 59:14 62:24 63:10

**up** 11:1,9,20 53:9,11,20 56:22 97:6

**upon** 10:1

**use** 46:12

**used** 51:23

**uses** 86:25

**usually** 32:7

## V

**Vanessa** 68:21

**various** 19:14

**vary** 40:22,23

**Vermont** 35:13

**versus** 6:16 39:8

**vis-a-vis** 89:14

**vocal** 89:23

**voice** 8:18

## W

**waiting** 91:15

**waive** 57:6

**waived** 54:12 76:18

**waiver** 53:3,7 54:9 64:23 66:8 67:17 73:17 76:25 77:7 78:19 80:25 81:24 89:8,15

**waives** 78:6

**waste** 9:14

**weakened** 50:2,7,19 51:6 52:6

**well** 15:15 17:12 24:19 25:9,17 31:5, 16 32:8,14 34:8 48:10 54:1 61:2,4,22 68:3,19 71:18 84:23 89:6 98:22

**went** 18:17 54:24

**whole** 54:6

**wording** 44:17

**words** 51:23 56:22 70:4

**work** 33:24 34:2 35:18 39:7 84:12

**worked** 34:17 84:13,22

**working** 34:4,12

**works** 41:3 88:11

**writing** 31:3

**written** 69:18 73:6 80:20

**wrong** 24:19

## Y

**years** 17:13 34:18 57:20 58:25

**Yeses**  5:20

**yesterday**  8:2

**yield**  17:16