**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL SURETY CORPORATION, | ) | |
| | ) | Case No. 1:17-cv-3455 |
| Plaintiff, | ) | |
| | ) | Judge: Sara L. Ellis |
| v. | ) | |
| | ) | Magistrate Judge: Jeffrey Cole |
| LAMORAK INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT BEDIVERE INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO NATIONAL SURETY
CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

Scott M. Seaman
Jason R. Schulze
HINSHAW & CULBERTSON LLP
151 N. Franklin St.
Suite 2500
Chicago, IL 60606
(312) 704-3000

Attorneys for Defendant
BEDIVERE INSURANCE COMPANY

Bedivere Insurance Company, incorrectly identified as Lamorak Insurance Company ("Bedivere"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(b)(2), submits this Memorandum in Opposition to the Motion for Summary Judgment of plaintiff National Surety Corporation ("National Surety's motion") (Dkt. #50).

## PRELIMINARY STATEMENT

Last year, National Surety paid its pro rata share of the Ciokajlo settlement at issue in this coverage action for the same reason it paid its same pro rata share to settle a nearly identical case ten years earlier: National Surety was legally obligated to do so under the insurance policies it issued to Resinoid. Despite this fact, National Surety now seeks to re-write history by claiming that it never was obligated to pay its pro rata share of such settlements because Illinois law, and not Ohio law as it previously believed, applies to its policies. However, National Surety's original determination that Ohio law applies to its policies was entirely correct, as evidenced by its subsequent handling of Resinoid's asbestos claims for over 15 years consistent with the application of Ohio law.

National Surety's opportunistic change of course in favor of the application of Illinois law to its policies, first raised eleven days before Resinoid's insurers were able to resolve the most dangerous (i.e., expensive) case ever asserted against Resinoid, is unsupported by the facts and the law and must be rejected. Because the National Surety policies were triggered by the Ciokajlo claim, National Surety had a legal obligation to pay its pro rata share of the Ciokajlo settlement. This legal obligation on the part of National Surety bars recovery under any of the alternative causes of action it has asserted against Bedivere. Accordingly, National Surety's motion for summary judgment should be denied.

1

<u>ARGUMENT</u>

**NATIONAL SURETY'S MOTION FOR SUMMARY JUDGMENT
SHOULD BE DENIED BECAUSE NATIONAL SURETY'S OBLIGATIONS ARE
GOVERNED BY OHIO LAW AND NATIONAL SURETY WAS OBLIGATED TO
FUND THE CIOKAJLO SETTLEMENT UNDER OHIO LAW**

Fundamentally, Ohio law governs National Surety's obligations in this case because Ohio

has the most significant contacts to the National Surety policies issued to Resinoid. In its brief in

support of its motion, National Surety exclusively relies upon two purported facts to justify its

position that Illinois law applies to its policies issued to Resinoid.[1] However, National Surety's

reliance upon the purported "delivery" of its policies to Resinoid's broker in Illinois fails both as

a matter of fact and as a matter of law. The evidence cited does not support National Surety's

conclusion and, more significantly, several decisions rendered by Illinois courts reject the

proposition that an insurance policy is "delivered," for purposes of choice of law, when it is

received by the broker.

As for National Surety's second basis for applying Illinois law to its policies, the sole fact

that Resinoid was incorporated, <u>i.e.</u>, "domiciled" in Illinois is vastly outweighed by the various

other choice-of-law factors favoring the application of Ohio law, including the final factor which

considers the insured's principal place of business, the insured's headquarters or corporate

"nerve center," and the location that played an "active, dominant and dynamic role in the

procurement" of the policies. <u>See</u>, <u>e.g.</u>, <u>Westchester Fire Ins. Co. v. G. Heileman Brewing Co.,</u>

<u>Inc.</u>, 747 N.E.2d 955, 962 (Ill. App. 2001) (focusing its choice-of-law analysis on the insured's

principal place of business and concluding that Illinois law applied because, in part, "[m]ore

---

[1]     Pursuant to the Court's Standing Order, Bedivere and National Surety filed with their motions for summary judgment a Joint Local Rule 56.1(a)(3) Statement of Material Facts to Which There Is No Genuine Issue (Dkt. #48) ("Joint Stmt."). Bedivere refers the Court to the Joint Statement and to its Statement of Facts contained in its Memorandum of Law in Support of its Motion for Summary Judgment (Dkt. #47) for a complete recitation of the undisputed materials facts addressed in this Opposition.

importantly, Heileman's principal place of business was in Illinois and not Wisconsin"); <u>Ace Rent-A-Car, Inc. v. Empire Fire & Marine Ins. Co.</u>, 580 F. Supp. 2d 678, 687-88 (N.D. Ill. 2008) (conducting an analysis of the insured's principal place of business in order to determine whether Illinois or Indiana has the most significant contacts to the policies, including evaluating where the corporation's "'nerve center' – where business is transacted, decisions are made, and where the company's executive offices are located"); <u>Emerson Elec. Co. v. Aetna Cas. & Sur. Co.</u>, 743 N.E.2d 629, 641-42 (Ill. App. 2001) (finding that the role of the domicile of the insured to be the dominant one specifically where that domicile "played an active, dominant and dynamic role in the procurement of all of these policies").

Irrespective of whether the location of Resinoid's corporate headquarters and its coordination of insurance functions is considered in analyzing the third choice-of-law factor, the domicile of the insurer and the insured, or in analyzing the final factor, the locations which bear a rational relationship to the contracts, the result is the same: Ohio law applies to the National Surety policies. Under Ohio law, the National Surety policies were triggered by the Ciokajlo claim and National Surety was obligated to fund the Ciokajlo settlement. Because of this obligation, National Surety cannot establish the elements of any of its theories of recovery against Bedivere and its motion should be denied.

## POINT I

**THE UNDISPUTED FACTS ESTABLISH THAT OHIO LAW CONTROLS NATIONAL SURETY'S OBLIGATIONS UNDER THE POLICIES IT ISSUED TO RESINOID**

National Surety's motion is fundamentally flawed because it is based upon the erroneous conclusion that Illinois law applies to the National Surety policies issued to Resinoid. Despite the issue of choice of law being outcome determinative for the parties' competing motions for summary judgment, National Surety surprisingly devotes only two paragraphs of its brief to the

issue. (Memo at 7-8). National Surety wholly ignores four of the six choice-of-law factors set forth in Lapham-Hickey Steel Corporation v. Protection Mutual Insurance Company, 655 N.E.2d 842, 845 (Ill. 1995) and, instead, entirely relies on its interpretation of facts relating to two factors. The two factors upon which National Surety relies are the place of delivery of the contract (factor two) and the domicile of the insured and of the insurer (factor three). However, National Surety misapplies the facts and the law and ignores other key facts. In sum, National Surety's choice-of-law position is fatally flawed.

### A. The Undisputed Facts Establish That The National Surety Policies Were Delivered To Resinoid In Ohio And Not In Illinois

First, National Surety is wrong when it argues that its policies were "delivered" to Resinoid in Illinois because it sent copies of the policies to Resinoid's broker in Chicago. This assertion is belied by the evidence upon which it relies and is contrary to established Illinois law. The sole support for National Surety's argument that the policies were "delivered" to Resinoid in Illinois is the declaration of Christopher Breck, a former customer service representative for Alper Services LLC ("Alper"), Resinoid's broker during the time that National Surety issued its policies. (Joint Stmt., at ¶¶50-52; Ex. 35). According to the Breck declaration, "it was standard practice for two copies of each of the policies to be sent by National Surety to Alper's office in Chicago. Alper then sent a copy of each policy to Resinoid in a binder, retaining the second copy." Id.; Ex. 35 at ¶5. Breck further declared that "[m]y understanding was that National Surety did not send copies of the policies directly to Resinoid." Id.; Ex. 35 at ¶6.

As an initial matter, Breck's declaration does not conclusively establish that National Surety did not send copies of its policies directly to Resinoid at the Ohio post office box address listed on the declarations page of those policies. Breck was the junior customer service representative for the account working under the supervision of the "senior producer" for the

4

account who, Breck admits, was "primarily responsible for the account, and who has since retired and passed away." Id., Ex. 35 at ¶4. Thus, this "senior producer" may have been aware of facts regarding the issuance of the policies that were unknown to Breck. More critically, Breck was not a National Surety underwriter, nor was he employed in the risk management department of Resinoid in Ohio. Id. Therefore, he does not - and cannot - provide any competent testimony as to whether National Surety actually mailed its policies directly to the Resinoid P.O. Box in Newark, Ohio that is listed on the declarations pages of the National Surety policies. What truly is undisputed is that the Resinoid point of contact for the procurement and the receipt of the National Surety policies was Resinoid's corporate headquarters located at "P.O. Box 2264, Newark, Ohio."[2] (Joint Stmt. ¶¶s 9, 49, 53, 57). As such, National Surety cannot establish that its policies were "delivered" to Resinoid in Illinois, and not Ohio, as a matter of *fact*.

More critically, though, National Surety cannot establish that its policies were "delivered" to Resinoid in Illinois, and not Ohio, as a matter of *law*. Relying upon a readily-distinguishable decision of the Northern District of Illinois and a finding by Court of Special Appeals of Maryland under Maryland law, National Surety argues that delivery of two copies of the National Surety policies to Alper in Chicago, with Alper then forwarding one copy to the named insured Resinoid at its post office box in Ohio, constitutes delivery to the insured in Illinois. (Memo at 7). National Surety bases its argument on the legal concept that delivery to an insured's broker can be deemed to be delivery to the insured for purposes of choice of law. However, the Illinois Appellate Court has repeatedly reached the opposite conclusion in insurance coverage cases in which the choice-of-law factors were analyzed. For example, in

---

[2]     The Illinois Appellate Court has noted that "'[i]n the absence of proof as to where the policy was delivered it is presumed that the delivery took place at the insured's residence.'" Emerson Elec. Co. v. Aetna Cas. & Sur. Co., 743 N.E.2d 629, 640 (Ill. App. 2001) (quoting 2 Couch on Insurance 2d § 16:6, at 492 (rev.1984)).

Liberty Mutual Fire Ins. Co. v. Woodfield Mall, LLC, 941 N.E.2d 209 (Ill. App. 2010), the

Illinois Appellate Court evaluated choice of law in a case in which the insured, Luxottica U.S.

Holdings, a subsidiary of an Italian company, was located in New York. Id. at 212. Luxottica

was the parent company of 33 United States corporations, each of which was identified on the

policy issued to Luxottica as named insureds. Id. The additional named insured listed on the

policy that was involved in the coverage dispute before the court, LensCrafters, was located in

Ohio and this Ohio office is where the "point person" coordinating all of the insurance needs for

Luxottica was located. Id. at 219. Ultimately, the court in Woodfield Mall found that Ohio had

the most significant contacts to the insurer's policy at issue in the case, primarily because of the

Ohio-based contacts relating to the procurement of the policy issue. Id. at 218-20.

The court then turned to the same argument that National Surety makes here, that the law

of the state in which the broker received a copy of the policy, New York in Woodfield Mall,

should apply. Id. at 219. First addressing and rejecting the argument made by the claimant

shopping mall that New York law applied because the policy had been mailed by the insurer to

New York, the Illinois Appellate Court reasoned:

> The record, however, does not show that the policy was delivered to the insured in
> New York. Insurance *broker DiBella* stated without contradiction that he did not
> know why Luxottica's New York address appeared on the policy declarations
> page and that *he had personally delivered* the contract to Muntel [the insured's
> "point person"] in Ohio. Thus, the record shows Ohio, not New York, was the
> place of delivery.

Id. (emphasis added). Next, the court rejected the mall's alternative argument that instead of the

policy being mailed to the New York address on the declarations, the policy had been sent

directly to the broker, DiBella, in New York. Id. Again noting the significance of the broker's

subsequent delivery of the policy to the insured in Ohio, the court reiterated that it was the

insured's representatives "who made the contracting decisions" and, thus, the court "fail[ed] to

6

see the relevance of the location of this particular broker in this choice-of-law analysis."[3] Id. As established in Woodfield Mall regarding the exact argument made by National Surety here, an insurance policy is deemed "delivered" for purposes of choice of law when the *insured*, not the broker, receives it. Id.

At least two additional Illinois Appellate Courts have reached similar conclusions in insurance coverage cases involving choice-of-law determinations. In Emerson Elec. Co. v. Aetna Cas. & Sur. Co., 743 N.E.2d 629, 632-33 (Ill. App. 2001), the Illinois Appellate Court analyzed the choice-of-law factors in an environmental coverage case involving dozens of insurers, hundreds of insurance policies, and claims for coverage relating to 47 environmental sites in 22 states. Analyzing the place-of-delivery-of-the-contract factor, the court cited the uncontested testimony that the policies of one of the insurers were "personally delivered to Emerson's corporate headquarters in St. Louis, Missouri" and that Emerson maintained those policies at its St. Louis headquarters. Id. at 640. The court next noted that Emerson did not challenge this testimony, but sought to discount it by urging that "overriding focus be given to its claim that the policies were negotiated, sold and *delivered largely through brokers* in Chicago." Id. (emphasis added).

The Illinois Appellate Court rejected the argument that the delivery of the policies by the Chicago-based brokers changed the conclusion that the policies were delivered in Missouri:

> [W]e note that even "[i]n the absence of proof as to where the policy was delivered it is presumed that the delivery took place at the insured's residence." 2 Couch on Insurance 2d §16:6, at 492 (rev.1984). Thus to the limited extent that

---

[3] The Illinois Appellate Court in Woodfield Mall further noted that "[a]lthough some courts have considered the location of an intermediary insurance broker, the mall has failed to discuss any precedent to that effect." Id. This passage relates to the fact that, in some instance, the location of the broker may be a relevant consideration in the analysis of the final "catch-all" choice-of-law factor, not whether delivery to a broker constitutes delivery to an insured for purposes of choice of law. Regardless, the two cases cited by National Surety for support for this proposition are addressed infra.

> the place of delivery is relevant to a choice-of-law determination, under the totality of all other facts and circumstances, we would conclude the place of delivery to be Emerson's corporate headquarters in Missouri.

Id. See also Westchester Fire Ins. Co. v. G. Heileman Brewing Co., Inc., 747 N.E.2d 955, 959-62 (Ill. App. 2001) (holding that the choice-of-law analysis for the state of delivery of the contract is to focus on the state in which the insured involved in the coverage action received the contract, not where the insured's parent company, broker, or other intermediary may have been located or received the contract).

Rather than addressing these key choice-of-law holdings for the issue it presents, National Surety instead relies upon TRAX, LLC v. Cont'l Cas. Co., 2011 LEXIS 145869 (N.D. Ill. Dec. 14, 2011) and a Maryland state court decision in Commercial Union Ins. Co. v. Porter Hayden Co., 698 A.2d 1167 (Md. App. 1997). However, neither decision provides National Surety with a basis to depart from established Illinois choice-of-law principles. In TRAX, the District Court analyzed the choice-of-law factors to determine whether the law of Illinois or Virginia was to apply to the coverage dispute before it. TRAX, 2011 LEXIS 145869 at *14-17. The District Court's analysis of the place-of-delivery factor required it to determine whether the policy was delivered in New Mexico, where TRAX, LLC's broker received the policy, or Nevada, where TRAX, LLC's parent company was located. Id. at *18-19. Because the parties' arguments required the District Court to choose between applying Virginia or Illinois law, the place-of-delivery factor was irrelevant to the choice-of-law determination. In essence, the District Court's opinion on whether the policy was delivered in New Mexico or Nevada constitutes dicta relating to an irrelevant choice-of-law factor that provides little probative value here. More importantly, the District Court's finding that delivery to the broker constitutes delivery to the insured under Illinois choice-of-law rules stands in contrast to the holdings of the

8

Illinois Appellate Courts in Woodfield Mall, Emerson Electric, and Westchester Fire, which constitute binding authority of that state's law. Similarly, the decision of the Special Court of Appeals of Maryland, applying Maryland law, in Porter Hayden does not provide this Court with any guidance as to how Illinois courts would address the issue. Indeed, that authority is found in the decisions of the Illinois Appellate Court, such as Woodfield Mall, Emerson Electric, and Westchester Fire.

**B.** **National Surety's Minimal Analysis of the Domicile Choice-Of-Law Factor Stands In Contrast To Undisputed Facts Establishing That Resinoid's Principal Place of Business And Insurance Procurement Functions Were Located in Ohio**

National Surety's second stated basis for arguing for the application of Illinois law to its policies is the fact that both National Surety and Resinoid are incorporated in Illinois. (Memo at 7-8). However, as the decisions in Westchester Fire, Ace Rent-A-Car, and Emerson Electric demonstrate, analysis of choice-of-law extends far beyond a simple recitation of the particular state in which an insured may be incorporated. Instead, courts focus on the location that constitutes the principal place of the insured's business, or its "nerve center." Westchester Fire, 747 N.E.2d at 962. A corporation has been held to have a single principal place of business where its executive headquarters are located and included in that analysis is the location where the corporation's executive officers and directors reside. Id., (citing Metropolitan Life Ins. Co. v. Estate of Cammon, 929 F.2d 1220 (7th Cir. 1991)); Ace Rent-A-Car, 580 F. Supp. 2d at 687 (holding that the "nerve center" for determining a principal place of business under Illinois law is generally "where the company is headquartered").

It is undisputed that since the first National Surety policy was issued to Resinoid, Resinoid's corporate headquarters have been located in Ohio. (Joint Stmt. ¶9). The documents cited by National Surety to support its contention that Resinoid's domicile is Illinois, Resinoid's

filings with the Illinois and Ohio Secretaries of State, establish that the company's principal place of business, i.e., "nerve center" is Ohio. For example, the Domestic Corporation Annual Reports filed by Resinoid with the Illinois Secretary of State for the years 1994-2000 indicate that a majority of the corporate officers of Resinoid (three of five) and corporate directors (three of four) resided in Ohio during the period of the National Surety policies. (Joint Stmt., Ex. 9 at 18, 20, 22, 24, 26, 28, and 30 of 31). The two corporate officers the Illinois Secretary of State requires to be identified on the form, corporate president and secretary Allan Olson and David Lipphart, are listed as residing in Newark, Ohio and Granville, Ohio, respectively. (Id.). Further, Resinoid's filings with the Ohio Secretary of State include its application for extension of time to file its corporate income tax return with the IRS. The form indicates that Resinoid lists its Hebron, Ohio headquarters as its address for purposes its federal corporate income tax returns, further establishing that Ohio is where the financial affairs of the company are coordinated. (Joint Stmt., Ex. 9 at 9 of 31).

The Illinois Appellate Court's domicile-of-the-insured analysis in Emerson Electric is also instructive. In that case, the court found that the insured's domicile was the key to the analysis because its corporate headquarters "played an active, dominant and dynamic role in the procurement of all of these policies." Emerson Electric, 743 N.E.2d at 642. In other words, the domicile was a dominant factor because the domicile was also the corporate headquarters where the policies were delivered and where the insurance functions of the company were located. Id. The court held that it was this location which "tied all the parties together" and which "'appeared to be most likely contemplated by the parties' as the source of law." Id. (citing Potomac Electric Power Co. v. California Union Insurance Co., 777 F. Supp. 968, 973-74 (D.D.C. 1991)). The court relied upon the fact that the insured "point person" for the procurement of the policies was

located at the insured's corporate headquarters in Missouri, as was the company's corporate risk management department. Id. at 642. This point person was responsible for gathering information regarding what would be covered under the policies, information it then reviewed with Emerson's broker. Id. The court in Emerson Electric held that focusing on the location of the activities conducted by Emerson's brokers, "instead of on the location of the corporate headquarters which coordinated insurance procurement company-wide," would lead to a result that disregards the "common sense reality of the situation." Id. at 643.

Just as in Emerson Electric, the undisputed record here establishes that Resinoid's "coordinat[ion] of insurance procurement company-wide" took place exclusively at its corporate headquarters in Ohio. The address of Resinoid's corporate headquarters is listed on the declarations of the National Surety policies and is where the policies were delivered to the insured. (Joint Stmt., ¶49). Resinoid provided information required by National Surety to underwrite and issue its policies exclusively from its Ohio headquarters. (Joint Stmt., ¶9, Exs. 9, 10, 11; ¶57, Ex. 36-41). National Surety addressed and sent its policies and other correspondence relating to its policies to Resinoid at its corporate headquarters in Ohio. (Joint Stmt., ¶¶s48, 49, Ex. 29-34; ¶53, Ex. 33 at NSC-US00710-11; ¶66, Ex. 44). Resinoid's corporate headquarters in Ohio is identified on Resinoid's insurance application as the location of the insured. (Joint Stmt., ¶57, Ex. 41). The record contains no indication that any of these activities took place at any location other than Resinoid's corporate headquarters in Ohio. In sum, whether characterized as domicile, principal place of business, insured's "nerve center," or insured's location which played an "active, dominant, and active" role in the procurement of the insurance policies, the dominant location of Resinoid for the choice-of-law analysis is its corporate headquarters in Ohio.

11

## POINT II

### EACH OF NATIONAL SURETY'S CAUSES OF ACTION IS WITHOUT MERIT BECAUSE NATIONAL SURETY WAS OBLIGATED TO FUND THE CIOKAJLO SETTLEMENT UNDER OHIO LAW

Applying Ohio law to the undisputed facts of the Ciokajlo claim, each of the six National Surety policies were triggered by that claim and, thus, National Surety was obligated to pay its agreed-upon 32.29% share to settle the claim. Because National Surety owed the funds it paid to settle the Ciokajlo claim, National Surety's motion must be denied.

The parties agree that Ciokajlo was first exposed to asbestos from Resinoid's products when he began working at Kirkwood in 1976 and that he was first diagnosed with mesothelioma in January 2015. (Joint Stmt., ¶¶s 22, 14). Under Ohio's continuous trigger, the Ciokajlo claim triggered each of the National Surety policies. See Owens-Corning Fiberglass Corp. v. Am. Centennial Ins. Co., 660 N.E.2d 770 (Ohio Ct. C.P., Lucas County 1995) (applying a continuous trigger to asbestos bodily-injury claims). This legal obligation on the part of National Surety to fund the settlement precludes any recovery by it under the theories of equitable contribution, equitable subrogation, and unjust enrichment against Bedivere. National Surety cannot establish that it is entitled to equitable contribution because it has not paid a loss, or a greater share of a loss, than it was legally obligated to pay. See Home Ins. Co. v. Cincinnati Ins. Co., 821 N.E.2d 269, 276 (Ill. 2004) (explaining that equitable contribution is available to a co-insurer who has paid "the entire loss, or greater than its share of the loss"). The elements of equitable subrogation require that the defendant insurer be "primarily" liable to the insured for a loss, that the plaintiff insurer be "secondarily" liable to the insured for the same loss under its policy, and that the plaintiff insurer must have discharged its liability to the insured and, at the same time, extinguished the liability of the defendant insurer. Home Ins., 821 N.E.2d at 280. Again, because National Surety was obligated to fund its pro rata portion of the Ciokajlo settlement, it was not

"secondarily" liable to Resinoid but, rather, primarily liable to fund its pro rata share of the settlement, which it did.

Finally, "[t]o state a cause of action upon a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates fundamental principles of justice, equity and good conscience." State Farm Gen. Ins. Co. v. Stewart, 681 N.E.2d 625, 633 (Ill. App. 1997). Typically, what makes the retention of the benefit unjust is due to some improper conduct by the defendant, such as "fraud, duress, or undue influence," and may be redressed by a cause of action based upon that improper conduct. Alliance Acceptance Co. v. Yale Ins. Agency, 648 N.E.2d 971, 977 (Ill. App. 1995). National Surety cannot establish that Bedivere has been unjustly enriched by paying the pro rata share of the Ciokajlo settlement that National Surety itself proposed, nor has National Surety identified any improper conduct on the part of Bedivere, such as fraud, duress, or undue influence. On the contrary, the record shows that National Surety willingly funded the Ciokajlo settlement with full knowledge of the facts relating to that claim and after having expressly instructed defense counsel on the best strategy to obtain the settlement it paid. (Joint Stmt., ¶¶s 19, 24, 25, 29, 30). National Surety's motion for summary judgment should be denied and, instead, Bedivere's motion for summary judgment should be granted.

## CONCLUSION

For the reasons stated above, this Court should deny National Surety's motion for summary judgment and provide whatever further relief the Court deems proper and just.

Dated:  November 1, 2018

Respectfully submitted,

HINSHAW & CULBERTSON LLP

/s/ Jason R. Schulze
Jason R. Schulze

Scott M. Seaman
Jason R. Schulze
HINSHAW & CULBERTSON LLP
151 N. Franklin St.
Suite 2500
Chicago, IL 60606
sseaman@hinshawlaw.com
jschulze@hinshawlaw.com

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of November, 2018, I electronically filed **Defendant Bedivere Insurance Company's Memorandum in Opposition to National Surety Corporation's Motion for Summary Judgment** with the clerk of the court using the CM/ECF system which will send a notice of the electronic filing to the following counsel of record listed below:

Rory T. Dunne
Alan M. Posner
Karbal, Cohen, Economou, Silk & Dunne, LLC
rdunne@karballaw.com
aposner@karballaw.com

/s/ Jason R. Schulze

15