## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL SURETY CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 3455 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| BEDIVERE INSURANCE COMPANY,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff National Surety Corporation ("National") entered into a pro rata cost-sharing arrangement with Defendant Bedivere Insurance Company ("Bedivere") to defend and settle asbestos-related claims against their former mutual client Resinoid Engineering Corporation ("Resinoid"). The parties premised the arrangement on Ohio law. National subsequently brought this suit against Bedivere for declaratory judgment, equitable contribution, equitable subrogation, and restitution, arguing that the Court should instead apply Illinois law to find Bedivere responsible for the costs that National incurred in settling and defending an asbestos lawsuit that Walter Ciokajlo filed against Resinoid. The parties filed cross-motions for summary judgment premised on the choice-of-law question. Because the Court finds that Ohio law governs this action, National cannot prevail on its claims, and the Court grants Bedivere's motion for summary judgment.

---

[1] The First Amended Complaint identified Lamorak Insurance Company ("Lamorak") as the defendant in this action, when in fact Bedivere is the proper defendant. Lamorak moved this Court to substitute Bedivere as the defendant and National does not object. Therefore, the Court grants Lamorak's request to substitute Bedivere as the defendant in this case [30].

# BACKGROUND[2]

## I.   Resinoid and the Asbestos Lawsuits

Resinoid, an Ohio-based company organized under Illinois law, manufactures phenolic materials used in household appliances and the automotive aftermarket industry. It operates three factories: one in Heath, Ohio, another in Hebron, Ohio, and a third in Skokie, Illinois. From 1972 until approximately 1985 or 1986, Resinoid manufactured material containing asbestos in its Skokie, Illinois factory. It sold that material to one customer: Kirkwood Commutator Corporation ("Kirkwood"), another Ohio-based manufacturing company.

Starting in 2003, hundreds of plaintiffs filed lawsuits against Resinoid for asbestos-related injuries related to its products. Four of Resinoid's past insurers agreed to fund Resinoid's defense based upon an informal cost-sharing arrangement. The insurers divided the costs by arrangement according to the amount of time each insurer provided coverage to Resinoid. The largest contributor was Bedivere, a Philadelphia-based company incorporated in Pennsylvania. Its predecessor, General Accident, issued policies to Resinoid from 1959 to 1973 and from 1979 to 1989. National, the second-largest contributor, issued policies from 1994 to 2000. As such, Bedivere paid 73.7% of Resinoid's defense costs and National paid 18.4%.

Resinoid has successfully resolved the claims against it without an adverse judgment or paying a settlement with the exception of two cases. The first was for the death of Darren Christian, who was exposed to asbestos when he worked at one of Kirkwood's facilities, located in Cleveland, Ohio, from 1978 until 1998. Resinoid's insurers agreed to fund the settlement

---

[2] The facts in this section are derived from the Joint Statement of Undisputed Material Facts and the supporting exhibits submitted by the parties. The Court has included only those statements and other facts that are appropriately presented, supported, and relevant to the resolution of the pending motions. The facts pertinent to the substantive summary judgment analysis, which are normally taken in the light most favorable to the non-movant, are not in dispute in this case. *Shiner v. Turnoy*, 29 F. Supp. 3d 1156, 1160 (N.D. Ill. 2014).

according to the time each policy provided coverage between 1978 and 2000—the expiration date of the last policy that provided coverage for asbestos claims. This was consistent with Ohio law interpreting general liability insurance policies in the context of latent injury claims, such as asbestos. Accordingly, the insurers calculated the percentages beginning in 1978—Christian's first exposure to Resinoid products—until 2000—the expiration of the last insurance policy that provided coverage for asbestos claims. Based on this agreement, National agreed to pay 34.1% of the costs to settle the Christian matter. It is unclear how much Bedivere paid toward the Christian settlement.

The second case to settle was that of Walter Ciokajlo, which is the underlying case to this action. Like Christian, Ciokajlo worked at Kirkwood's Cleveland facility from 1976 until 2001. He was exposed to asbestos from Resinoid's products no later than 1986, when Resinoid stopped shipping asbestos-containing materials. Ciokajlo did not experience health issues until he developed respiratory problems in approximately November or December 2014. In January 2015 he was diagnosed with mesothelioma, a malignant type of cancer. In June 2015, Ciokajlo sued Resinoid in Cuyahoga County Circuit Court, Ohio.

Prior to the settlement in Ciokajlo's case, National advised Resinoid that it did not believe that Ciokajlo's claim triggered coverage under National's policies. National's policies insured against "bodily injury"—defined as "bodily injury," "sickness," or "disease,"—that "is caused by an 'occurrence' that takes place" during the policy period. Doc. 48, Ex. 16 at 3–4. National asserted that there was no evidence an injury occurred during the National policy period because the exposure occurred before Resinoid purchased the National policies in 1994, and the subsequent respiratory problems and diagnosis occurred after the policies had expired in 2000.

National continued to defend Resinoid, while reserving its right to deny coverage for indemnity. In May 2017, the insurers, including Bedivere and National, entered into an interim agreement to fund a settlement of Ciokajlo's claims on a pro rata basis. National paid 32.29% of the settlement and reserved its right to recoup its costs in a subsequent action against the other parties. National subsequently filed this suit against Bedivere, seeking indemnification for the funds National paid toward the Ciokajlo settlement.

## II. National's Policies to Resinoid

National, which is incorporated in Illinois and has its headquarters in Chicago, issued six consecutive primary commercial general liability policies to Resinoid beginning August 1, 1994, until August 1, 2000. The declarations pages of the policies list the named insured as "Resinoid Engineering Corporation, Herbst Corporation" and its address as "P.O. Box 2264, Newark, OH 43055-2264." Doc. 48 ¶ 49. This was Resinoid's mailing address for its corporate headquarters. Resinoid listed Hebron, Ohio, as its physical headquarters on federal income tax returns. During the policy periods, three of Resinoid's five corporate officers resided in Ohio, and three of its four corporate directors also resided in Ohio.

Resinoid acquired the insurance policies through a broker, Alper Services ("Alper"), located in Chicago. National's "standard practice" was to send two copies of the insurance policy to Alper, which kept one copy and forwarded the other to Resinoid's headquarters in Ohio. On at least one occasion, National mailed communications regarding the insurance policies directly to Resinoid's Newark, Ohio, address.

In addition to commercial general liability coverage, National also provided other forms of insurance to Resinoid, including property, boiler and machinery, and auto insurance. With respect to the auto policy, Resinoid kept the majority of the insured vehicles at its Newark, Ohio

4

facility.  For example, National insured seven vehicles from 1999-2000.  Resinoid garaged six of these vehicles in Newark, Ohio, and one in Barrington, Illinois.

The policy also listed five "locations of premises" applicable to its property, boiler and machinery, auto, and general liability insurance policies.  Doc. 48, Ex. 34 at 4.  Three of these locations were in Ohio: two in Heath, and one in Hebron.  One location was in Skokie, Illinois. The last location listed in the policy was Arvada, Colorado.  Countersignature documents list both Ohio and Colorado as the "risk state" for the policies.  *Id.* at 63–64.

## III.     Kathleen Clark's Declaration

Kathleen Clark works as an underwriting manager for Allianz Group of Insurance Companies ("Allianz"), an umbrella organization that includes National.  After reviewing National's insurance policies issued to Resinoid, she "state[d] with certainty that Resinoid paid its premiums to its broker, Alper Services in Chicago, Illinois, and then the broker would have paid Allianz."  Doc. 53, Clark Decl. at 2.  Clark also stated that Allianz's general practice was to send copies of the policy to the broker, and that it was not its practice to send a copy directly to the policyholder.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record.  Fed. R. Civ. P. 56 & advisory committee's notes.  The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The same standard applies when considering cross-motions for summary judgment. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Therefore, when considering National's motion for summary judgment, the Court views all evidence in the light most favorable to Bedivere, and when considering Bedivere's motion for summary judgment, the Court views all evidence in the light most favorable to National. *Id.*

## ANALYSIS

### I.  Motion to Strike Clark Declaration

Bedivere argues that the Court should strike Clark's declaration because National did not disclose Clark as an individual likely to have discoverable information pursuant to Federal Rule of Civil Procedure 26(a)(1), which requires a party to disclose "the name . . . of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." *See also* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."). Bedivere also argues that National did not comply with this Court's procedures on summary judgment practice, and that Clark's declaration does not set forth a

6

sufficient foundation for the Court to conclude she is competent to testify to the matters stated. In response, National contends that it did not anticipate using the information provided by Clark until Bedivere made arguments regarding the location of premium payments for the first time in its motion for summary judgment.

The Court's summary judgment procedures differ from Local Rule 56.1, in that this Court requires the parties to submit a joint statement of undisputed facts. *See Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711–12 (7th Cir. 2015) (affirming this Court's summary judgment case management procedures). The party opposing summary judgment may, however, submit additional facts it contends demonstrate a genuine issue of material fact in its response, providing citations to supporting material. *Id.*; Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice, https://www.ilnd.uscourts.gov/judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA==.

The Court agrees with Bedivere that National should have anticipated that the location of premium payments would be a fact the Court considers in its choice-of-law analysis. *See Emerson Elec. Co. v. Aetna Cas. & Sur. Co.*, 743 N.E.2d 629, 641, 319 Ill. App. 3d 218, 252 Ill. Dec. 761 (2001) (location of premium payment was last act giving rise to contract); *see also* 43 Am. Jur. 2d Insurance § 335 ("Often, the 'last act' is the place of delivery of the contract, or the place of delivery and where the premiums are paid . . . ."). However, National is free to raise issues it disputes in response to Bedivere's arguments. Clark's declaration calls into doubt the location of premium payments—specifically whether Resinoid paid premiums directly to National, or whether Resinoid paid Alper, who then paid the premiums to National. To this extent, the Court can consider it to resolve the pending motions and denies Bedivere's motion to strike. *Sweatt*, 796 F.3d at 711–12 ("Nothing in this [case management procedure] prohibits *one* party from responding to *another* party's version of the *disputed* facts.").

7

II.     **Choice-of-Law Analysis**

A.  **Conflict Between Illinois and Ohio Law**

The insurance policies National issued to Resinoid do not contain a choice-of-law provision, and the parties disagree whether Illinois or Ohio law applies to this action. The Court must engage in a choice-of-law determination when "a difference in law will make a difference in the outcome." *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 898, 227 Ill. 2d 147, 316 Ill. Dec. 505 (2007). As such, "a choice-of-law analysis begins by isolating the issue and defining the conflict." *Id.*

Here, the question is which test the Court should apply to determine when claims that involve latent injuries such as asbestos trigger an occurrence-based general commercial liability policy. National argues that the Court should apply Illinois' "triple trigger" test, which triggers insurance coverage if the claimant suffered "bodily injury," "sickness," or "disease" during a policy period. *Zurich Ins. Co. v. Raymark Indus., Inc.*, 514 N.E.2d 150, 161, 118 Ill. 2d 23, 112 Ill. Dec. 684 (1987). Bedivere argues that under Ohio law, the Court should apply a "continuous" trigger, where every insurance policy from exposure to the manifestation of the sickness or disease is triggered. *See GenCorp, Inc. v. AIU Ins. Co.*, 104 F. Supp. 2d 740, 745 (N.D. Ohio 2000). And while neither party disputes which test applies under Illinois law, National argues that it is uncertain which test Ohio would apply, and therefore the Court should find that Ohio would follow Illinois law on this topic. Therefore, the Court must first determine which test Ohio would apply in order to determine whether a conflict does in fact exist. *Townsend*, 879 N.E.2d at 898.

When a state's highest court has not ruled on a particular issue, federal courts should "follow the decisions of intermediate appellate courts unless there is a convincing reason to

predict the state's highest court would disagree." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). Prior to 2002, federal courts trying to determine what sort of trigger analysis would apply under Ohio law did not have much guidance. *See, e.g.*, *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 689 (6th Cir. 2000) (finding "Ohio law provides no dispositive guidance" on interpreting occurrence-based insurance policies in latent injury claims); *GenCorp*, 104 F. Supp. 2d at 747 ("The Ohio Supreme Court has no opinions on the issue of trigger, and this Court has been unable to find any Ohio appellate decisions dealing with the issue of trigger in the context of environmental contamination."). However, both *Lincoln Electric* and *GenCorp* predicted that Ohio would apply some sort of continuous trigger theory. *Lincoln Elec.*, 210 F.3d at 689–90 (adopting a "flexible continuous trigger" where there is a rebuttable presumption that "all policies in effect at the time of both exposure to the offending product and actual manifestation will be construed to have been triggered"); *GenCorp*, 104 F. Supp. 2d at 747 ("[W]here damage or injury is the result of a continuing process rather than a single or episodic exposure, continuous trigger should apply.").

Furthermore, the Ohio Supreme Court endorsed the reasoning of a continuous trigger without explicitly saying so in *Goodyear Tire & Rubber Co. v. Aetna Casualty & Surety Co.*, 769 N.E.2d 835, 841 (Ohio 2002) (explaining that an insured claimant could recover all of its losses from one policy in the context of a continuous environmental pollution injury, and that insurers could then seek contribution from other applicable policies). The *Goodyear* opinion cited to *Keene Corp. v. Insurance Co. of North America*, which similarly endorsed the reasoning behind a continuous trigger. 667 F.2d 1034, 1048 (D.C. Cir. 1981) (finding that "each policy that [insured] purchased between an initial exposure and the ultimate manifestation of a disease [is] triggered" in the context of latent asbestos injuries).

9

Subsequent Ohio Court of Appeals decisions have interpreted *Goodyear* to endorse the continuous trigger theory in latent injury cases. *See Penn. Gen. Ins. Co. v. Park-Ohio Indus., Inc.*, 902 N.E.2d 53, 58 (Ohio Ct. App. 2008) (interpreting *Goodyear* to mean "each insurer on the risk between the initial exposure and the manifestation of disease or death is fully liable to the insured for indemnification and defense costs"), *aff'd sub nom. Penn. Gen. Ins. Co. v. Park-Ohio Indus.*, 930 N.E.2d 800 (Ohio 2010); *Polk v. Landings of Walden Condo. Ass'n*, No. 2004–P–0075, 2005 WL 1862126, at *8 (Ohio Ct. App. Aug. 5, 2005) (citing *Goodyear* and affirming lower court's application of continuous trigger to latent environmental damage claim). Other decisions have explicitly applied the continuous trigger theory to similar contexts. *See Plum v. W. Am. Ins. Co.*, No. C–050115, 2006 WL 256881, at *5 (Ohio Ct. App. Feb. 3, 2006) (applying continuous trigger theory to latent property damage claim); *Westfield Ins. Co. v. Milwaukee Ins. Co.*, No. CA2004–12–298, 2005 WL 2179312, at *3 (Ohio Ct. App. Sept. 12, 2005) (applying continuous trigger theory to latent water damage claim).

For these reasons, the Court finds that Ohio would apply the continuous trigger theory to this case. This creates a conflict between Illinois and Ohio law. Because the parties agree that the trigger employed by the Court will decide the outcome, the Court must determine which state's law governs this action. *Townsend*, 879 N.E.2d at 898.

## B.  Most Significant Contacts Analysis

Because the Court considers National's claim under its diversity jurisdiction, it applies Illinois' choice of law rules to determine the applicable substantive law. *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000). "The Illinois choice of law rule for insurance contracts is the 'most significant contacts' test." *Westchester Fire Ins. Co. v. G. Heileman Brewing Co.*, 747 N.E.2d 955, 961, 321 Ill. App. 3d 622, 254 Ill. Dec. 543 (2001).

10

This is similar to the "most significant relationship" test defined in the Second Restatement of Conflict of Laws. *Id.* Under the most significant contacts test, the Court considers "the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract." *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 655 N.E.2d 842, 845, 166 Ill. 2d 520, 211 Dec. Ill. 459 (1995) (citation omitted). The Court weighs each factor according to its relative importance to the issues involved. *Emerson*, 743 N.E.2d at 640 (citation omitted). Although the location of the underlying suit is not determinative, it "can, however, be considered as an additional relevant factor." *Westchester*, 747 N.E.2d at 962.

### 1. Location of Subject Matter

In this case, the location of the subject matter is the location of the risk insured. *Emerson*, 743 N.E.2d at 640. Bedivere argues that the majority of the insured risk was located in Ohio, including the vehicles garaged in Ohio, the Ohio factories, as well as Resinoid's headquarters. Bedivere also points to countersignature records which identify Ohio as the "risk state" under the policy. Doc. 48 ¶ 58.

Where the risk is principally located in one state this is an important factor in the Court's analysis. *Emerson*, 743 N.E.2d at 640 (citing Restatement (Second) of Conflict of Laws § 193, cmt. b (1971)). But here the insurance policies identified risks in Illinois, Ohio, and Colorado, and therefore the location of the subject matter has less significance. *Id.* ("Though the location of the insured risk is often seen as the most important factor in [the choice-of-law] analysis, that is not the case where, as here, the risk locations are scattered throughout several states."). Additionally, the countersignature documents could be probative of the parties' intentions, but

neither Bedivere nor National explain why there is a second countersignature document that lists Colorado as the risk state for the exact same policy. Doc. 48, Ex. 33 at 60–61, Ex. 34 at 63–64. The fact that Resinoid's Skokie, Illinois, factory manufactured the asbestos-containing moldings and commutators demonstrates that "the insured risk could occur in any state where [Resinoid] conducted its business." *Westchester*, 747 N.E.2d at 964. As such, the location of the subject matter does not weigh in favor of either state in this case. *Id.*

## 2. Place of Delivery, Payments, and the Last Act Giving Rise to the Contract

The Court discusses place of delivery, the location of premium payments, and the location of the last act giving rise to a valid contract collectively because of an overlap in the analysis. *See G.M. Sign, Inc. v. Pennswood Partners, Inc.*, 40 N.E.3d 169, 181, 2015 IL App (2d) 121276-B, 396 Ill. Dec. 516 (2015) (citing *Emerson*, 743 N.E.2d at 641–42) ("[T]he place of the last act giving rise to the policies is the state where the policies were delivered and where the premiums were paid."). These questions boil down to one issue in this case: how significant are a broker's actions and location to the formation of a contract?

To begin, the parties agree that National issued two copies of the insurance policy to Resinoid's broker in Chicago, who kept one copy on file and forwarded the other to Resinoid's corporate headquarters in Ohio. The parties dispute, however, whether National also mailed a copy of the insurance policy directly to Resinoid's Ohio headquarters. *Compare* Clark Decl. at 2 ("It was not Allianz's practice to send a copy of the policy directly to the policyholder.") *with* Doc. 48 ¶ 53 ("National Surety has produced at least one certified mail return receipt confirming that National Surety mailed communications regarding its policies directly to Resinoid at the address listed on the declarations pages of the policies located in Newark, Ohio."). Neither do they agree on whether Alper made payments to National on Resinoid's behalf, or if Resinoid

paid its premiums directly to National. *Compare* Doc. 47 at 12–13 ("Given that Resinoid's corporate headquarters were located in Ohio, the policies were delivered to Resinoid in Ohio, and all insurance-related decisions involving Resinoid came from its Ohio headquarters, the record supports the conclusion that premiums for the National Surety policies were paid from Ohio.") *with* Clark Decl. at 2 ("I can state with certainty that Resinoid paid its premiums to its broker, Alper Services in Chicago, Illinois, and then the broker would have paid Allianz.").

But even if Alper delivered the policies and paid the premiums, Illinois courts have given little weight to a broker's location when they are used as an intermediary. *See, e.g.*, *Liberty Mut. Fire Ins. Co. v. Woodfield Mall, L.L.C.*, 941 N.E.2d 209, 219, 407 Ill. App. 3d 372, 346 Ill. Dec. 651 (2010) (finding broker's delivery to the insured signified the place of delivery, and "the location of an intermediary insurance broker" was irrelevant to the choice-of-law analysis); *Westchester*, 747 N.E.2d at 962 (emphasizing principal place of business over location of insurance broker used to procure policies); *Emerson*, 743 N.E.2d at 643 (explaining brokers "were essentially intermediaries" and that "[t]o focus on the locations of the brokers generally instead of on the location of the corporate headquarters which coordinated insurance procurement company-wide would be to disregard the common-sense reality of the situation presented in this record"). These cases also illustrate that when the factual record is muddled, as it is here, Illinois courts have deferred to the insured's principal place of business. *Woodfield Mall*, 941 N.E.2d at 219 (finding "record d[id] not definitely indicate where premiums were paid but the location of the insured's headquarters in Ohio . . . suggests the payments emanated in Ohio"); *Emerson*, 743 N.E.2d at 640 ("[I]n the absence of proof as to where the policy was delivered it is presumed that delivery took place at the insured's residence." (quoting 2 Couch on Insurance 2d § 16:6 (rev. 1984))).

National relies on *TRAX, LLC v. Continental Casualty Co.*, for the proposition that a "broker is considered an agent of the insured" and therefore "delivery to the broker . . . would constitute delivery to the insured." No. 10-CV-6901, 2011 WL 6400473, at *7 (N.D. Ill. Dec. 14, 2011). But *TRAX*, a federal district court decision, only cites to one Illinois case, *State Security Insurance Co. v. Burgos*, where the question was whether a "broker who sold the policy to the insured is also the authorized agent of the insurance company for the limited purpose of accepting notice of an occurrence from the insured." 583 N.E.2d 547, 550, 145 Ill. 2d 423, 164 Ill. Dec. 631 (1991). That is not the issue here. To the extent *TRAX* conflicts with Illinois cases on this issue, the Court follows Illinois decisions. *See Diginet, Inc. v. W. Union ATS, Inc.*, 958 F.2d 1388, 1395 (7th Cir. 1992) (explaining "[s]tate courts are not bound by federal courts' interpretations of state law").

For these reasons, the Court finds that Resinoid's headquarters in Ohio, rather than Alper's office in Chicago, is the more significant location for determining the place of delivery, place of payment, and the last act giving rise to a valid contract. Therefore, these factors weigh in favor of applying Ohio law.

### 3. Place of Performance

Similarly, the parties dispute whether the record establishes the place of performance. "Where there is no express agreement as to the place of performance, it may be determined according to the intent of the parties, namely, the intended place of the insurer's payment of claims under the policy." *Emerson*, 743 N.E.2d at 641. Bedivere argues that because Resinoid's headquarters applied for the insurance, this demonstrates the parties intended its Ohio headquarters to receive payment for claims. But "the place from which procurement was coordinated is not necessarily the place where the claim was to be paid." *Id.* And as National

points out, courts place little weight on the place of performance when the insured is located in more than one state. *Id.* (citing Restatement (Second) of Conflict of Laws § 188, cmt. e (1971)) ("[P]lace of performance can bear little weight in the choice of the applicable law when . . . performance by a party is to be divided more or less equally among two or more states."). Here the record does not conclusively show that the parties intended for Resinoid's Ohio headquarters solely to receive payment for claims, so this factor has no bearing on the Court's determination.

### 4. Domicile and Place Bearing a Rational Relationship to the Contract

National argues that domicile refers solely to the place of incorporation and that therefore this factor weighs in favor of Illinois, where both Resinoid and National are incorporated. But caselaw demonstrates that a company's place of incorporation is one of many factors the courts use to determine domicile for a choice-of-law analysis. *Westchester*, 747 N.E.2d at 962 (discussing location of offices, location where business is carried out, and "nerve center test," which "focuses on the location of decision making as opposed to the volume of activity at various locations"); *Emerson*, 743 N.E.2d at 642 (finding insured's domicile to be state of incorporation and principal place of business, and that domicile was "not simply a passive, coincidental factor" but a location that "played an active, dominant and dynamic role in the procurement of all of [the insurance] policies"); *see also* Restatement (Second) of Conflict of Laws § 188, cmt. e (1971) ("[A] corporation's principal place of business is a more important contact than the place of incorporation . . . ."). Here the record shows that the majority of Resinoid's corporate officers and directors resided in Ohio, that Resinoid located its headquarters in Ohio, and that the company coordinated its insurance coverage and other finances out of its Ohio headquarters. As such, Resinoid's domicile for determining the most significant contacts is Ohio.

Further, "[g]iven the facts in this case . . . the role of the domicile of the insured should be a dominant one." *Emerson*, 743 N.E.2d at 641–42 (citing 4 Appleman on Insurance 2d § 21.11 (1998) ("[W]here the insured is headquartered in one state where the policies were delivered, that state's law will generally govern all coverage disputes.")). This is because Resinoid's Ohio office was the common point of contact between National and the insured risks spread throughout multiple states. *Id.* at 642 (citing *Potomac Elec. Power Co. v. Ca. Union Ins. Co.*, 777 F. Supp. 968, 973–74 (D.D.C. 1991) ("[C]ommon sense suggests that, knowing of the potential for claims in any number of states . . . the parties would consider the insured's principal headquarters as the one jurisdiction which ties all potential parties together.")).

Resinoid's domicile also bears the most rational relationship to the contract because Ohio was the common denominator to all of the insurance policies implicated in Ciokajlo's case. The overarching goal of the choice-of-law analysis is a "consistent interpretation" of Resinoid's policies. *Lee v. Interstate Fire & Cas. Co.*, 86 F.3d 101, 103 (7th Cir. 1996) (describing a consistent interpretation of policies as "the end [t]hat [the most significant contacts test] stands for"). Accordingly, "[t]wo policies with identical language covering the same risk should have identical effects." *Id.* "It would be absurd" if two policies governing the same risk were interpreted according to different laws "just because that is the location of the insurers." *Id.*, *see also Evangelical Lutheran Church in Am. v. Atl. Mut. Ins. Co.*, 169 F.3d 947, 950 (5th Cir. 1999) (noting "[t]he *Lapham–Hickey* court placed some emphasis on the domicile of the insured, but no emphasis on the insurer's domicile"). Accordingly, applying Ohio law helps to achieve a uniform interpretation of Resinoid's many policies.[3] *Maremont Corp. v. Cheshire*, 681 N.E.2d

---

[3] Resinoid's insurers collaborated to settle the asbestos claims in just this way, consistent with Ohio's continuous trigger test. It is worth noting that at least two of the insurers had different domiciles (Bedivere in Pennsylvania and National in Illinois), and that deferring to the domicile of the insurer in such a situation could, in theory, lead to gaps in Resinoid's coverage. *See Emerson*, 743 N.E.2d at 640

16

548, 552, 288 Ill. App. 3d 721, 224 Ill. Dec. 233 (1997) (applying Illinois law to "obtain a consistent interpretation" of policies issued by several insurers covering risks in several states, and noting that "[a] contrary result would open these policies to five different views of the law" that "would not be good policy or good law").

For all these reasons, the Court finds that Ohio law should govern this case.

## III.    Bedivere's Motion for Summary Judgment

As such, the Court does not need to consider National's motion for summary judgment because it rests entirely on the application of Illinois law. Nor does National argue it can prevail if the Court applies a continuous trigger under Ohio law. Consequently, the summary judgment analysis is straightforward. The parties do not dispute that Ciokajlo was first exposed to asbestos from Resinoid's products when he began working at Kirkwood's Cleveland facility in 1976. He received a diagnosis of mesothelioma in 2015. Under Ohio law, Ciokajlo's claim triggered all general liability policies that covered "bodily injury" from 1976 to 2000—the date of the last policy covering asbestos injuries. *Goodyear*, 769 N.E.2d at 841; *Penn. Gen. Ins. Co.*, 902 N.E.2d at 58. Resinoid subsequently settled Ciokajlo's case in 2017. Under the "all sums" approach, Resinoid was entitled to recover its costs of settlement from any of its insurers during that time period. *Goodyear*, 769 N.E.2d at 841. This includes National's policies that were issued from 1994 to 2000. If Resinoid had sought indemnification from only one of its insurers, that insurer could seek to recoup some of its losses from other policies. *Id.* Here, the insurers already paid the settlement according to a pro rata cost sharing agreement. Accordingly, National is not entitled to recover its costs from Bedivere.

---

(citation omitted) ("[I]n the application of the *Lapham–Hickey* analysis, consideration should be given to the justified expectations of the parties and to the predictability and uniformity of the result, as well as to ease in determination and application of the law to be applied.").

## CONCLUSION

For the foregoing reasons, the Court denies National's motion for summary judgment [49]. The Court grants Bedivere's motion for summary judgment [46] and enters summary judgment for Bedivere. The Court terminates this case.


Dated: July 1, 2019

_____
SARA L. ELLIS
United States District Judge